**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JENNIFER COUSINS, et al.,

*Plaintiffs*

v.

SCHOOL BOARD OF ORANGE
COUNTY, FLORIDA, et al.,

*Defendants.*

**Challenge to
Constitutionality of
§ 1001.42(8)(c) Fla. Stat.
(2022)**

**Preliminary Injunctive Relief
Requested**

**Case No.: 6:22-cv-01312-
WWB-LHP**

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 6.02, Plaintiffs, by and through undersigned counsel, move for an Order enjoining Defendants from enforcing or taking action to enforce Fla. Stat. § 1001.42(8)(c) (2022) ("HB 1557").

1.      Plaintiffs challenge HB 1557 because it violates the First and Fourteenth Amendments by infringing Plaintiffs' freedom of speech and depriving Plaintiffs of due process and equal protection.

2.      Plaintiffs' claims are likely to succeed on the merits.

3.      First, HB 1557 impermissibly chills the exercise of all Plaintiffs' constitutionally protected speech and expression, based on content and viewpoint, and is overbroad, in violation of the First Amendment. ECF 1 ¶¶ 104-119. Second, HB 1557 is unconstitutionally vague, as it infringes upon Plaintiffs' constitutionally protected right to free speech and provides inadequate notice of the conduct it purports to prohibit, in

violation of the Due Process Clause of the Fourteenth Amendment. *Id.* ¶¶ 120-128. Third, HB 1557 discriminates against Plaintiff students and parents on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶ 129-137.

4.  Plaintiff students and parents have engaged in affirming speech and expression of the nature prohibited by HB 1557, and wish to continue to do so, but as a result of Defendants' implementation of HB 1557, they have been chilled and/or forced to self-censor, and Plaintiff students have been deprived of access to information and ideas.

5.  Plaintiff CenterLink's members have engaged in speech that affirms students' sexual orientation and gender identity and wish to continue to do so, but as a result of Defendants' implementation of HB 1557, they have been silenced and prevented from communicating information critical to their mission.

6.  Plaintiffs are denied, and will continue to be denied, equal protection of law as the result of Defendants' implementation of HB 1557, as the statute was enacted with the purpose to discriminate and has the effect of discriminating against LGBTQ+ students and those with LGBTQ+ family members, subjecting them to differential and adverse treatment on the basis of their sex.

7.  If this Court fails to grant the requested preliminary injunctive relief, Plaintiffs and other similarly situated students and parents will be subjected to further loss of their constitutional rights. Plaintiffs have already suffered and will face irreparable harm and have no adequate remedy at law. The balance of equities and the public interest favor granting relief because the irreparable constitutional injuries described above far outweigh any marginal burden on Defendants that might result from delaying HB 1557 from taking effect pending an adjudication on the merits. Governmental entities, including

school boards, have no legitimate interest in enforcing an unconstitutional law. An injunction will further the public interest in that it will protect and preserve the exercise of protected First Amendment activity and ensure equal protection and due process of law.

8.     A preliminary injunction will maintain the status quo and is consistent with the proper mission of public schools: "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

9.     Plaintiffs request that the Court waive the requirement of bond in Fed. R. Civ. P. 65(c). *BellSouth Tellecomm., Inc. v. MCIMetro Access Transmission Srvcs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (whether to require bond is within court's discretion). Public interest litigation is a recognized exception to the bond requirement, especially where, as here, requiring a bond would injure the constitutional rights of Plaintiffs and the relief sought would not pose a hardship to government Defendants. *See Univ. Books & Videos, Inc. v. Metro. Dade Cnty.*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999).

**WHEREFORE,** Plaintiffs move this Honorable Court for an Order preliminarily enjoining Defendants from enforcing Fla. Stat. § 1001.42(8)(c)(2022) because it violates the First and Fourteenth Amendments of the U.S. Constitution.

## MEMORANDUM OF LAW

## I. INTRODUCTION AND FACTUAL BACKGROUND

HB 1557, by design, deters speech by and about lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") people in schools. To achieve this end, the law employs undefined terms that restrict an absurdly broad scope of speech and activity, casting a broad chilling effect and leaving school officials to draw arbitrary and

discriminatory lines in their attempts to implement the law. The law combines this vague text with a private right of action that empowers parents to sue the school district directly if they are dissatisfied with where the school has drawn that line.  The impact of HB 1557 has been immediate and severe, and significant constitutional harm will persist absent injunctive relief to restore the status quo ante.

### A. HB 1557 Was Enacted with Intentionally Undefined Terms

HB 1557, which took effect on July 1, 2022, prohibits any "[c]lassroom instruction" regarding "sexual orientation or gender identity" for children in kindergarten through grade 3, or that is "in a manner that is not age-appropriate or developmentally appropriate" for other grades. Fla. Stat. § 1001.42(8)(c)(3). It also requires parental notification for changes in student services related to a student's "well-being" and imposes requirements regarding "encourag[ing]" or "discourag[ing]" students to discuss their well-being with their parents. *Id.* § 1001.42(8)(c)(1)-(2). The law fails to define any of these terms.

