**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**Case No. 6:22-cv-01312-WWB-LHP**

JENNIFER COUSINS; MATTHEW
COUSINS; P.C., M.C., S.C., and N.C., by
and through their next friends and parents,
Jennifer and Matthew Cousins; WILL
LARKINS, by and through his next friend
and parent, Ted Larkins;[1] DAVID DINAN;
VIKRANTH REDDY GONGIDI; K.R.D. and
R.R.D., by and through their next friends
and parents David Dinan and Vikranth
Reddy Gongidi; and CENTERLINK, INC.,
on behalf of itself and its members,

        *Plaintiffs*,

vs.

THE SCHOOL BOARD OF ORANGE
COUNTY, FLORIDA; THE SCHOOL
BOARD OF INDIAN RIVER COUNTY,
FLORIDA; THE SCHOOL BOARD OF
DUVAL COUNTY, FLORIDA; and THE
SCHOOL BOARD OF PALM BEACH
COUNTY, FLORIDA,

        *Defendants,*

and

ASHLEY MOODY, Attorney General,

        *Defendant-Intervenor*.

_____/

**Challenge to the Constitutionality of
   Florida Statute § 1001.42(8)(c)
   (2022)**

**Preliminary and Permanent Injunctive
   Relief Requested**

**Declaratory Relief Requested**

**Demand for a Jury Trial**

---

[1] Pursuant to Fed. R. Civ. P. 5.2(h), Plaintiff Will Larkins, a minor, waives the privacy
protections afforded by Fed. R. Civ. P. 5.2(a) as to his name only.

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF[2]</u>

Plaintiffs Jennifer ("**Jen**") and Matthew ("**Matt**") Cousins, individually and as next friends and parents of P.C., M.C., S.C., and N.C., minor children; Will Larkins, a minor, by and through his next friend and parent, Ted Larkins; David Dinan and Vikranth Reddy Gongidi ("**Vik Gongidi**"), individually and as next friends and parents of K.R.D. and R.R.D., minor children; and Plaintiff CenterLink, Inc., by and through their undersigned counsel, bring this challenge to Florida Statute § 1001.42(8)(c) (2022) ("**HB 1557**")[3] seeking a declaratory judgment, preliminary and permanent injunctive relief, and nominal and compensatory damages against Defendants, the following Florida schools boards: The School Board of Orange County, The School Board of Indian River County, The School Board of Duval County, and The School Board of Palm Beach County.

## <u>INTRODUCTION</u>

1. Florida enacted HB 1557 to silence and erase lesbian, gay, bisexual, transgender, queer, and questioning ("**LGBTQ+**") young people and families. The law is profoundly vague and requires schools to ban undefined broad categories of speech based on undefined standards such as "appropriateness." The law demands that school districts implement its terms, and it empowers any parent to directly sue the school district if they are dissatisfied with its implementation of the law. And it simultaneously saddles

---

[2] Plaintiffs file this First Amended Complaint by written consent of all parties pursuant to Fed. R. Civ. P. 15(a)(2), as provided in the accompanying Notice.

[3] Although HB 1557's provisions have now been codified as part of Florida's statutory scheme, we refer to this portion of the law by its former bill number for ease of reference. We do not employ the widely-used "Don't Say Gay" label to refer to this portion of the law, as that moniker fails to recognize the harms HB 1557 intentionally inflicts upon transgender people and others who identify as members of the LGBTQ+ community.

school districts with the cost of litigation and the risk of paying plaintiffs' attorney fees. This vigilante enforcement mechanism, combined with the law's intentionally vague and sweeping scope, invites parents who oppose any acknowledgment whatsoever of the existence of LGBTQ+ people to sue, resulting in schools acting aggressively to silence students, parents, and school personnel. The law, by design, chills speech and expression that have any connection, however remote, to sexual orientation or gender identity.

2.      The impact of HB 1557 is immediate and severe. Defendant school boards and their agents have already begun implementing significant changes under the law. They have instructed teachers to review hundreds of books that acknowledge LGBTQ+ people and families, and have eliminated vital support systems for LGBTQ+ students, including guidance and training that combat bullying and violence.

3.      Plaintiffs Jen and Matt Cousins want their children, including their non-binary seventh grader, Plaintiff S.C., to feel safe and supported at school. HB 1557 attacks not only S.C. but the entire Cousins family. All members of the family—including Plaintiffs P.C. and M.C., who are in first and third grades—love and are proud of their family and wish to be able to speak openly about S.C. in school. Jen and Matt want their younger children to be able to complete the same assignments their older siblings did at their age, including a family tree that describes their siblings, without the shame and censorship that HB 1557 has imposed. S.C. fears they will lose the critical lifeline they have found in their school's Gay Straight Alliance ("*GSA*") student group, knowing that parents looking to enforce HB 1557 have already begun to target teachers who sponsor those groups.

4.      This law restricts LGBTQ+ students' ability to access life-saving information, including Plaintiff Will Larkins' ability to share the knowledge that helped him understand and love himself. When Will learned about LGBTQ+ people and their history, he finally realized he was not broken or wrong, as his childhood bullies had made him believe. Will knows that sharing knowledge about LGBTQ+ history can empower young people who are struggling. However, after he shared a presentation about the Stonewall riots with his history class just after HB 1557 was passed, he was moved to another history class and his grades suffered as a result. Will has seen anti-LGBTQ+ bullying and harassment increase since HB 1557 was enacted, to such a degree that students have torn pride flags out of fellow students' hands and stomped on them, causing distress and fear for Will and his peers. In the first semester of the new school year since the enactment of HB 1557, Will has experienced more bullying than he ever has in the past. As school districts actively move to rescind guidance and training about compassion and respect for LGBTQ+ people, the risk of such harm will only increase.

5.      HB 1557 also sends a message to the children of same-sex parents that they should be ashamed of their families. Plaintiffs David Dinan and Vik Gongidi want their third and fourth graders, R.R.D. and K.R.D., to feel supported and safe at their school. They also want their children to be able to speak about their family at this critical age when family is often a topic of discussion. But HB 1557 places a barrier to that most basic goal. For example, when David recently chaperoned a field trip with K.R.D.'s class, he censored himself in a way he had not before HB 1557's passage. David knew any mention of K.R.D.'s other dad was likely to prompt future questions by classmates that would be silenced under the law, sending a message to his child that their family is a topic

4

too shameful to be discussed.

6.      HB 1557 impacts entire communities of young people, interfering with and putting additional pressure on LGBTQ+ community centers that provide services and support for LGBTQ+ youth. As a result of HB 1557, at least one member center of Plaintiff CenterLink has been impeded from providing the training, referrals, and other support services it has traditionally provided through a collaboration with a school district. When schools eliminate supports for LGBTQ+ youth and fail to provide them a safe environment, it negatively impacts LGBTQ+ students' mental health and increases their need for community services. One of Plaintiff CenterLink's LGBTQ+ community center members has seen its demand for counseling sessions double since HB 1557 was passed, requiring the diversion of resources previously designated for other critical services. Another has increased community advertising to make sure LGBTQ+ youth know there are still safe places and support available, even after HB 1557's enactment.

7.      The law silences and stigmatizes LGBTQ+ youth, such as Plaintiffs S.C. and Will Larkins, inviting discipline for the mere act of acknowledging who they are and advocating for themselves and their community. The law tells children and families with LGBTQ+ members that their family is not worthy of acknowledgment and discussion. The intentionally broad law, together with its enforcement scheme, erodes the ability of LGBTQ+ students to obtain affirming support services in school, undermines protections from bullying based on their identities and the structure of their families, and deprives them of literature and resources vital to their development, education, and mental health. As a result, the law is unconstitutional, and the Defendant school boards must be enjoined from enforcing it.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the action arises under the U.S. Constitution. The Court also has subject matter jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the U.S. Constitution and laws, and seeks to secure equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

9.     The Court has personal jurisdiction over Defendants because Defendants are domiciled in Florida and the deprivation of Plaintiffs' rights arises out of and relates to Defendants' official duties in Florida.

10.     Venue lies in this District under 28 U.S.C. § 1391(b)(1) because Defendants School Board of Orange County, Florida, and School Board of Duval County, Florida, reside in this District and all Defendants are residents of Florida. Venue also lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

11.     Venue lies in this Division under Local Rule 1.04(b) because this action is most directly connected to and most conveniently advanced in this Division.

12.     The Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

### I.  Plaintiffs

13.     Plaintiffs JEN and MATT COUSINS, a married different-sex couple of 15

years, reside in Orange County, Florida, with their four children, Plaintiffs P.C. (age 6), M.C. (age 8), S.C. (age 12), and N.C. (age 14). Each of the children attends Orange County Public Schools ("*OCPS*"). Plaintiffs P.C., M.C., S.C., and N.C., minor children, sue pursuant to Federal Rule of Civil Procedure 17(c) by and through their next friends Plaintiffs Jen and Matt Cousins. As students enrolled in OCPS and their parents, Plaintiffs Jen Cousins, Matt Cousins, P.C., M.C., S.C., and N.C. are subject to Defendant School Board of Orange County's implementation of HB 1557.