The law also encourages schools to err on the side of broad censorship by empowering any parent to sue a school district and collect attorney's fees and costs if they are dissatisfied with the district's implementation of the law, while denying districts a reciprocal right if they are successful. *Id.* § 1001.42(8)(c)(7).

The legislative history shows that legislators understood and intended that schools, children, teachers, and parents would interpret "sexual orientation" and "gender identity" to mean "mention of LGBTQ+ people." During debate on the bill, one Republican legislator proposed an amendment to replace those terms with "human sexuality" and

"sexual activity." Amendment 546314.[1] He explained, "if the intent of this bill isn't to marginalize anyone, let's make sure we aren't by passing this amendment." Ex. 11, *Transcript: Hearing on H.B. 1557 Before the S. Comm. on Appropriations*, 2022 Leg. R. Sess. 52-53 (Fl. Feb. 28, 2022) (statement of Sen. Jeff Brandes, Comm. Member). HB 1557's sponsor responded that this change "would significantly gut the effort of the bill," and the amendment failed. *Id.* at 66 (statement of Sen. Dennis Baxley, Comm. Member). The legislature also rejected an amendment clarifying that "sexual orientation" includes heterosexuality. Amendment 290096. Lawmakers rejected amendments to specify that the law did not bar discussions between students. Amendments 734244 and 600607. Perhaps most alarmingly, a proposed amendment to specify that the law did not prevent discussion of families or "bullying prevention" also failed. Amendment 755282.

### B. HB 1557's Implementation Targets Speech, Services, and Safety for LGBTQ+ Students and Families

Predictably, the law's design has placed its chilling effect squarely on the shoulders of LGBTQ+ young people and families. For example, Duval County Public Schools ("DCPS"), School District of Indian River County ("SDIRC"), and School District of Palm Beach County ("SDPBC") have all reduced or eliminated LGBTQ+ student support guides and LGBTQ+ anti-bullying guidance for grades K-12.[2] In SDPBC, professional development workshops on LGBTQ+ issues were suspended and, in many districts,

---

[1] All amendments available at https://www.flsenate.gov/Session/Bill/2022/1557/?Tab=Amendments.

[2] Ex. 4, Watson Decl. ¶¶ 19-20; School Board of Duval County, *Workshop on Student Support Guide Update*, (May 17, 2022), https://duvalcosb.civicclerk.com/Web/Player.aspx?id=2632&key=-1&mod=-1&mk=-1&nov=0; Ex. 3, Dinan Decl. ¶ 13; Ex. 8, Woods Decl. ¶ 25; Ex. 6, Seaver Decl. ¶ 24.

books with LGBTQ+ characters for students in K-12 have been removed or are being reviewed under HB 1557.[3] Teachers have been encouraged to avoid anything that might generate discussion about LGBTQ+ people and have been chilled from supporting LGBTQ+ students and student groups.[4] And, organizations that have traditionally provided LGBTQ+ training and other services to schools are being blocked from completing their work.[5] Equivalent support guides, trainings, and services for non-LGBTQ students have not been targeted under HB 1557.

Defendants are issuing rapidly-changing guidance under the law, illustrating its ambiguity and amplifying the resulting confusion. For example, in June 2022, Orange County Public Schools ("OCPS") sent out guidance for teachers recommending that they remove, among other things, safe space stickers (symbols on classroom doors or walls that signal LGBTQ+ people will be safe and supported) from K-3 classrooms "so that classroom instruction did not inadvertently occur on the prohibited content of sexual orientation or gender identity." Ex. 1, Attach. 2, Camp Legal Clarifications. OCPS later provided additional "guidance" via a memo to district leadership, which quotes from the legal arguments made in the state's Motion to Dismiss filed in case 4:22-cv-00134 (N.D.

---

[3] Ex. 6, Attach. 2, Palm Beach County Instructional Guidance for Legislative Compliance (July 21, 2022) *and* Ex. 9, Indian River County Classroom Library Selection Form for Instructional Staff (August 4, 2022), (both SDPBC and SDIRC forms instruct that books where a character "questions" their sexual orientation or gender identity must be reviewed); Ex. 1, Attach. 1, OCPS Legislative Updates, May 2022 (instructing that books that "make written or pictorial reference" to sexual orientation or gender identity are prohibited from being accessible, including to check out for reading outside of the classroom); Ex. 8, Woods Decl. ¶¶ 16, 19; Ex. 6, Seaver Decl. ¶ 25; Ex. 1, Cousins Decl. ¶¶ 7, 14.

[4] Ex. 1, Attach. 2, Camp Legal Clarifications, June 2022 (avoid discussion); Ex. 8, Woods Decl. ¶ 17 (avoid discussion); Ex. 4, Watson Decl. ¶ 18 (student group advisors chilled).

[5] Ex. 4, Watson Decl. ¶¶ 15-18, 22.