14.     Plaintiff WILL LARKINS resides in Orange County, Florida. He sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friend Ted Larkins. As a student at OCPS, Plaintiff Will Larkins is subject to Defendant School Board of Orange County's implementation of HB 1557.

15.     Plaintiffs DAVID DINAN and VIK GONGIDI, a married same-sex couple, reside in Indian River County, Florida, with their two children, Plaintiffs K.R.D. and R.R.D., who attend the School District of Indian River County ("*SDIRC*"). Plaintiffs K.R.D. and R.R.D., minor children, sue pursuant to Federal Rule of Civil Procedure 17(c) by and through their next friends Plaintiffs David Dinan and Vik Gongidi. As students at SDIRC and their parents, Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D are subject to Defendant School Board of Indian River County's implementation of HB 1557.

16.     Plaintiff CENTERLINK, INC. is a mission-driven not-for-profit 501(c)(3) organization and member-based coalition that was founded in 1994 and is based in Fort Lauderdale, Florida. CenterLink's members are LGBTQ+ community centers across the country, whose strength and sustainability CenterLink supports. CenterLink helps build the capacity of its member centers to fulfill their missions of addressing the social, cultural,

health, and advocacy needs of LGBTQ+ community members. One of CenterLink's fundamental missions is to help its member centers improve their organizational and service delivery capacity. CenterLink sues on its own behalf and on behalf of affected member centers that operate in Orange County, Duval County, and Palm Beach County.

## II. Defendants

17.     Defendant School Board of Orange County, Florida, is the governing body of the OCPS, organized and operated under Fla. Stat. §§ 1001.34 through 1001.453. The School Board of Orange County is charged with implementing the terms of HB 1557 as provided in the newly enacted subsection (8)(c) of Fla. Stat. § 1001.42, "Powers and duties of district school board." As a political subdivision of the State of Florida, the School Board of Orange County is subject to civil suits pursuant to Fla. Stat. § 1001.41(4) and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983. Plaintiffs P.C., M.C., S.C., and N.C., and Plaintiff Will Larkins attend public school in Orange County. A member center of Plaintiff CenterLink provides services to LGBTQ+ students in OCPS.

18.     Defendant School Board of Indian River County, Florida, is the governing body of the SDIRC, organized and operated under Fla. Stat. §§ 1001.34 through 1001.453. The School Board of Indian River County is charged with implementing the terms of HB 1557 as provided in the newly enacted subsection (8)(c) of Fla. Stat. § 1001.42, "Powers and duties of district school board."  As a political subdivision of the State of Florida, the School Board of Indian River County is subject to civil suits pursuant to Fla. Stat. § 1001.41(4) and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983. Plaintiffs K.R.D. and R.R.D. attend public school in Indian River County.

19.     Defendant School Board of Duval County, Florida, is the governing body of the Duval County Public School District ("**DCPS**"), organized and operated under Fla. Stat. §§ 1001.34 through 1001.453. The School Board of Duval County is charged with implementing the terms of HB 1557 as provided in the newly enacted subsection (8)(c) of Fla. Stat. § 1001.42, "Powers and duties of district school board." As a political subdivision of the State of Florida, the School Board of Duval County is subject to civil suits pursuant to Fla. Stat. § 1001.41(4) and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983. A member center of Plaintiff CenterLink provides services to multiple schools and students in DCPS.

20.     Defendant School Board of Palm Beach County, Florida, is the governing body of The School District of Palm Beach County ("**SDPBC**"), organized and operated under Fla. Stat. §§ 1001.34 through 1001.453. The School Board of Palm Beach County is charged with implementing the terms of HB 1557 as provided in the newly enacted subsection (8)(c) of Fla. Stat. § 1001.42, "Powers and duties of district school board." As a political subdivision of the State of Florida, the School Board of Palm Beach County is subject to civil suits pursuant to Fla. Stat. § 1001.41(4) and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983. A member center of Plaintiff CenterLink provides services to LGBTQ+ students in SDPBC.

## FACTUAL ALLEGATIONS

### I.   HB 1557's Requirements and Enforcement Structure

21.     HB 1557, which took effect on July 1, 2022, provides that "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." Fla.

Stat. § 1001.42(8)(c)(3).

22.     HB 1557 also imposes the following requirements and limits upon district

school boards:

> (c)(1). In accordance with the rights of parents enumerated in
> ss. 1002.20 and 1014.04, adopt procedures for notifying a
> student's parent if there is a change in the student's services
> or monitoring related to the student's mental, emotional, or
> physical health or well-being and the school's ability to provide
> a safe and supportive learning environment for the student.
> The procedures must reinforce the fundamental right of
> parents to make decisions regarding the upbringing and
> control of their children by requiring school district personnel
> to encourage a student to discuss issues relating to his or her
> well-being with his or her parent or to facilitate discussion of
> the issue with the parent. . . .
>
> (c)(2). A school district may not adopt procedures or student
> support forms that prohibit school district personnel from
> notifying a parent about his or her student's mental, emotional,
> or physical health or well-being, or a change in related
> services or monitoring, or that encourage or have the effect of
> encouraging a student to withhold from a parent such
> information. School district personnel may not discourage or
> prohibit parental notification of and involvement in critical
> decisions affecting a student's mental, emotional, or physical
> health or well-being. This subparagraph does not prohibit a
> school district from adopting procedures that permit school
> personnel to withhold such information from a parent if a
> reasonably prudent person would believe that disclosure
> would result in abuse, abandonment, or neglect . . . .

Fla. Stat. § 1001.42(8)(c)(1)-(2).

23.     The law does not define "classroom instruction," "sexual orientation,"

"gender identity," "school personnel," "third party," "age-appropriate," "developmentally

appropriate," "standards," "services," "monitoring," or "well-being."

24.     HB 1557 provides two enforcement mechanisms for parents who are

unsatisfied with any school district's handling of speech, expression, and information

concerning sexual orientation and gender identity. Subsection 8(c)(7) provides for a parent to wait merely 30 days after notifying the district of any concern that falls under the law and then, if the concern is not resolved, authorizes parents to either: (1) request the assignment of a special magistrate to investigate the parent's claims and make a recommended decision to the State Board of Education for resolution, or (2) exercise a new private right of action to sue their child's school district for declaratory and injunctive relief if they believe the law is being violated. Fla. Stat. § 1001.42(8)(c)(7).

25.     The law places the burden of paying the costs of the special magistrate process on the school district. Fla. Stat. § 1001.42(8)(c)(7)(b)(I). And it provides that, if a parent's lawsuit is successful, the school district may be required to pay a monetary award in addition to mandatory attorney fees and court costs. Fla. Stat. § 1001.42(8)(c)(7)(b)(II). HB 1557's enforcement scheme poses little risk for parents who desire to litigate against their child's school district, and it incentivizes school districts to bend to any single parent's demands rather than to prioritize student safety and education.

26.     Section 2 of HB 1557 states that "[b]y June 30, 2023, the Department of Education shall review and update, as necessary, school counseling frameworks and standards; educator practices and professional conduct principles; and any other student services personnel guidelines, standards, or frameworks in accordance with the requirements of this act." Although parents are empowered to sue at any time, there is no indication which "state standards" will apply before these standards are developed.

**II.   HB 1557's vague language restricts such a broad range of discussion as to be infeasible.**

27.     HB 1557's vagueness inevitably has led to, and continues to lead to,

11

discriminatory and arbitrary application and enforcement across various school districts.[4] As noted above, the law fails to define numerous terms that are integral to its scope, including "classroom instruction," "third parties," "sexual orientation," "gender identity," "age-appropriate," and "developmentally appropriate." These terms and concepts are fundamental to understanding the confines of the statute yet are open to numerous interpretations. The failure to define them results in confusion for anyone tasked with following the law.

28.     It is also unclear who the law binds. The law restricts "classroom instruction" by "school personnel or third parties." It is unclear whether parents or students are "third parties" whose discussion of their own sexual orientation on school grounds could constitute instruction.

29.     The forbidden subjects of instruction are equally unclear. Without a definition of "sexual orientation" in the law's text, it is unclear whether it prohibits an assignment to draw a family tree or a kindergarten teacher reading her class a book that references a character's "mommy" and "daddy." Because sexual orientation and gender identity infuse all family and romantic relationships, references to "brother," "aunt," or "wife" can communicate information about gender identity or sexual orientation. It is unclear whether HB 1557 prohibits the mention of a non-binary family member, or whether a high school student can offer a class presentation about LGBTQ+ historical events or historical or current public figures, regardless of whether the figures are known

---

[4] The actions of all Florida school districts in implementing HB 1557 are relevant to demonstrating the vagueness of the law and the reasonableness of chilled speech; thus, Plaintiffs include select examples of interpretation and implementation by both Defendant and non-Defendant school districts.

for achievements unrelated to their sexual orientation or gender identity.