Fla., 2022), providing an interpretation inconsistent with OCPS' prior guidance. Ex. 10. Because the law's chilling effect is sustained by its vague text and vigilante enforcement structure, injunctive relief remains necessary to stem these harms in the midst of these evolving voluntary state interpretations.

### C. Plaintiffs Have Been Harmed by HB 1557

Plaintiffs Jen and Matt Cousins are a different-sex married couple of 15 years whose four children, N.C., S.C., M.C., and P.C., all attend OCPS schools. In the first week of the school year, seventh grader S.C., who is gender non-binary, has already been bullied about their gender identity more intensely than ever in the past. Ex. 1, Cousins Decl. ¶ 9. They fear that bullying will continue to increase as long as HB 1557 remains in effect. *Id.* ¶¶ 9, 23. S.C. also fears that critical lifelines, such as their school's LGBTQ+ student group, will be impacted by HB 1557, *id.* ¶¶ 6, 23, a reasonable fear, as teachers have already been told to remove safe-space stickers and have been chilled from serving as sponsors of these groups since HB 1557's enactment. *See, e.g.*, Ex. 1, Attach. 2, Camp Legal Clarifications; Ex. 4, Watson Decl. ¶ 18; Ex. 8, Woods Decl. ¶¶ 17, 29. Jen and Matt are struggling to provide guidance to their other children about what they can and cannot say about their non-binary sibling S.C. in class and worry that their youngest two children, in first and third grades, will be prevented from completing assignments about their family and made to feel shame if their teacher deems their family too "inappropriate" for discussion. Ex. 1, Cousins Decl. ¶¶ 8, 11; *see also* Ex. 1, Attach. 2, Camp Legal Clarifications (OCPS interpreting discussion as instruction).

Plaintiff Will Larkins is a high school senior in OCPS. Ex. 2, Larkins Decl. ¶ 2. Will identifies as gay and non-binary and is the president and co-founder of his school's Queer

Student Union. *Id.* Following enactment of HB 1557, Will created and delivered a presentation on the Stonewall riots to his class on the significance of the uprising to LGBTQ+ history. *Id.* ¶¶ 10-11. After Will's history teacher complained to administrators, school officials placed Will under "investigation." *Id.* ¶¶ 12-13. Will now fears additional consequences if he speaks out again about anything that may be related to LGBTQ+ people or history at school. *Id.* ¶ 19.

Plaintiffs David and Vik are a same-sex married couple with two children, K.R.D. and R.R.D., a fourth grader and third grader, respectively, both of whom attend schools within SDIRC. Ex. 3, Dinan Decl. ¶¶ 2, 5.  Since HB 1557's enactment, David and Vik have advised their children not to discuss their parents' relationship and have censored their own speech and expression when they attend school events. *Id.* ¶¶ 7-10. For example, Plaintiff R.R.D. loved the energy of the London Pride parade he attended with his brother and dads this summer, and he was excited to tell his third-grade class about it when he got back to school. *Id.* ¶  8. His dads struggled to prepare and protect R.R.D. before sending him into his new classroom. If R.R.D. told his class about the parade, and especially if it generated questions, the discussion could be shut down by the teacher (consistent with guidance that teachers avoid anything that might generate discussion about sexual orientation, Ex. 1, Attach. 2). This would be confusing and harmful to a child who is proud of his family, so they suggested that he skip this portion of their family story. *Id.* ¶ 8. Previously, the teacher might have responded with a simple affirming statement about everyone having different families who love them, which is okay. They do not want their kids to suffer the shame of a teacher having to silence discussion of their family instead. *Id.*

Plaintiff CenterLink is a member-based coalition that supports the development of sustainable LGBTQ+ community centers across the country, including the Orlando Youth Alliance ("OYA"), Compass Community Center ("Compass"), and the Jacksonville Area Sexual Minority Youth Network ("JASMYN"). Ex. 7, Spivak Decl. ¶¶ 4, 5, 13. HB 1557 already has directly obstructed services performed by these organizations for students and schools within Defendants' districts. Ex. 4, Watson Decl. ¶¶ 15-18; Ex. 6, Seaver Decl. ¶  26; Ex. 8, Woods Decl. ¶ 17.

In Orange County, OYA operates facilitated peer-to-peer counseling sessions for LGBTQ+ youth, including those that attend OCPS. Ex. 5, Slaymaker Decl. ¶ 6. Since the law's enactment, attendance at OYA support groups has doubled and staff are struggling to meet the needs of youth and parents who have expressed increased anxiety and distress as a result of the law. *Id.* ¶¶ 13-15.