30.    Because the law does not define "gender identity," a reasonable person cannot tell what type of instruction is prohibited.[5] Every person has a gender identity, whether or not it corresponds with their sex assigned at birth. It is unclear whether HB 1557 bans a discussion on stereotypical gender roles or gender expression. For example, it is not clear whether a kindergarten teacher can still read the class a book where Jane wants to play football. Even if this is permitted, a reasonable person cannot tell where to draw the line. Surely HB 1557 was not intended to ban all use of pronouns or gendered terms for people. But the law on its face does not answer, for example, whether transgender students may request the use of accurate pronouns by teachers and other students in the classroom, particularly if such a change may require explanation to other students in the class.

31.    The law also fails to clarify what constitutes "classroom instruction." The preamble to HB 1557 frames the law broadly as "prohibiting classroom discussion about sexual orientation or gender identity" by any "school personnel."

32.    Whether a teacher can answer a student's question about another student's family structure without running afoul of the law is unclear. The law is vague, leaving school districts to decide whether or not teachers and classroom visitors, such as parents, must refrain from answering students' questions on the forbidden topics—to the extent those can even be ascertained. Similarly, it is unclear whether a teacher must censor

---

[5] Defendant school districts are already implementing inconsistent definitions for these terms. For example, at least one DCPS documents defines sexual orientation in terms of attraction to others and defines gender identity in terms of self-perception. On the other hand, at least one OCPS document defines sexual orientation in terms of self-identity and defines gender identity in terms of behavior that can be shown through evidence.

students from discussing their own sexual orientation or gender identity, or that of their LGBTQ+ parents, family members, or friends, and whether or not to silence, censor, or even discipline students who do so.

33.    Florida's K-3 board-approved state education standards are replete with examples of assignments requiring instruction and discussion of family structures, familial relationships, historical individuals, and proper pronoun usage.[6] For example, a kindergarten theater standard requires students to "create a story about an everyday event involving family members and/or pets using body movements, sounds, and imagination."[7] A kindergarten social studies standard asks students to "compare children and families of today with those in the past."[8] A first grade social studies standard requires students to "create a timeline based on the student's life or school events, using primary sources."[9] The standard suggests examples of primary sources including "photographs, birth certificates, … and diaries."[10] English standards in grades 1-3 all require students demonstrate increasing awareness and use of proper pronouns.[11] A kindergarten English

---

[6] "CPALMS is the State of Florida's official source for standards." Florida Department of Education, Standards & Instructional Support, available at https://www.fldoe.org/academics/standards/.

[7] CPALMS, Standards, Theater Standard TH.K.C.1.1, available at https://www.cpalms.org/PreviewStandard/Preview/4210.

[8] CPALMS, Standards, Social Studies Standard SS.K.A.2.1, available at https://www.cpalms.org/PreviewStandard/Preview/2879.

[9] CPALMS, Standards, Social Studies Standard SS.1.A.3.2, available at https://www.cpalms.org/PreviewStandard/Preview/2912.

[10] *Id.*

[11] CPALMS, Standards, English Language Arts Standard LAFS.3.L.1.1, available at https://www.cpalms.org/PreviewStandard/Preview/5926.

standard asks students to "describe familiar people … and, with prompting and support, provide additional detail."[12] HB 1557's vague and overbroad terms chill the participation of children with same-sex parents or transgender or non-binary family members in such assignments.

34.     These questions arise even if "classroom instruction" is limited to the designated classroom and class time. But without a definition, it is not clear that "classroom instruction" is so limited. HB 1557 chills and censors speech between individual students, parents, and school personnel in numerous contexts, including during extracurricular activities, such as student-led GSAs and other clubs.

35.     HB 1557 creates uncertainty about the extent to which library books must also be policed because they may constitute "classroom instruction." The law has already caused Defendant school districts in at least Orange County and Palm Beach County to remove LGBTQ+ materials from their libraries. A policy adopted by Defendant School Board of Palm Beach County places library media specialists on the committee to review parent complaints under HB 1557, indicating that it deems library materials to fall within the scope of the law. Guidance published by Defendant School Board of Palm Beach County, which took effect August 10, 2022, also mandates that books be submitted to media specialists for review if "a character questions their own gender or sexual orientation." SDIRC has implemented identical guidance.

36.     HB 1557 chills schools from responding effectively to bullying based on a student's sex, sexual orientation, and gender identity. For example, in the proposed

---

[12] CPALMS, Standards, English Language Arts Standard LAFS.K.SL.2.4, available at https://www.cpalms.org/PreviewStandard/Preview/5855.

revision it made to its LGBTQ+ student support guide in response to HB 1557, DCPS removed guidance to teachers on how to respond to anti-LGBTQ+ bullying, including sample responses to students using "gay" as an insult. DCPS also has removed for legal review an anti-bullying video that taught middle and high school students how to support their LGBTQ+ peers and create a safe environment. SDPBC likewise has removed from its website a support guide for LGBTQ+ students that contained similar anti-bullying language and, on information and belief, is currently in the process of revising the guide due to HB 1557.

37.     For grades other than K-3, the law restricts instruction where not "age-appropriate or developmentally appropriate." These terms are not defined, and no standards or guidance is due until June 30, 2023. Until then, schools are incentivized to chill and censor speech, expression, and access to information according to the standard of the parent most hostile to the existence of LGBTQ+ people, simply to avoid a lawsuit. For example, at least two Florida school districts have restricted content from 12th grade curricula due to concern that such content may violate the vague restrictions imposed by HB 1557.

38.     The law is vague as to whether a student merely discussing their sexual orientation with their teacher constitutes a "change in the student's services or monitoring related to the student's mental, emotional, or physical health or well-being and the school's ability to provide a safe and supportive learning environment for the student." The phrase includes multiple terms that are undefined and unclear, including "well-being," which is used repeatedly throughout subsections 8(c)(1) and 8(c)(2).

39.     On June 15, 2022, Defendant School Board of Palm Beach County adopted

Policy 5.735 implementing HB 1557. Despite the vagueness of various terms described above, including "classroom instruction," "sexual orientation," and "gender identity," Policy 5.735 does not define those terms. Instead, it inserts additional vagueness by subjecting employees to disciplinary action for "attempt[ing] to encourage" a student to withhold information from their parents. Teachers in Palm Beach County schools have already been instructed to review all classroom books and remove any that instruct on sexual orientation or gender identity for grades K-3 and any that are not age or developmentally-appropriate for grades 4-12, including those about which the teacher is "unsure." A member of Defendant School Board of Palm Beach County stated that avoiding litigation from parent complaints is one of the district's "biggest concerns" because they need "to be fiscally responsible."[13] On information and belief, a SDPBC administrator who questioned the decision to remove books before standards were put in place has been transferred and demoted.

**III. HB 1557 was enacted to shame and silence LGBTQ+ children and families, stigmatizing them, subjecting them to adverse treatment, and barring them from full and equal participation in their school communities.**

40.     HB 1557's purpose is to silence LGBTQ+ people and their families based on their identities and the content and viewpoint of their speech and expression. The law's sponsor in the Senate stated that the law addresses concerns about students "coming out" as LGBTQ+ in school, and parents' concerns about a "departure [from] core belief systems and values."

41.     HB 1557's imprecision exacerbates its chilling effect, pushing school

---

[13] *See* https://www.wlrn.org/education/2022-06-09/palm-beach-county-teachers-are-being-told-to-review-classroom-library-books-for-references-to-racism-sexism-oppression.

districts to broadly restrict speech about LGBTQ+ students and families under threat of private lawsuits and accompanying expenses.

42.     Unsuccessful amendments show that the legislature intentionally failed to clarify the vague terms used in the bill and intended to target the LBGTQ+ community. Most tellingly, proposed Amendment 973790 would have replaced "sexual orientation" and "gender identity" with "human sexuality" and "sexual activity." Its sponsor clarified that the amendment was designed to avoid discrimination against LGBTQ+ children: "If the intent of this bill isn't to marginalize anyone, let's make sure we aren't by passing this amendment." As one colleague noted: "The other advantage to the senator's amendment is that it takes out the words that target a minority group. . . . We do not want children and others to get the impression we think it is wrong to be gay or to be transgender." Critically, HB 1557's sponsor in the Senate stated that the amendment should not be supported because it "would significantly gut the effort of the bill." The amendment failed.

43.     Amendments 734244 and 600607 proposed clarifying that HB 1557 "does not apply to any discussion between a student who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBTQ and their peers." The amendments failed. And amendment 290096, which would have defined "sexual orientation" and "gender identity" to clarify that the terms encompass identities other than LGBTQ+ identities, such as heterosexuality, also failed.

44.     Amendment 755282 would have limited the definition of "classroom instruction" to exclude discussions of family structures, objective historical events, and bullying prevention; student IEP or 504 plans; facilitating discussion between students; and asking and answering questions by students. The amendment failed.

45.    HB 1557's nebulous and overbroad terms achieve the intended, discriminatory goal of erasing all mention of LGBTQ+ people and families in schools. HB 1557 creates lose-lose situations for parents, teachers, and students. A school either can avoid any conversation acknowledging LGBTQ+ people or face a lawsuit by any parent hostile to the presence of LGBTQ+ students and families.