In Palm Beach County, over 93% of Compass members are enrolled in SDPBC. Ex. 6, Seaver Decl. ¶ 8. As a result of HB 1557, some teachers no longer feel comfortable referring students to Compass, depriving those LGBTQ+ youth of necessary support services. *Id.* ¶ 26; Ex. 8, Woods Decl. ¶ 17. Even absent those referrals, Compass has experienced an increase in demand for its mental health services, resources, and support services for parents and local students since passage of HB 1557. Compass needs to add two full-time employees to meet the increased demand for therapeutic groups. Seaver Decl. ¶¶ 18-19. The trend is likely to continue, as LGBTQ+ youth who do not feel safe and affirmed at school, and who in fact are being marginalized and threatened, are

more likely to experience depression, anxiety, suicidal ideation, and psychological distress, and are more likely to drop out of school. *Id.* ¶ 20.[6]

In Duval County for at least the last nine years—including the last four years under a federally funded grant from the Centers for Disease Control and Prevention's Division of Adolescent and School Health ("DASH grant")—JASMYN has provided subcontracted services to DCPS in its areas of expertise, including teacher training; advice on student support and anti-bullying policies; development and support for student LGBTQ+ clubs; and acceptance of referrals for support, housing, and health and wellness services. Ex. 4, Watson Decl. ¶¶ 9-10, 12, 14. Upon enactment of HB 1557, DCPS cancelled meetings that are part of JASMYN's DASH grant responsibilities and are necessary to coordinate its subcontracted work under the grant for the current school year. *Id.* ¶¶ 16-17. In addition, at least one student referral has been blocked and teacher sponsors of student LGBTQ+ groups have been chilled from participating in planning meetings with JASMYN. *Id.* ¶¶ 18, 22.

## II. PLAINTIFFS MEET THE PRELIMINARY INJUNCTION STANDARD

This Court may issue a preliminary injunction where the movant demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs any damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Palmer v. Braun*, 287 F.3d 1325,

---

[6] For a consensus study report summarizing relevant research, *see* National Academies of Sciences, Engineering, and Medicine, *Understanding the Well-Being of LGBTQI+ Populations*, Chapter 9, Educational Environments at 233-34 (bullying), 236-37 (school policies); 237-41 (school climate, including teacher training, student clubs, and curriculum) (Charlotte J. Patterson, et al. eds., 2020), http://doi.org/10.17226/25877.

1329 (11th Cir. 2002).

### A. Plaintiffs Are Likely to Prevail on the Merits

Plaintiffs are likely to succeed on the merits of their claims as demonstrated below. Success on the merits is all the more likely because the enforcement of HB 1557 already has resulted in violations of Plaintiffs' constitutional rights.

#### 1. Plaintiffs Are Likely to Succeed on the Merits of their Claim that HB 1557 Violates the First Amendment.

##### a. Targeting LGBTQ+ speech and content for special restriction impermissibly chills and restricts protected speech and expression based on content and viewpoint.

HB 1557 is a one-sided law that restricts protected speech based on content and viewpoint. The law impermissibly chills LGBTQ+ people from engaging in speech disclosing their sexual orientation and gender identity and that of their family members (i.e., "coming-out speech") and expressing themselves in a manner consistent with their sexual orientation and gender identity, but does not suppress comparable speech and expressive conduct by non-gay and non-transgender people in school-related settings. It has also been used to target library books and materials that acknowledge LGBTQ people.

HB 1557 targets and chills two forms of protected First Amendment expression. First, it chills LGBTQ+ students and parents from disclosing their sexual orientation and transgender status by speech such as "I am gay," "I am transgender," or "I am a girl." By contrast, a female student who is neither a lesbian nor transgender may disclose these facts without consequence. Thus, HB 1557 attaches different consequences to the same speech based on who the speaker is, constituting impermissible viewpoint discrimination. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Second, and equally

impermissible, HB 1557 chills speech and gendered expressive conduct that reveals or conforms with a person's sexual orientation and gender identity, even implicitly (e.g., a student's depiction of two same-sex parents in a drawing, or a transgender girl's choice to wear a dress). HB 1557 does not similarly chill speech and conduct that reveal or conform to the sexual orientation and gender identity of a heterosexual cisgender person. HB 1557 furthers its goal of suppressing speech by inviting people to pursue legal actions and recover attorneys' fees and other penalties against Defendant school districts if they do not agree with Defendants' application of the law, allowing those parents most hostile to acknowledgement of the existence of LGBTQ+ people to dictate the scope of the law. *See* Fla. Stat. § 1001.41(8)(c)(7).

Courts long have held that coming-out speech, including in school settings, constitutes protected First Amendment activity. *See, e.g., Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652 (1st Cir. 1974) (student speech); *Henkle v. Gregory*, 150 F. Supp. 2d 1067, 1075-77 (D. Nev. 2001) (same); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284-85 (D. Utah 1998) (coming-out speech by teacher); *Karnoski v. Trump*, 2017 WL 6311305, at *9, vacated by stipulation, Case No. 2:17-cv-01297 (W.D. Wash., Aug. 5, 2019); *Log Cabin Republicans v. U. S.*, 716 F. Supp. 2d 884, 926 (C.D. Cal. 2010), vacated as moot, 658 F.3d 1162 (9th Cir. 2011). Expression of gender identity through one's appearance also is protected expression. *See Doe ex rel. Doe v. Yunits*, 2000 WL 33162199, at *3 (Mass. Super. Oct. 11, 2000).