46.    In practice, HB 1557 tells all children that there are certain subjects about which they cannot learn, and it tells all people that LGBTQ+-identifying people are not human beings worthy of acknowledgment and discussion. It interferes with the ability of LGBTQ+ students to obtain affirming support services in school, undermines protections from bullying based on their identities and the structure of their families, and deprives them of literature and resources vital to their development, education, and mental health.

## IV. HB 1557 harms Plaintiffs by impermissibly chilling speech and expression, obstructing communications, sowing confusion, depriving young people of vital support services, and stigmatizing children.

### 1. HB 1557 has harmed and will continue to harm Plaintiffs Jennifer and Matt Cousins, and Plaintiffs P.C., M.C., S.C., and N.C.

47.    Jen and Matt Cousins have been married for over 15 years and are the parents of four children. Jen is a full-time mom and Matt is a software architect at Sapiens. The family lives in Orlando, Florida.

48.    Jen and Matt's children are N.C., who is 14 years old and is in the ninth grade; S.C., who is 12 years old and is in the seventh grade; M.C. who is 8 years old and is in the third grade; and P.C., who is 6 years old and is in the first grade. Each of the children attends public school in OCPS.

49.    Jen and Matt have raised their children to be kind, open-minded, respectful of differences, and comfortable in their own skin. More than anything, they want their

children to feel safe and supported—not only at home, but in all aspects of their lives, including at school.

50.     Jen and Matt's child, S.C., came out as non-binary last year, and uses "they/them" pronouns. The family supports S.C. completely, and loves that S.C. is comfortable in their own skin and confident in who they are. S.C. is completely "out" at school and is an active member of their school's GSA student club. The GSA has been a lifeline for S.C. at school, and provides a sense of belonging, community, and acceptance for S.C. and other LGBTQ+ students. S.C. has friends who do not have any other space in which they safely can be themselves outside of the GSA.

51.     An OCPS document recently utilized in training at the school district, "Legislative Updates May 2022," instructs staff that library "books that make written or pictorial reference to sexual orientation or gender identity should not be available to K-3 students to browse or check out" and further states that "hundreds" of materials will need to be reviewed. An OCPS document titled "Legislative Media Center Changes," states that "we encourage elementary media specialists to conduct a review of books available to students in grades K through 3, making note of any books that include written or pictorial references to sexual orientation or gender identity." An OCPS document titled "Instructional Materials Library Media 2022 Legislation" poses the question: "A book is used for instructional purposes to teach about families. The book includes references and pictures of a family with two moms and two dads. Since the lesson is about families and not sexual orientation or gender identity, is it okay to use that book?" It answers: "Book can be viewed as introducing sexual orientation to K-3 kids if it is used as part of instruction in K-3."

52.     Jen and Matt wish their children to continue to be able to access information that depicts diversity and literature that reflects their lived experiences. For example, they want S.C. and their siblings to be able to seek out a book in a school library that contains a non-binary character, so that they can better understand that S.C. is not alone. Jen and Matt have always fostered empathy and inclusivity in their children, and they want their children to learn in school the importance of representation, especially for people from marginalized communities. They have witnessed how the passage of HB 1557 has increased demands from members of their community to erase LGBTQ+ voices and stories from the literature currently available to young people in their schools.

53.     HB 1557 attacks not only S.C. but the entire Cousins family. All members of the family are proud of S.C. and wish to be able to speak openly and with love for S.C. in school, including by explaining S.C.'s non-binary identity to friends, classmates, teachers, and others. S.C. wishes to advocate for themself and asks to have others refer to them with they/them pronouns. The law paints their family as abnormal. The law shames, chills, and silences such communications; and it portrays S.C., a kind and thoughtful child, as someone who should be feared or ostracized. For example, given the uncertainty of HB 1557, Jen and Matt's youngest children, Plaintiffs P.C. and M.C., who are in first and third grade, are afraid they will get in trouble for speaking about their own sibling in class and explaining their sibling's identity and pronouns. P.C. and M.C. are also afraid their teacher will not be able to support their speech by answering other student's questions about their sibling's identity and pronouns, leaving them open to bullying for having an LGBTQ+ family member.

54.     Jen and Matt proudly display and preserve the school projects and artwork

completed by their children, and in looking over the beautiful keepsakes from S.C. and N.C.'s K-3 years, they realize that P.C. and M.C. may not be able to complete the same kinds of assignments. For example, S.C. completed a family tree in kindergarten that included pictures and details about their family members, and a first-grade project, "About [S.C.]," that stated, "I have 1 sister and 2 brothers." Jen and Matt worry what their two youngest children will be prohibited from sharing in a similar assignment, because S.C. is neither their "sister" nor their "brother." A first-grade assignment asked N.C. "Who is worth more to you than gold?" N.C. drew pictures of mom, dad, M.C., and S.C. The K-3 curriculum is full of instruction on and discussion about family, and Jen and Matt do not want their two youngest children to be excluded from the benefits of these assignments and discussions due to the censorship imposed by HB 1557.

55.     For Plaintiff S.C., HB 1557 sends a particular message of shame, telling them that there is something so wrong with them that they and their identity cannot be discussed in a classroom setting. Internalizing this message at such a young, formative age results in profound stigma and dignitary harm.

56.     For Plaintiffs M.C. and P.C., HB 1557 tells them that their sibling is someone who cannot be spoken about at school, that their sibling is wrong for who they are, and that they should be ashamed of their family. This is contrary to everything that Jen and Matt have raised them to understand, and antithetical to the values that they, as parents, have instilled in their children.

57.     Jen and Matt are concerned the law will require them to explain to their two youngest children why their teacher may have to shut down conversations about their non-binary sibling while permitting conversation about other siblings. This concern has

grown as documents and guidance from the school district have continued to surface. For example, a recent training for OCPS staff "recommended that the safe space stickers be removed from K-3 classrooms so that classroom instruction did not inadvertently occur on the prohibited content of sexual orientation or gender identity." Similar guidance was provided regarding teachers with same-sex partners displaying family photos and teachers' clothing with affirming or "pride" messages, focusing on teachers avoiding anything that may elicit prohibited discussion on sexual orientation or gender identity. Jen and Matt are also aware that other districts have interpreted the law to require the removal of "safe space" stickers and similar messages of inclusion for LGBTQ+ students. For instance, Pasco County School District's official website states: "Due to recent legislation concerning parental rights, our school district will no longer utilize 'safe spaces' and will no longer display 'safe space' stickers[,]" explaining it could result in a parent bringing "an action in court for 'damages…attorney fees and court costs' stemming from a violation of these parental rights."

58.    S.C. witnessed a marked increase in bullying at school before the end of the 2021-2022 school year, which continued outside of school over the summer, including against one of their transgender friends. S.C. stayed up late during those difficult weeks on the phone providing support and being a safe space for their friends who do not have a safe space at home to be themselves. S.C. wonders how, if at all, they will be able to support their LGBTQ+ friends in school. S.C. fears that if they ask a teacher to address anti-LGTBQ+ bullying in the classroom and the teacher is unable to address the bullying, the bullies will feel validated and the bullying will get worse. In just the first week of the new school year, S.C. experienced bullying based on gender identity that they had never

before been subjected to at school.

59.     S.C. and N.C. do not feel that their schools will be safe this year, particularly if schools can no longer allow GSAs to function (because they require teachers to serve as sponsors) or affirming and welcoming items such as safe space stickers and LGBTQ+ inclusive library materials. Removal of the stickers is also likely to embolden those students, and even parents, who seek to harass them or do them harm. On information and belief, a group of anti-LGBTQ+ parents has requested the names of every GSA club sponsor at public schools in the state of Florida, including those in the OCPS, to weaponize HB 1557 to get those teachers fired.

60.     Teachers have always been one of the most valuable and important resources for S.C., N.C., P.C., and M.C. Jen and Matt know that HB 1557 is creating a barrier to building positive relationships and interactions between their children/themselves and the teachers tasked with educating their children. Their two youngest, M.C. and P.C., have already expressed concerns about getting in trouble themselves, as well as "getting their teachers in trouble" by talking about their non-binary sibling in classroom settings. Without safe space stickers, M.C. and P.C. do not know which teachers would be supportive resources for them at school.

**2. HB 1557 has harmed and will continue to harm Plaintiff Will Larkins.**

61.     Will is a senior at Winter Park High School in Orange County, Florida, a part of the OCPS. He identifies as gay and non-binary and is the president and a co-founder of his school's Queer Student Union.

62.     Will knew from a very young age that he was different from other boys his age, and he struggled for acceptance both internally and externally with his peers. Will

lacked the language to understand what it was about him that made him different. He was not familiar with the concepts of sexual orientation or gender identity and expression that would help him understand why he felt the way he did. By the fourth grade, he was convinced that he was broken. He did not know how to respond or defend himself when he was bullied by other kids, and because he did not know anyone who shared his experience, he assumed that what the bullies said about him was true.

63.     Will came to understand what LGBTQ+ meant the summer before seventh grade. With that life-changing understanding came the language to describe this critical aspect of his identity and the realization that he was not alone in the way that he felt. He finally believed that he was not abnormal or wrong, that he was not a tragic anomaly or a strange fluke that needed to be fixed. It was as if a weight was lifted off his shoulders. Will then became fascinated with learning about LGBTQ+ history and culture, and the more he learned about other people's experiences, the more he came to understand himself and to love himself. Through education on these concepts, he developed a sense of self-worth, community, and belonging.