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Content-based regulation is subject to "the most

exacting scrutiny." *Texas v. Johnson,* 491 U.S. 397, 412 (1989) (citation omitted). Such enactments "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

"When the government targets particular views taken by speakers on a subject and not the subject matter, the First Amendment violation is all the more blatant." *Rosenberger*, 515 U.S.at 829. Indeed, "[i]n the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health*, 131 S. Ct. 2653, 2667 (2011) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 391–92 (1992)); *see also, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others'") (quotations omitted); *McCullen v. Coakley*, 134 S. Ct. 2518, 2549 (2014) (Alito, J., concurring) ("[I]f the law discriminates on the basis of viewpoint, it is unconstitutional"); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98,106 (2001).

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Under the First Amendment, schools may not restrict student speech merely to avoid controversy or to avoid the "discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. The Constitution allows schools to control student speech only in very narrow circumstances, none of which are present here. *Mahanoy Area School Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) (noting exceptions for

lewd student speech, speech advocating for illegal drug use, and speech bearing the imprimatur of the school). Indeed, schools have a strong interest and obligation to protect a student's unpopular expression in particular because "America's public schools are the nurseries of democracy." *Id.* at 2046.

CenterLink's member centers' speech also enjoys protection. The centers speak with students who seek information about sexual orientation and gender identity, including mental health resources and referrals, and they communicate with school district partners to create policies to address bullying. Providing training, expert advice or assistance, referrals, and other services, as CenterLink member centers do, constitutes protected First Amendment activity. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010). Communications that impart a specific skill or convey advice based on specialized knowledge are a form of pure speech. *Id.* "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)). First Amendment protections also cover would-be recipients of such training, advice, and assistance, and this right is particularly vital in schools. *Kleindiesnst v. Mandel*, 408 U.S. 753, 762-63 (1972).

HB 1557 also violates Plaintiff students' First Amendment right to receive information and ideas. Schools may not remove books containing LGBTQ+ content from school libraries to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Bd. of Educ. v. Pico*, 457 U.S. 853, 855 (1982) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). "[T]he Constitution protects the right

to receive information and ideas," a right that extends to students with respect to materials in a school library. *Id.* (quoting S*tanley v. Georgia*, 394 U.S. 557, 564 (1969)). Restrictions on this right constitute a cognizable First Amendment injury. *Id.*

Here, not only does HB 1557 "cause a reasonable would-be speaker to self-censor" because it "objectively chills protected expression," *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022), but Plaintiffs already have been silenced and disciplined, have censored themselves or their children, and have lost access to library materials that acknowledge the existence of LGBTQ people. *See supra*, Section I(C). It is reasonable that LGBTQ+ students and families could decide they are "better off just keeping [their] mouth shut," given the sheer breadth and ambiguity of the law. *See Speech First*, 32 F.4th at 1122. This is especially true for young students who would not want to run the risk of being accused of being "inappropriate" by discussing their LGBTQ+ families when students discussing their non-LGBTQ+ families would not be. *See id.* at 1124 (it is reasonable, even absent direct threat of punishment, that student would not want to risk being labeled "offensive"). Because the law lacks even a rational relationship to any legitimate interest, let alone the narrow tailoring required in service of a compelling interest, *see infra* Section II(A)(3)(a), it violates the First Amendment.

### b.    HB 1557 Is Unconstitutionally Overbroad.

HB 1557 is also overbroad. By prohibiting "classroom instruction" related to "sexual orientation or gender identity," the law creates a "substantial risk" that it "will have an impermissible chilling effect on protected speech." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1302 (11th Cir. 2017) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973)). To determine whether a law is overbroad, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment [because] ambiguous

meanings cause citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505-06 (11th Cir. 1990) (internal quotations omitted). Such a chilling effect already has occurred. In addition to the struggles Plaintiffs are facing regarding whether they can speak about themselves and their families, *see supra* Section I(C), students have reported that they are unsure if they can use their own pronouns or if they can report bullying based on their LGBTQ+ identity. Ex. 8, Woods Decl. ¶¶ 8, 29. They don't know. The law's vagueness and "imprecision exacerbates its chilling effect." *Speech First*, 32 F.4th at 1121; *see infra* Section II(A)(2).