64.     After enactment of HB 1557 this past spring, Will's history class was studying pivotal historical events from the 1960s and early 1970's. Will asked his teacher if the class was going to learn about Stonewall, an uprising of LGBTQ+ people in New York City in 1969 that is commonly understood to mark the beginning of the modern LGBTQ+ civil rights movement. His teacher responded that she was not familiar with Stonewall. Will created and delivered a Google Slides presentation on the Stonewall riots to his class on the significance of the uprising to LGBTQ+ history. Will's friend, who was also a student in the class, filmed the presentation. The video of Will's lesson went viral

on social media, and an article about it was published in a national news outlet.

65.     After the news story was published, Will's history teacher complained to administrators. School officials then placed Will under "investigation" for the presentation on the Stonewall Riots. Ultimately, he was told that he was being moved to another history class, and that he had no choice in the matter. Given that it was close to the end of the year and moving into a new and unfamiliar class so close to finals was challenging, Will's grades suffered in the new class as a result. Will's friend also was disciplined for filming his presentation.

66.     Will also has witnessed an increase in anti-LGBTQ+ bullying and harassment since the enactment of HB 1557. Will hung up a banner that read "PRIDE BELONGS HERE" ahead of a student-organized protest opposing HB 1557, and within a day it had been vandalized and torn in several places. Further, during a student-organized walk-out, for which Will had sought and obtained permission from the principal in advance, a student walked up and tore a pride flag out of the hand of another student and ripped it up. A second student stomped on a pride flag they took from another student who had been holding it. Will has also experienced more bullying against him personally since the start of the new school year than he ever experienced previously. For example, recently a group of students chased Will and his sister, who also identifies as LGBTQ+, after a football game, hurling homophobic and transphobic slurs at them as they ran. Upon reporting this incident and others, rather than addressing the bullying itself, OCPS offered Will the option to transfer to another school. Will feels less safe at his OCPS school as a result of HB 1557.

67.     As President of the Queer Student Union, Will has spoken to his fellow club

members about how they feel in light of HB 1557. Many have expressed feelings of fear and distress, not only because of the law but also the hateful and painful rhetoric being spewed by the Florida Legislature. Will believes the rhetoric perpetuated by the state in support of this bill, including the Governor's Press Secretary calling it the "Anti-Grooming Bill" and stating that those opposed to the bill, like Will, support "the grooming of 4-8 year old children," is being mimicked by students who are increasing their bullying of and hostility toward LGBTQ+ students.

68.    Will wants to be himself in school. He wants to talk about LGBTQ+ history without fear of being penalized again. As a high school senior with college prospects on the horizon, Will cannot afford to be disciplined and have his grades suffer for speaking accurately in class about relevant LGBTQ+ historical and current events. He wishes to acknowledge to other students, to teachers, and to his community that he is queer. He wants to go to school and not be shamed and silenced simply for who he is. HB 1557's enactment, and its implementation by Defendant School Board of Orange County, have chilled and penalized Will's speech and expression based on its content and viewpoint, and subjected him and other LGBTQ+ students at OCPS to increased harassment, bullying, and discrimination. Will's reasonable fear of being denied access to information about his own community, and being censored in seeking to provide critical information about the LGBTQ+ community to his fellow students, stems not only from his own experience at OCPS but was also reinforced when he heard about the official action taken by the Miami-Dade School Board to reject a measure that would have (1) included landmark LGBTQ+ civil rights cases in the 12th grade U.S. Government curriculum; and (2) recognized October as LGBTQ+ history month. School board members explained that

they believed the proposal would have violated HB 1557.

69.     Teachers have been one of the most wonderful resources for Will and for other LGBTQ+ students who are struggling to find their place at school. One supportive teacher can make all the difference, as Will experienced when his teacher comforted him regarding an incident at a Halloween party where his male classmates threatened him with physical violence and shouted homophobic slurs. The teacher provided safety for Will at school when he most needed it, and Will fears that under HB 1557, LGBTQ+ students like himself will be deprived of this safety as teachers will have to actively censor themselves to avoid potential conflicts with anti-LGBTQ+ parents.

**3. HB 1557 has harmed and will continue to harm Plaintiffs David Dinan, Vik Gongidi, and Plaintiffs K.R.D. and R.R.D.**

70.     David and Vik are both physicians and met during their residency training in Michigan. After several years together, they married and have now been legally married for 8 years, although they had their own private commitment ceremony 12 years ago. The freedom to marry under Florida law was a defining moment for them in being officially recognized in the same way as other couples.

71.     David and Vik decided to take the first formal steps toward having children in 2011, after having discussed it for some time.  Both had always known they would be parents when the time was right. For David, having a family seemed a natural extension of his work as a pediatric radiologist.  Vik grew up in a large extended family and starting his own family also seemed a natural and logical extension.  They began the process while living in Pennsylvania and continued their adoption journey after moving to Florida.

72.     In 2013, David and Vik adopted K.R.D., who is currently 9 years old. In 2014, they adopted R.R.D., who is currently 8 years old. They have had K.R.D. in their

28

family from approximately 4 months old and R.R.D. from a few days old.

73.     K.R.D. is in the fourth grade and R.R.D. is in the third grade. Both attend public school in the SDIRC.

74.     David and Vik want their children to feel supported and safe at their school. David is a member of the parent-teacher association ("*PTA*") at the children's school. David and Vik are in regular contact with their children's teachers and attend periodic school board meetings.

75.     David chaperoned one of K.R.D.'s third grade field trips and plans to chaperone future trips. HB 1557 caused him to self-censor by taking care not to mention K.R.D.'s other dad, Vik. From their experience at school board meetings, David and Vik know that some parents interpret discussions of "sexual orientation" to include neutral acknowledgements of any person that is not heterosexual. Therefore, David realized that reference to K.R.D.'s other dad could invite questions from K.R.D.'s classmates that will put him, K.R.D., or a teacher in a position to run afoul of HB 1557 by explaining the family's structure. He did not want K.R.D. to witness a teacher struggle with a response, silence K.R.D.'s classmates, or be penalized for affirming K.R.D.'s family, so he censored himself. The chill, shame, and stigma caused by HB 1557 harms David and Vik, in addition to their children.

76.     Even if K.R.D. and R.R.D. were allowed to reference the fact that they have two dads, and that their dads are gay, HB 1557 nonetheless restricts a teacher's ability to answer questions by classmates the way they would about another child's family, explain that their family is as worthy as any other family, and protect K.R.D. and R.R.D. from feeling alone, ashamed, exposed, and bullied as a result of their family structure. HB

1557 harms their children, sending a message that their family is a topic too shameful or "inappropriate" for their teachers and classmates to discuss.

77.     David and Vik now self-censor their appearance and speech around teachers and classmates of K.R.D. and R.R.D. and when they attend school events, avoiding reference to their relationship, sexual orientation, and any other topic that might be deemed "inappropriate" by parents that could threaten to sue the school under HB 1557. For example, David realized while picking up K.R.D. from school that he was wearing a t-shirt celebrating aviation that could be interpreted as a "Pride" t-shirt because it featured rainbow colors, and he felt uncomfortable as a result of HB 1557. He felt conspicuous because he did not want to prompt discussion of his sexual orientation and family structure that would be prohibited by HB 1557. Therefore, he is chilled from wearing clothing explicitly celebrating Pride or his own identity on school grounds.

78.     Based on David's experience and involvement at previous school board meetings, he is particularly worried about the way this law causes censorship of materials from K.R.D. and R.R.D.'s schools because of the content and viewpoint of these materials. For example, there was a recent effort by parents in his children's school district to ban over 150 books, including those that mentioned LGBTQ+ people. Before HB 1557, the school district was able to hear those concerns, undertake its review, and then decide that nearly all of those books—although described by some parents as "pornography"— were appropriate for school. But under HB 1557, the most extreme of those same parents may censor school instruction and books by threatening legal action for the inclusion of anything they deem "inappropriate," forcing schools to adopt a standard of complete LGBTQ+ erasure to avoid costs and liability. K.R.D. and R.R.D. deserve to be able to

access books that show that other children their age also have same-sex parents and David and Vik want them to be able to access those books in school.

79.     The enactment of HB 1557 already has impacted the way in which mental health support services have been delivered to K.R.D. and R.R.D. Since the passage of HB 1557, David has observed that school counselors are seeking additional permission from him before interacting with his children, and he worries that his children cannot access timely and appropriate services the way they have previously been able to do.

80.     HB 1557 harms David and Vik and their children for the additional reason that the law inhibits school officials' ability to respond effectively to anti-LGBTQ+ bullying and slurs targeting their children because their dads are gay and comprise a married same-sex couple.