### 2. Plaintiffs Are Likely to Succeed on their Claim that HB 1557 Is Unconstitutionally Vague.

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. A law that "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement" is vague and violates the Fourteenth Amendment. *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319-20 (11th Cir. 2017) (en banc); *see Dream Defs. v. DeSantis*, 2021 WL 4099437, at *27 (N.D. Fla. Sept. 9, 2021) (enjoining law because "an individual of ordinary intelligence could read the [statute] and not be sure of its real-world consequence"). "'When speech is involved, rigorous adherence to [notice and precision] requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Id.* at 1320 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012)). "Content-based regulations thus require 'a more stringent vagueness test,'" *id.* (quoting *Vill. of Hoffman Est. v. Flipside, Hoffman*

*Est., Inc.*, 455 U.S. 489, 499 (1982), to ensure that the government regulates protected speech "only with narrow specificity," *id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

As noted above, many critical terms in the statute are undefined and subject to multiple interpretations. Indeed, Defendants and other school districts have issued conflicting guidance for the proposed interpretation of the law.[7] The law's unworkable vagueness is perhaps most evident in its use of the term "classroom instruction," which could refer solely to in-classroom lessons, class assignments, or books selected by the teacher. The preamble to HB 1557, however, describes the law as "prohibiting classroom *discussion* about sexual orientation or gender identity" (emphasis added). This, along with the failure of several amendments that sought to exclude student speech and questions and responses to student questions from the law's scope, has left the language susceptible to an interpretation that "classroom instruction" covers activity beyond lesson plans, instructions, or assignments. *See Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 871 n.37 (1997) (in holding statute unconstitutionally vague, court cited absence of statutory definitions and Congress's rejection of clarifying, limiting amendments). As discussed above, *supra* Section I(B), some Defendants have interpreted "classroom instruction" to include the provision of library books and have removed LGBTQ+ library materials.[8]

If one sets aside, for a moment, the reality that this law targets LGBTQ+ people

---

[7] *See, e.g.*, ECF 1 ¶ 30 n.3 (describing Defendants' conflicting definitions of "sexual orientation or gender identity"); *supra* Section I(B) (discussing conflicting guidance).

[8] For instance, in May 2022, SDPBC removed several books that feature transgender characters (and do not discuss sexually explicit topics) from school libraries. Ex. 6, Attach. 1, SDPBC Memos, May 2022.

and content, the text on its face restricts an absurdly broad scope of speech and activity. A prohibition on "classroom discussion" of "gender identity," taken at face value, could plausibly foreclose any conversation or instructional material using gender-based terms such as "he," or "she." May a teacher ask the class to draw a family tree? Whether children in the class have a mom and a dad, and a sister or brother, can reflect sexual orientation and gender identity. The law provides no guidance, and school officials are left to draw arbitrary and discriminatory lines to avoid such extreme applications. Consistent with the law's intent, those lines have been drawn to restrict speech only as it pertains to LGBTQ+ identities. *See, e.g.*, *supra* Section I(A)(B).

HB 1557 invites discriminatory enforcement because the law's failure to provide reasonable notice as to what conduct is prohibited gives those tasked with policing it— Defendants' teachers, administrators, and other employees—wide discretion to decide how, when, and against whom to apply it. By delegating this authority and encouraging hostile parents to sue with one-sided fee-shifting, the Florida legislature has invited arbitrary and discriminatory enforcement of the law. *See, e.g., League of Women Voters of Fla., Inc. v. Lee*, 2022 WL 969538 *70 (N.D. Fla. Mar. 31, 2022) (statute encouraged arbitrary and discriminatory enforcement, where various officials interpreted law based on their own understanding of vague terms); *see also Graynard v. City of Rockford*, 408 U.S. 104, 108 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

HB 1557's failure to establish any meaningful guidelines permits a "standardless sweep [that] allows [teachers and other administrators] to pursue their personal

predilections" in determining whether certain instruction and discussion is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citing *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). This invites arbitrary enforcement and guarantees that the law will be disproportionately applied against LGBTQ+ students, parents, and organizations, in violation of Plaintiffs' Fourteenth Amendment rights.

### 3. Plaintiffs Are Likely to Succeed on the Merits of their Claim that HB 1557 Violates the Equal Protection Guarantee.

HB 1557 violates the Fourteenth Amendment, which ensures "equal protection of the laws." U.S. Const. amend. XIV, § 1. Under established equal protection jurisprudence, class-based discrimination by the government involving a suspect class is "presumptively invidious," triggering heightened scrutiny. *See Plyer v. Doe*, 457 U.S. 202, 216 (1982). Classifications based on sex, sexual orientation, and gender identity/transgender status all warrant heightened scrutiny. *See, e.g., Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017) (sex); *Baskin v. Bogan*, 766 F.3d 648, 654-657 (7th Cir. 2014) (sexual orientation); *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 484 (9th Cir. 2014) (sexual orientation); *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir. 2012) (sexual orientation), *aff'd*, 570 U.S. 744 (2013);[9] *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610-13 (4th Cir. 2020) (transgender status); *Karnoski v. Trump*, 926 F.3d 1180,

---

[9] This Circuit has never independently analyzed the appropriate level of scrutiny for classifications based on sexual orientation. In *Lofton v. Sec'y of Dep't of Children & Fam. Servs.*, the court made no assessment of its own, stating only that other Circuits had declined to treat sexual orientation classifications as suspect. 358 F.3d 804, 818 (11th Cir. 2004). Yet the cases *Lofton* pointed to turned on *Bowers v. Hardwick*, 478 U.S. 186 (1986), and were necessarily abrogated when the Supreme Court overturned *Bowers* in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003). *See Pedersen v. Office of Personnel Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012); *Golinski v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012).