81.     HB 1557 prevents school officials from protecting students effectively because any reasonably supportive intervention may be characterized as violating the vague and overly broad law, inviting lawsuits by private parties. This makes it less safe for their children to attend school. At its May 2022 meeting, as a result of HB 1557, Defendant School Board of Indian River County discussed proposals from at least one board member to completely rescind an LGBTQ+ Administrative Resource Guide that, since at least the 2019-2020 school year, has provided guidance to school administrators in establishing safe and inclusive schools and promoting academic success for LGBTQ+ students. The LGBTQ+ Administrative Resource Guide is under review and unavailable.

**4. HB 1557 has harmed and will continue to harm Plaintiff CenterLink and its member centers.**

82.     CenterLink's mission is to strengthen, support, and connect LGBTQ+ community centers. CenterLink works to develop strong, sustainable community centers

that provide LGBTQ+ people of all ages with the building blocks of well-being that all people need to thrive, such as healthy social connections, safe places to live and work, support to do well in school and prepare for careers, enriching cultural experiences, and timely health and mental health services. With over 300 member LGBTQ+ community centers across the country and internationally, including 27 in Florida, CenterLink assists newly forming community centers and helps strengthen existing centers through networking opportunities for leaders, peer-based technical assistance and training, and a variety of capacity-building services. CenterLink's efforts are based on the belief that LGBTQ+ community centers lay the foundation for a national movement working to ensure that all LGBTQ+ people can live happy and healthy lives in communities that honor and support them.

83.     LGBTQ+ community centers work very closely with their LGBTQ+ constituency and engage community leaders and decision-makers. These centers are often the only staffed non-profit LGBTQ+ presence in a given area and the first point of contact for people seeking information, coming out, accessing services, or organizing for social change.  According to CenterLink's survey of LGBTQ+ centers, over 60% provide some direct health services (including counseling, peer-led programs, and support groups, as well as physical health and other mental health services). At the same time, those centers remain thinly staffed: over 30% operate solely with volunteers, and over 60% employ five or fewer paid staff. CenterLink's members pay a sliding-scale membership fee. Once a center becomes a member, it has access to services such as the CenterLink resource portal, newsletter, programming and listservs, annual leadership and staff conferences, and professional advice about operation and services.

84.     Since passage of HB 1557, CenterLink has responded to an increased volume of calls for assistance from multiple Florida member centers requesting assistance in interpreting and responding to HB 1557. As a result, CenterLink staff have spent an average of four to eight hours per week since the passage of HB 1557 responding to member inquiries and creating educational materials about the law.

85.     If CenterLink staff did not have to spend time responding to inquiries about HB 1557 and helping member centers respond to its implementation, they would use those resources serving other member centers by connecting member centers with lawmakers, planning advocacy trainings, working on a healthcare enrollment awareness project, contributing comments to federal rulemaking processes, or reaching out to members to join their advocacy efforts.

86.     Among the services provided to member centers by CenterLink is YouthLink, a program that assists, supports, and strengthens member centers' youth programs in various ways. YouthLink offers networking opportunities for youth center leaders and youth program staff, peer-based technical assistance and training, webinars on a variety of topics of interest to youth programming staff, a monthly resource e-newsletter, a member portal with documents, and templates. It also provides other practical assistance, including coaching and consultation for youth programming staff, needs assessment research, and a safe chat space for LGBTQ+ youth facilitated by staff at CenterLink and member centers nationwide. CenterLink receives funding from federal subcontracts, individual and corporate donors, and private foundations to support this work.

87.     An important aspect of CenterLink's mission is to strengthen its member

centers' ability to support and empower LGBTQ+ youth, which member centers accomplish in part by communicating to young people that they are loved and supported, affirmed in their identities, confident in their future, and that they are valued assets in their communities. Many of CenterLink's member centers—including multiple centers in Florida—offer youth programs that bring LGBTQ+ teens together to create safer schools, support one another, build future leaders, and to have fun. These member centers also provide mental health services and resources to LGBTQ+ youth. When a youth seeks support from a member center, staff at the center provide the young person with support, resources, and information. Member centers also receive a combination of public funding, individual and corporate donations, and financial support from private foundations.

88.     Some of CenterLink's member centers, including at least one Florida member center, also assist school districts on policies and procedures to prevent bullying, including bullying based on students' LGBTQ+ identities. Multiple centers provide trainings in schools and facilitate the development and functioning of GSAs, which are youth-led organizations that seek to create safe spaces for LGBTQ+ youth and address anti-LGBTQ+ harassment, bullying, and discrimination in schools. Member centers act as a resource for students and teacher facilitators, which can include assisting with training and meeting facilitation, providing micro-grants for GSA events and materials, offering trainings for interested parents of LGBTQ+ youth on topics including how to provide a safe and supportive environment, and connecting local GSA youth leaders to national conferences. Many member centers also provide health and wellness services for LGBTQ+ teens, including access to HIV testing, linkage to care as needed, drop-in counseling services, and group support meetings both for LGBTQ+ youth and their

families. Certain member centers also offer housing support services for homeless youth, including access to hot meals, shower and laundry facilities, bus passes, computer labs, and one-on-one staff support.

89.    When LGBTQ+ youth are unable to feel safe or unable to be themselves at school, they suffer. LGBTQ+ students who are victimized based on their identity are nearly three times more likely to miss school, have lower grade point averages, are twice as likely to report they have no post-secondary education aspirations, and have lower self-esteem and higher rates of depression. These problems can be lessened by practices that foster an affirming learning environment. Youth who have a supportive school environment created by staff and administrators report fewer homophobic or transphobic comments, are more likely to report that school personnel intervene when issues arise, feel a greater sense of community, and are more likely to graduate high school.

90.    Research specifically links the presence of GSAs to greater feelings of school connectedness, positive youth development, and increasing sense of purpose, self-esteem, and agency among LGBTQ+ youth. GSAs also have been linked to improved public health outcomes for school-aged young people, including reduced risk across health outcomes related to HIV and other sexually transmitted infections, violence, illicit drug use and prescription drug misuse, and suicidal ideation. Prevention benefits from the presence of GSAs have been documented for non-LGBTQ+ youth as well as LGBTQ+ youth.

91.    HB 1557 already has interfered with, and obstructed work performed by, CenterLink and several of its Florida member centers, frustrating the mission of

CenterLink and these member centers, interfering with activities they wish to continue in furtherance of their missions and their obligations under federally-funded contracts, consuming and diverting their resources, and harming the LGBTQ+ youth that they serve.

### a. CenterLink member center in Duval County

92.     For example, a CenterLink member center in Duval County provides training for parents and teachers on safe and supportive environments for LGBTQ+ students; assists DCPS on policies and procedures for student support and anti-bullying; communicates with and provides support to GSAs and their advisors; and supports individual students directly referred from staff at DCPS. This center is subcontracted by Defendant School Board of Duval County to perform these services under a federal collaborative grant, and private donors and foundations provide additional funding support for its work.

93.     Over the course of a long-standing relationship for at least the last five years, CenterLink's Duval County member center received multiple referrals of students from DCPS. Within the first few weeks after HB 1557 was passed, however, DCPS blocked at least one youth referral because the DCPS staff feared the referral might run afoul of HB 1557. Consequently, the center's staff were unable to follow up with this student, provide information, answer questions, and offer resources and assistance. Indeed, since passage of HB 1557, CenterLink's Duval County member center has not received any referrals from any DCPS school.

94.     Over the course of the last nine years, employees of DCPS held regular meetings that enabled CenterLink's Duval County member center to plan teacher trainings, establish and maintain referrals, coordinate the collection of data that is required

under grants, and meet other requirements for the upcoming school year. After the passage of HB 1557, however, DCPS cancelled those standing meetings. Absent HB 1557, the member center would be using those DCPS-led meetings to plan summer teacher training, identify prospective GSA teacher sponsors, and plan for a student leadership retreat, as it has done in prior summers. Because of HB 1557, the collaboration has been stalled and that work has been put on hold. The member center wishes to continue speaking with and supporting teachers and students through this work.

95.     As part of its subcontracted work under the federal collaborative grant, CenterLink's Duval County member center worked for many years with DCPS and other community stakeholders to create an LGBTQ+ student support guide so that students, including the member center's participants, could expect a safe environment at any school across the district. However, DCPS staff charged with updating the guide to comply with HB 1557 have proposed to cut the length of the guide from 37 pages to 8 pages, removing critical sections including those that guide teachers in responding to name-calling and bullying of LGBTQ+ students and that provide guidelines to protect students' personal information about their sexual orientation and gender identity. These changes forced by the District's interpretation of HB 1557 will leave students vulnerable to unequal treatment and harm.

96.     In the past, the Duval member center (as part of the collaborative federal grant) had been in contact with most or all of the GSA advisors for approximately 18-22 GSAs throughout DCPS. This summer, by contrast, only two advisors attended the most recent meeting. They explained that they and their colleagues are afraid to communicate through school email accounts or otherwise about GSA involvement because of HB 1557.

Several GSA sponsors in Florida school districts have expressed concern that the mere attendance at a GSA meeting by students could trigger the parental notification requirement under HB 1557. The Duval member center wishes to continue speaking with these advisors.