1199-1201 (9th Cir. 2019) (transgender status); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (transgender status). Because these traits "generally provide no sensible ground for differential treatment," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), the equal protection clause requires that the government provide an "exceedingly persuasive justification" for legislation that differentiates on those bases, *United States v. Virginia*, 518 U.S. 515, 531 (1996). Classifications based on sexual orientation and transgender status warrant such scrutiny both in and of themselves and as forms of sex discrimination. As the Supreme Court recognized in *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020), discrimination on the bases of sexual orientation and transgender status "necessarily entails discrimination based on sex." And the Eleventh Circuit has explicitly recognized that discrimination against a transgender person constitutes sex discrimination under the equal protection clause. *Glenn*, 663 F.3d at 1317. Because HB 1557 lacks adequate tailoring in service of even a legitimate governmental purpose, let alone the exceedingly persuasive one required, *see infra* Section II(A)3(a), it violates the equal protection guarantee of the Constitution.

### a. HB 1557 Lacks Adequate Tailoring and Any Permissible Justification, Let Alone the Compelling or Exceedingly Persuasive Justification Required.

HB 1557 fails to serve even a legitimate governmental purpose. As the law's sponsor acknowledged, its purpose is to prevent students "coming out" as LGBTQ+ at school and to impose a particular moral value judgment about LGBTQ+ people. *See* ECF 1 ¶ 40; *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (facially neutral law may nonetheless violate Equal Protection Clause if it has a discriminatory purpose and effect).

Even under the lowest level of scrutiny, governmental action must not disadvantage a disfavored group for its own sake, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and must bear at least a rational relationship to a legitimate governmental interest, *City of Cleburne*, 473 U.S. at 446. In *Romer v. Evans*, 517 U.S. 620 (1996), the Supreme Court struck down a statewide referendum that precluded state or local government from taking actions to protect the status of persons based on sexual orientation. The Court held that protecting the interests of people with personal or religious objections to gay people was not a valid rationale for the law, finding that the law was "a status-based enactment divorced from any factual context from which [the Court] could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Id.* at 635. The law's classification of gay, lesbian, and bisexual people was "not to further a proper legislative end but to make them unequal to everyone else. … A State cannot so deem a class of persons a stranger to its laws." 517 U.S. at 635.

Florida may no more legislatively make LGBTQ+ people unequal than Colorado could. HB 1557 was enacted with the purpose and effect of discriminating against LGBTQ+ students and students with LGBTQ+ family members, subjecting them to differential and adverse treatment, including through an invitation to arbitrary enforcement and a private right of action for hostile parents.

Nor may the State justify the law as promoting "parental rights in education." *See* Fla. Stat. § 1001.42(8)(c)(1). The government may not enact a law endorsing the hostility of certain parents to acknowledging in school that LGBTQ+ people exist. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("private biases" are not "permissible considerations for"

governmental action); *see also Obergefell v. Hodges*, 576 U.S. 644, 672 (2015) (personal religious or philosophical objections to gay people may not constitutionally be given the imprimatur of the Government). "The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." *Shelley v. Kraemer,* 334 U.S. 1, 22 (1948). The Supreme Court rejected similar rationales proffered by the State of Colorado in *Romer* (including the "respect for … personal or religious objections to homosexuality"). *Romer,* 517 U.S. at 634. As noted above, *supra* Section I(A), the invidious intent of HB 1557 is apparent from the legislative history, including floor statements from the bill's co-sponsors and its failed amendments.

HB 1557 is not an appropriate restriction on curriculum. Its purpose and effect are to chill speech based on viewpoint in contexts well outside of any textbook or course offering, including student speech, library materials, and student services. Moreover, even curricular decisions violate the First Amendment when they serve no pedagogical purpose, or if the decision was taken to suppress a particular speaker's viewpoint. *Searcey v. Harris*, 888 F.2d 1314, 1322 (11th Cir. 1989). Indeed, courts have recognized that the Constitution places limits on curricular decisions. *See, e.g.*, *Meyer v. Neb.*, 262 U.S. 390, 403 (1923) (due process guarantee prohibits state from barring teaching of German in schools because "no emergency" rendered the knowledge "so harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed"). The

erasure of LGBTQ+ students and parents from Florida schools serves no valid educational purpose, let alone the compelling one required.[10]