97.     The obstruction of the Duval County center's work by DCPS in implementing HB 1557 harms the center itself by rendering the center unable to fulfill all of its subcontracted obligations, in addition to frustrating its mission and diverting its resources. HB 1557 has silenced this member center, prevented its staff from fully communicating with students, teachers, and school officials to the extent it has in the past to provide them with support, and otherwise obstructed its mission and its federally-funded work to support individual LGBTQ+ students and GSAs.

**b. CenterLink member center in Orange County**

98.     A CenterLink member center in Orange County also has experienced harm as a result of HB 1557. This center operates facilitated peer-to-peer counseling sessions for LGBTQ+ youth. Before passage of HB 1557, these sessions averaged 7 to 10 youth in attendance. Since the law's enactment, the number of student attendees at these sessions has doubled. Students at these sessions have stated that HB 1557 has made them nervous and heightened their anxiety. Parents have sought out these services for their teens specifically because of HB 1557. As a result of the law, their teens no longer feel as though they have an inclusive, welcoming, and safe environment at school.

99.     To make clear that students have an alternate safe space at the Orange County center despite HB 1557, this member center has spent approximately $6,250 to advertise the availability of its services to LGBTQ+ youth, in addition to the resources

expended as a result of greater demand for its counseling sessions.

### c. CenterLink member center in Palm Beach County

100.    A CenterLink member center in Palm Beach County has experienced and continues to experience harm as a result of HB 1557 and its implementation by SDPBC. At least some teachers in SDPBC who previously would refer students and their families to the center or direct them to resources provided by the center are no longer comfortable doing so in light of HB 1557's vague language, including the law's parental notification requirements, interfering with the center's ability to communicate with students who are not otherwise aware of the center. These teachers have been warned by SDPBC that they will lose their license if they fail to comply with the law.

101.    The Palm Beach County member center has experienced an increased demand for its mental health services, resources, and support for local young people. HB 1557 has exacerbated a mental health crisis for LGBTQ+ youth, who—even before passage of HB 1557—already were four times more likely to attempt suicide or think about suicide than their non-LGBTQ+ peers. The staff at this member center have spent an inordinate amount of time and resources on mitigating the impacts of HB 1557 on students' mental health and quelling the anxiety of youth and families.  The increased demand from LGBTQ+ youth and their families for direct services, driven by HB 1557, has exceeded the capacity of the center's staffing. Given the member center's limited resources, directing a large percentage of the staff to address concerns raised by HB 1557 has hindered the member center's ability to perform other program work, frustrated its mission, and hindered its ability to meet the needs of the LGBTQ+ community more generally.

102.    SDPBC has cancelled several long-standing diversity and inclusion trainings for teachers on LGBTQ+ history and curriculum inclusion, removed inclusive materials in high school courses from the curriculum and several books with LGBTQ+ content from all classrooms, and is revising affirming policies for LGBTQ+ students in response to HB 1557. For example, a teaching tool titled the "Genderbread Person," which is a component of the Human Growth and Development curriculum for high school students, was removed from curriculum materials in response to HB 1557, and teachers have been instructed to restrict access to the books Call Me Max, I am Jazz, and Flamer. Further, the "LGBTQ+ Critical Support Guide," for which Compass is one of the lead contributors, and which has long served as a vital resource for LGBTQ+ students in Palm Beach County's public schools, was removed from the website and revised in response to HB 1557. Finally, the Palm Beach County member center has provided trainings in the past, and would like to be able to perform trainings in the future, for SDPBC staff relating to best practices for working with LGBTQ+ youth.

103.    OCPS, SDIRC, DCPS, and SDPBC continue to implement HB 1557 and the facts regarding implementation in each school district continue to evolve.

<u>**COUNT I**</u>

**Deprivation of Freedom of Speech and Expression, and Overbreadth**
**First Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**

104.    Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C. state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference paragraphs 1-13, 17, 21-60, and 68 as if fully stated herein.

105.    Plaintiff Will Larkins states this cause of action against Defendant School Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12,

14, 17, 21-46, 57, and 61-69, as if fully stated herein.

106.    Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. state this cause of action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 18, 21-46, 57, 68, and 70-81 as if fully stated herein.

107.    Plaintiff CenterLink, on behalf of itself and its members, states this cause of action against Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and re-alleges and incorporates by reference paragraphs 1-12, 16-17, 19-46, 57, 68, and 82-103, as if fully stated herein.

108.    All Plaintiffs seek preliminary and permanent injunctions, and challenge HB 1557, and any action by Defendants or their agents seeking to implement it both facially and as applied to them.

109.    In addition to the affirmative implementation efforts referenced in paragraphs 104-107 above, Defendants School Board of Orange County, School Board of Indian River County, School Board of Duval County, and School Board of Palm Beach County each have the authority to enforce HB 1557 within their respective school districts.

110.    The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983, provides in part that the government "shall make no law . . . abridging the freedom of speech."

111.    HB 1557 impermissibly chills the exercise of all Plaintiffs' constitutionally protected speech, based on the content and viewpoint of their speech and is therefore unconstitutional as applied to Plaintiffs under the First Amendment.

112.    Discrimination against speech based on its content and viewpoint is a

violation of the First Amendment. Efforts to suppress speech based on the government's opposition to the speaker's view are unconstitutional absent narrow tailoring in service of a compelling justification.

113.    As its legislative history indicates, HB 1557 is a façade for viewpoint-based discrimination and is therefore facially unconstitutional under the First Amendment.

114.    The manner in which the Defendant School Boards are implementing HB 1557 censors messages of inclusion, affirmation, and support with respect to students' LGBTQ+ sexual orientation and gender identity and is therefore unconstitutional as applied to Plaintiffs under the First Amendment.

115.    The First Amendment also protects a student's right to receive information and ideas. A student's constitutional right to receive information is violated when library materials are removed or curriculum or classroom instruction are curtailed for a purpose not reasonably related to a legitimate pedagogical concern.

116.    Additionally, a law may be invalidated as overbroad when a substantial number of its applications are unconstitutional, judged in relation to any permissible applications of the statute.

117.    Plaintiffs Jen Cousins, Matt Cousins, P.C., M.C. S.C., N.C., Will Larkins, David Dinan, Vik Gongidi, K.R.D., and R.R.D. have engaged in affirming speech and expression concerning their own or others' sexual orientation and gender identity in school contexts and with students, and wish to continue to do so. These Plaintiffs already have been chilled and/or forced to self-censor by taking care not to mention their own or a family member's sexual orientation and/or gender identity in school contexts when they otherwise would engage in such speech and expression as a result of the implementation

of HB 1557 and enforcement authority of Defendants School Board of Orange County and School Board of Indian River County. HB 1557 impermissibly chills the exercise of these Plaintiffs' constitutionally protected speech and expression, based on content and viewpoint.

118.    Additionally, HB 1557 chills and precludes teachers and school officials (1) from answering questions by students about the sexual orientation, family structure, and/or gender identity of Plaintiffs S.C., Will Larkins, David Dinan, Vik Gongidi, K.R.D., and R.R.D. in the same way teachers and school officials would answer questions about non-LGBTQ+ students or their families, (2) from intervening to explain that these Plaintiffs and their families are as worthy as any other family, and (3) from protecting Plaintiffs P.C., M.C., S.C., N.C., Will Larkins, K.R.D., and R.R.D. from stigma and bullying as a result of their sexual orientation and gender identity or the sexual orientation and gender identity of their family members. HB 1557 harms these Plaintiffs, sending a message that they and/or their families are a topic too shameful or "inappropriate" for their teachers and classmates to discuss.

119.    HB 1557, and its implementation by Defendants School Board of Orange County and School Board of Indian River County, have censored materials in these school districts, depriving Plaintiffs P.C., M.C., S.C., N.C., Will Larkins, K.R.D., and R.R.D. of access to information and ideas, and curtailing classroom instruction, for a reason not reasonably related to a legitimate pedagogical concern, violating their First Amendment right to receive information.

120.    Plaintiff CenterLink's members have engaged and want to continue engaging in speech that affirms students' sexual orientation and gender identity in

communications with school officials, parents of LGBTQ+ students, and students themselves. Plaintiff CenterLink's members wish to continue engaging in speech that affirms students' sexual orientations and gender identity and believe that their communications and the information they provide to students, parents of LGBTQ+ youth, and school staff, are critical to their mission and the well-being of students.

121.   The decision by Plaintiff CenterLink's members to communicate a message of inclusion, affirmation, and support with respect to students' LGBTQ+ sexual orientation and gender identity—consistent with their mission—constitutes protected First Amendment activity.

122.   The purpose and effect of HB 1557 is to chill and suppress constitutionally protected First Amendment activity by targeting specific content and viewpoints for suppression. HB 1557, and its enforcement by Defendants have penalized Plaintiff CenterLink's members. HB 1557, as enforced by Defendant School Boards of Duval and Palm Beach Counties, has penalized Plaintiff CenterLink's members by preventing their staff from engaging in affirming and inclusive speech and communications about sexual orientation and gender identity; HB 1557, as enforced by Defendant School Boards of Orange and Palm Beach Counties, has penalized Plaintiff CenterLink's members by forcing them to spend additional resources on the mental health of young people at these school districts; and Defendant School Board of Duval County has penalized a Plaintiff CenterLink's member by interfering with its ability to comply with certain grant obligations and to seek future funding to do this mission-driven work.