**B. Plaintiffs Will Suffer Irreparable Injury Absent Injunctive Relief**

Plaintiffs will continue to suffer irreparable harm absent an injunction. "[T]he loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983); *see also Cone Corp. v. Hillsborough Cnty.*, 723 F. Supp. 669, 678 (M.D. Fla. 1989) (irreparable harm shown from continuation of equal protection violation). By censoring Plaintiffs' constitutionally protected speech based on its content and viewpoint, and failing to provide adequate notice of what speech is proscribed, HB 1557 already has had an impermissible chilling effect: students are self-censoring or subject to discipline; parents are censoring themselves and instructing their children to self-censor about who they are; organizations are prevented from educating local communities, serving students, and promoting inclusion; LGBTQ+ youth and children with LGBTQ+ family members have lost access to library materials that might comfort them in the knowledge that they are not alone and that other LGBTQ+ people exist; and DCPS has

---

[10] The absence of any empirical evidence in the legislative record to support a need for HB 1557's prohibition on classroom discussions about sexual orientation and gender identity provides an independent reason to conclude that it serves no valid purpose. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1312 (11th Cir. 2017). HB 1557 was justified as a "proactive bill" to counteract "social engineering approaches" at schools and "what people are running into in the school system and [] the evidence unearthed by the kinds of lesson plans that they were doing*." Ex. 11, *Transcript: Hearing on H.B. 1557 Before the S. Comm. on Appropriations*, 2022 Leg. R. Sess. 29-32 (Fl. Feb. 28, 2022) (statement of Sen. Dennis Baxley, Comm. Member). However, in response to a question about which lesson plans that provoked this "outcry," the bill's sponsor was unable to say where the lesson plans came from and conceded that he'd have to "do a little research to show you.... [I]t was very obvious that these lesson plans were moving in a specific direction. That's all I can tell you right now." *Id.*

23

removed from its website anti-bullying resources that are key to providing a safe environment for students. *See supra*, Sections I(B) & I(C).

### C. The Balance of Equities Favors Plaintiffs

The balance of equities and the public interest favor Plaintiffs because the irreparable constitutional injuries described above far outweigh any marginal burden on Defendants that might result from delaying HB 1557 from continuing in effect pending an adjudication on the merits. Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1293 (M.D. Fla. 2021) (cleaned up). Governmental entities, including school boards, have "no legitimate interest in enforcing an unconstitutional" law. *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006); *see Gilio*, 905 F. Supp. 2d at 1275 (balance of equities and public interest weighed in favor of enjoining school board policy restricting proselytizing literature). As here, where constitutional rights hang in the balance, the serious and substantial injury that even a temporary loss of such rights for Plaintiffs must outweigh any potential harm to the Defendants. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001) ("the public interest is always served in promoting First Amendment values").

Any purported state interest in the enforcement of HB 1557 cannot overcome Plaintiffs' weighty interests. A preliminary injunction will restore the status quo ante and the free "[d]iscussion of public issues," which is "integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976).

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin enforcement of HB 1557 until the present matter is resolved.

Respectfully submitted this 26th day of August 2022.

By: _/s/ Debra Dandeneau_
Debra Dandeneau, Esq. (FBN 978360)
L Andrew S. Riccio, Esq. (FBN 91978)
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018
(212) 626-4100
debra.dandeneau@bakermckenzie.com
andrew.riccio@bakermckenzie.com

**Angela Vigil, Esq.** (FBN 38627)
Baker McKenzie LLP
1111 Brickell Avenue
Suite 1700
Miami, Florida 33131
(305) 789-8900
angela.vigil@bakermckenzie.com

**Simone Chriss, Esq.** (FBN 124062)
Jodi Siegel, Esq. (FBN 511617)
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601
(352) 271-8890
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

**Camilla B. Taylor, Esq.**
(admitted _pro hac vice_)
Lambda Legal Defense
and Education Fund, Inc.
Midwestern Regional Office
65 E. Wacker Pl., Suite 2000
Chicago, IL, 60601
(312) 663-4413
ctaylor@lambdalegal.org

**Kell L. Olson, Esq.**
(admitted _pro hac vice_)
Lambda Legal Defense
and Education Fund, Inc.
Western Regional Office
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010-3512
(213) 382-7600
kolson@lambdalegal.org

**Paul D. Castillo, Esq.**
(admitted _pro hac vice_)
Lambda Legal Defense
and Education Fund, Inc.
South Central Regional Office
3500 Oak Lawn Ave., Ste. 500
Dallas, TX 75206
(214) 219-8585
pcastillo@lambdalegal.org

**Jennifer Vail, Esq.**
(admitted *pro hac vice*)
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL. 36104
jennifer.vail@splcenter.org

**Bacardi Jackson, Esq.** (FBN 47728)
**Scott McCoy, Esq.** (FBN 1004965)
**Sam Boyd, Esq.** (FBN 1012141)
Southern Poverty Law Center
2 Biscayne Boulevard, Suite 3750
Miami, Florida 33131
bacardi.jackson@splcenter.org
scott.mccoy@splcenter.org
sam.boyd@splcenter.org

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 26, 2022, I electronically served the foregoing

document on all counsel of record through the Court's CM/ECF filing system.

By: *<u>/s/ Debra A. Dandeneau</u>*

Debra A. Dandeneau

26