123.   Because a substantial number of the applications of HB 1557 are unconstitutional, judged in relation to its legitimate sweep, HB 1557 is also overbroad,

and its enforcement should be enjoined.

124.    As a direct and proximate result of Defendants' authority and conduct (including enforcement of HB 1557), Plaintiffs have suffered damages.

## COUNT II

### Deprivation of Due Process of Law
### Fourteenth Amendment to the U.S. Constitution
### 42 U.S.C. § 1983

125.    Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C. state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference paragraphs 1-13, 17, and 21-60, and 68 as if fully stated herein.

126.    Plaintiff Will Larkins states this cause of action against Defendant School Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12, 14, 17, 21-46, 57, 68, and 61-69, as if fully stated herein.

127.    Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. state this cause of action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 18, 21-46, 57, 68, and 70-81 as if fully stated herein.

128.    Plaintiff CenterLink, on behalf of itself and its members, states this cause of action against Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and re-alleges and incorporates by reference paragraphs 1-12, 16-17, 19-46, 57, 68, and 82-103, as if fully stated herein.

129.    All Plaintiffs seek preliminary and permanent injunctions, and challenge HB 1557, and any action by Defendants seeking to implement it both facially and as applied to them.

130.    The Due Process Clause of the Fourteenth Amendment, enforceable

45

pursuant to 42 U.S.C. § 1983, provides that "[no] state shall . . . deprive any person of life, liberty, or property, without due process of law."

131.    Under the Fourteenth Amendment to the United States Constitution, a governmental enactment like HB 1557 is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. Differently stated, governmental enactments are unconstitutionally void for vagueness when their prohibitions are not clearly defined. Such enactments may also be void for vagueness if they inhibit First Amendment freedoms.

132.    Vague prohibitions inhibit freedom of speech when individuals do not know whether their speech is permitted and choose not to exercise their rights for fear of the consequences.

133.    HB 1557 includes vague and subjective terms that lend themselves to conflicting interpretations and it fails to provide adequate notice as to which information, concepts, and ideas may or may not be discussed or included in school settings in communications by Plaintiff students, Plaintiff parents, or by the staff of CenterLink and its member centers.

134.    Despite HB 1557's vagueness, it includes a range of penalties if a parent were not satisfied with their child's school's or school district's handling of a complaint.

135.    Plaintiff students and Plaintiff parents do not know which of their activities are prohibited by HB 1557 and are justifiably fearful of engaging in any speech or conduct that could be penalized by Defendants School Board of Orange County and School Board of Indian River County. Plaintiff CenterLink and its member centers are justifiably fearful

that their communications and activities will be prohibited by Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and their ability to perform their contractual obligations and seek future funding will be threatened, despite these activities' centrality to their mission and their ability to serve and support LGBTQ+ youth.

136.    HB 1557 violates the Due Process Clause of the Fourteenth Amendment and is void for vagueness because it infringes on all Plaintiffs' constitutionally protected right to free speech and provides inadequate notice of the conduct it purports to prohibit.

137.    As a direct and proximate result of Defendants' authority and conduct (including enforcement of HB 1557), Plaintiffs have suffered damages.

## COUNT III

**Deprivation of Equal Protection of the Laws**
**Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**

138.    Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C.  state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference paragraphs 1-13, 17, 21-60, and 68 as if fully stated herein.

139.    Plaintiff Will Larkins state this cause of action against Defendant School Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12, 14, 17, 21-46, 57, and 61-69, as if fully stated herein.

140.    Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. state this cause of action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 18, 21-46, 57, 68, and 70-81 as if fully stated herein.

141.    Plaintiff CenterLink, on behalf of itself and its members, states this cause of

action against Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and re-alleges and incorporates by reference paragraphs 1-12, 16-17, 19-46, 57, 68, and 82-103, as if fully stated herein.

142.    All Plaintiffs seek preliminary and permanent injunctions, and challenge HB 1557, and any action by Defendants seeking to implement it both facially and as applied to them.

143.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

144.    HB 1557 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating against students and parents based on sex, sexual orientation, gender identity, and transgender status, both facially and as applied.

145.    HB 1557 was enacted with the purpose to discriminate and has the effect of discriminating against students who have LGBTQ+ parents and family members, LGBTQ+ students, and LGBTQ+ parents, subjecting them to differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, and transgender status, and/or the sex, sexual orientation, gender identity, and/or transgender status of their parents or family members.

146.    HB 1557 shames and stigmatizes these students and families, invites school officials, teachers, and classmates to view them as inferior, harms their long-term health and well-being, and denies them equal educational opportunities on the basis of their sex, sexual orientation, gender identity, and transgender status.

147.    HB 1557 has contributed to the creation of an anti-LGBTQ+ climate in the public schools operated by Defendants. It fosters a culture of silence and non-acceptance of LGBTQ+ students and LGBTQ+ families and discourages school officials from complying with their obligations to treat all students equally.

148.    Discrimination based on sex, sexual orientation, gender identity, and transgender status each warrant at least heightened scrutiny.

149.    HB 1557 does not serve any legitimate purpose, pedagogical or otherwise, let alone the exceedingly persuasive or compelling one required, and is instead rooted in animus toward and moral disapproval of LGBTQ+ people. HB 1557 lacks adequate tailoring in service of any such government purpose.

150.    As a direct and proximate result of Defendants' authority and conduct (including enforcement of HB 1557), Plaintiffs have suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A.    A declaratory judgment that Fla. Stat. § 1001.42(8)(c) (2022) (referred to herein as "HB 1557") and the actions taken to implement the law deprive Plaintiffs of their rights under the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution;

B.    Preliminary and permanent injunctive relief enjoining enforcement of Fla. Stat. § 1001.42(8)(c) (2022) by Defendants and their respective officers, agents, servants, employees, attorneys, and successors, as well as all other persons who are in active concert or participation with them;

C.     Award nominal and compensatory damages, in an amount to be determined at trial for garden variety emotional distress, including humiliation, embarrassment, shame, loss of opportunity to speak, and other damages that flow naturally from events that are an affront to dignity, against Defendant School Board of Orange County (for Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C., and Plaintiff Will Larkins) and Defendant School Board of Indian River County (for Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D.) for injury caused by such defendants' respective conduct and for the violation of the rights of the Plaintiffs specified herein under the First and Fourteenth Amendment to the U.S. Constitution.

D.     Award nominal and compensatory damages in an amount to be determined at trial for loss of opportunity to speak, mission frustration and loss of funding opportunities, and any other damages as permitted by law to Plaintiff CenterLink, on behalf of itself and its members, against each of the Defendants, the School Board of Orange County, the School Board of Duval County, and the School Board of Palm Beach County, for violation of CenterLink's rights under the First and Fourteenth Amendment to the U.S. Constitution.

E.     Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and,

F.     Grant all other and further relief as the Court deems appropriate, just, and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues triable of right by a jury.

Respectfully submitted this 14th day of October 2022.

By: */s/ Debra Dandeneau*
Debra Dandeneau, Esq. (FBN 978360)
L Andrew S. Riccio, Esq. (FBN 91978)
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018
(212) 626-4100
debra.dandeneau@bakermckenzie.com
andrew.riccio@bakermckenzie.com

Angela Vigil, Esq. (FBN 38627)
Baker McKenzie LLP
1111 Brickell Avenue
Suite 1700
Miami, Florida 33131
(305) 789-8900
angela.vigil@bakermckenzie.com

Simone Chriss, Esq. (FBN 124062)
Jodi Siegel, Esq. (FBN 511617)
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601
(352) 271-8890
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

Jennifer Vail, Esq.
(admitted *pro hac vice*)
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL. 36104
jennifer.vail@splcenter.org

Bacardi Jackson, Esq. (FBN 47728)
Scott McCoy, Esq. (FBN 1004965)
Sam Boyd, Esq. (FBN 1012141)
Southern Poverty Law Center
2 Biscayne Boulevard, Suite 3750
Miami, Florida 33131
bacardi.jackson@splcenter.org
scott.mccoy@splcenter.org
sam.boyd@splcenter.org

Camilla B. Taylor, Esq.
(admitted *pro hac vice*)
Lambda Legal Defense
and Education Fund, Inc.
Midwestern Regional Office
65 E. Wacker Pl., Suite 2000
Chicago, IL, 60601
(312) 663-4413
ctaylor@lambdalegal.org

Kell L. Olson, Esq.
(admitted *pro hac vice*)
Lambda Legal Defense
and Education Fund, Inc.
Western Regional Office
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010-3512
(313)605-3222, ext. 4342
kolson@lambdalegal.org

Paul D. Castillo, Esq.
(admitted *pro hac vice*)
Lambda Legal Defense
and Education Fund, Inc.
South Central Regional Office
3500 Oak Lawn Ave., Ste. 500
Dallas, TX 75206
(214) 219-8585
pcastillo@lambdalegal.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 14, 2022, I electronically served the foregoing document on all counsel of record through the Court's CM/ECF filing system.

By: */s/ Debra A. Dandeneau*
Debra A. Dandeneau