## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

### Case No. 6:22-cv-01312-WWB-LHP

JENNIFER COUSINS; MATTHEW
COUSINS; P.C., M.C., S.C., and N.C., by
and through their next friends and parents,
Jennifer and Matthew Cousins; WILL
LARKINS, by and through his next friend
and parent, Ted Larkins;[1] DAVID DINAN;
VIKRANTH REDDY GONGIDI; K.R.D. and
R.R.D., by and through their next
friends and parents David Dinan and Vikranth
Reddy Gongidi; and CENTERLINK, INC.,
on behalf of itself and its members,

     *Plaintiffs*,

vs.

THOMAS R. GRADY, BEN GIBSON,
MONESIA BROWN, ESTHER BYRD,
GRAZIE P. CHRISTIE, RYAN PETTY, and
JOE YORK, in their official capacities as
members of the State Board of Education;
THE SCHOOL BOARD OF ORANGE
COUNTY, FLORIDA; THE SCHOOL
BOARD OF INDIAN RIVER COUNTY,
FLORIDA; THE SCHOOL BOARD OF
DUVAL COUNTY, FLORIDA; and THE
SCHOOL BOARD OF PALM BEACH
COUNTY, FLORIDA,

     *Defendants,*

and

ASHLEY MOODY, Attorney General,

     *Defendant-Intervenor*.

**Challenge to the Constitutionality of
Florida Statute § 1001.42(8)(c)
(2022)**

**Preliminary and Permanent Injunctive
Relief Requested**

**Declaratory Relief Requested**

**Demand for a Jury Trial**

---

 1 Pursuant to Fed. R. Civ. P. 5.2(h), Plaintiff Will Larkins, a minor, waives the privacy
protections afforded by Fed. R. Civ. P. 5.2(a) as to his name only.

_____/

## SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

Plaintiffs Jennifer ("Jen") and Matthew ("Matt") Cousins, individually and as next friends and parents of P.C., M.C., S.C., and N.C., minor children; Will Larkins, a minor, by and through his next friend and parent, Ted Larkins; David Dinan and Vikranth Reddy Gongidi ("Vik Gongidi"), individually and as next friends and parents of K.R.D. and R.R.D., minor children; and Plaintiff CenterLink, Inc., by and through their undersigned counsel, bring this challenge to Florida Statute § 1001.42(8)(c) (2022) seeking a declaratory judgment as well as preliminary and permanent injunctive relief against all Defendants, and nominal and compensatory damages against only the following Florida district school boards: The School Board of Orange County, The School Board of Indian River County, The School Board of Duval County, and The School Board of Palm Beach County.

## INTRODUCTION

1.      Florida enacted Fla. Stat. § 1001.42(8)(c) ("the Law") to silence and erase lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") young people and families. The Law is profoundly vague and requires schools to ban undefined broad categories of speech based on undefined standards such as "appropriateness." The Law demands that school districts implement its terms, and it empowers any parent to directly sue the school district if they are dissatisfied with its implementation of the law. And it simultaneously saddles school districts with the cost of litigation and the risk of paying plaintiffs' attorney fees. This vigilante supplemental enforcement mechanism, combined with the Law's intentionally vague and sweeping scope, invites parents who oppose any acknowledgment whatsoever of the existence of LGBTQ+ people to sue, resulting in

schools acting aggressively to silence students, parents, and school personnel. The Law, by design, chills speech and expression that have any connection, however remote, to sexual orientation or gender identity.

2.      The impact of the Law has been immediate and severe. Defendant school boards and their agents have already begun implementing significant changes under the Law. They have instructed teachers to review hundreds of books that acknowledge LGBTQ+ people and families, and have eliminated vital support systems for LGBTQ+ students, including guidance and training that combat bullying and violence.

3.      Plaintiffs Jen and Matt Cousins want their children, including their non-binary seventh grader, Plaintiff S.C., to feel safe and supported at school. All members of the family—including Plaintiffs P.C. and M.C., who are in first and third grades—love and are proud of their family and wish to be able to speak openly about S.C. in school. Jen wants to read a book that includes LGBTQ+ history in the classroom as part of an upcoming parent volunteer event. Jen and Matt want their younger children to be able to complete the same assignments their older siblings did at their age, including a family tree that describes their siblings, without the shame and censorship the Law has imposed. S.C. fears they will lose the critical lifeline they have found in their school's Gay Straight Alliance ("*GSA*") student group, knowing that parents looking to bolster enforcement of the Law have already begun to target teachers who sponsor those groups.

4.      The Law restricts LGBTQ+ students' ability to access life-saving information, including Plaintiff Will Larkins' ability to share the knowledge that helped him understand and love himself. When Will learned about LGBTQ+ people and their history, he finally realized he was not broken or wrong, as his childhood bullies had made him

believe. Will knows that sharing knowledge about LGBTQ+ history can empower young people who are struggling, and he wants to choose class presentation topics that teach about LGBTQ+ history. However, after he shared a presentation about the Stonewall riots with his history class just after the Law was passed, he was moved to another history class and his grades suffered as a result. Will has seen anti-LGBTQ+ bullying and harassment increase since the Law went into effect, to such a degree that students have torn pride flags out of fellow students' hands and stomped on them, causing distress and fear for Will and his peers. Will has also personally experienced more bullying targeted at his sexual orientation and gender identity since the start of the new school year than ever before in his life. As school districts actively move to rescind guidance and training about compassion and respect for LGBTQ+ people, the risk of such harm will only increase.

5.     The Law also sends a message to the children of same-sex parents that they should be ashamed of their families. Plaintiffs David Dinan and Vik Gongidi want their third and fourth graders, R.R.D. and K.R.D., to feel supported and safe at their school. They also want themselves and their children to be able to speak about their family at this critical age when family is often a topic of discussion. But the Law places a barrier to that most basic goal. For example, when David recently chaperoned a field trip with K.R.D.'s class this fall, he censored himself in a way he had not before the Law's passage. David knew any mention of his husband was likely to prompt questions by classmates that would be silenced under the Law, sending a message to his child that their family is a topic too shameful to be discussed.

6.     The Law impacts entire communities of young people, interfering with and putting additional pressure on LGBTQ+ community centers that provide services and

support for LGBTQ+ youth. As a result of the Law, at least one member center of Plaintiff CenterLink has been impeded from providing the training, referrals, and other support services it has traditionally provided through a collaboration with a school district. When schools eliminate supports for LGBTQ+ youth and fail to provide them a safe environment, it negatively impacts LGBTQ+ students' mental health and increases their need for community services. More than one of Plaintiff CenterLink's LGBTQ+ community member centers have had to divert significant resources away from core programmatic activities to provide mental health services after the enactment of the Law caused the demand for these services to skyrocket.

7.       The Law silences and stigmatizes LGBTQ+ youth, such as Plaintiffs S.C. and Will Larkins, inviting discipline for the mere act of acknowledging who they are and advocating for themselves and their community. The Law tells children and families with LGBTQ+ members that their family is not worthy of acknowledgment and discussion and labels them as "inappropriate." The intentionally broad Law, together with its enforcement scheme, erodes the ability of LGBTQ+ students to obtain affirming support services in school, undermines protections from bullying based on their identities and the structure of their families, and deprives them of literature and resources vital to their development, education, and mental health. As a result, the Law is unconstitutional, and the Defendants must be enjoined from enforcing it.

## JURISDICTION AND VENUE

8.       The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the action arises under the U.S. Constitution. The Court also has subject matter jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured

by the U.S. Constitution and laws, and seeks to secure equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

9.      The Court has personal jurisdiction over Defendants because Defendants are domiciled in Florida and the deprivation of Plaintiffs' rights arises out of and relates to Defendants' official duties in Florida.

10.      Venue lies in this District under 28 U.S.C. § 1391(b)(1) because Defendants School Board of Orange County, Florida, and School Board of Duval County, Florida, reside in this District and all Defendants are residents of Florida. Venue also lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

11.      Venue lies in this Division under Local Rule 1.04(b) because this action is most directly connected to and most conveniently advanced in this Division.

12.      The Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

<div align="center">**PARTIES**</div>

**I.      Plaintiffs**

13.      Plaintiffs Jen and Matt Cousins, a married different-sex couple of 15 years, reside in Orange County, Florida, with their four children, Plaintiffs P.C., M.C., S.C., and N.C.. Each of the children attends Orange County Public Schools ("*OCPS*"). Plaintiffs P.C., M.C., S.C., and N.C., minor children, sue pursuant to Federal Rule of Civil Procedure 17(c) by and through their next friends Plaintiffs Jen and Matt Cousins. As students enrolled in OCPS and their parents, Plaintiffs Jen Cousins, Matt Cousins, P.C.,

M.C., S.C., and N.C. are subject to Defendant School Board of Orange County's implementation and enforcement of the Law.

14.     Plaintiff Will Larkins resides in Orange County, Florida. He sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friend Ted Larkins. As a student at OCPS, Plaintiff Will Larkins is subject to Defendant School Board of Orange County's implementation and enforcement of the Law.

15.     Plaintiffs David Dinan and Vik Gongidi, a married same-sex couple, reside in Indian River County, Florida, with their two children, Plaintiffs K.R.D. and R.R.D., who attend the School District of Indian River County ("**SDIRC**"). Plaintiffs K.R.D. and R.R.D., minor children, sue pursuant to Federal Rule of Civil Procedure 17(c) by and through their next friends Plaintiffs David Dinan and Vik Gongidi. As students at SDIRC and their parents, Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. are subject to Defendant School Board of Indian River County's implementation and enforcement of the Law.

16.     Plaintiff CenterLink, Inc. is a mission-driven not-for-profit 501(c)(3) organization and member-based coalition that was founded in 1994 and is based in Fort Lauderdale, Florida. CenterLink's members are LGBTQ+ community centers across the country, whose strength and sustainability CenterLink supports. CenterLink helps build the capacity of its member centers to fulfill their missions of addressing the social, cultural, health, and advocacy needs of LGBTQ+ community members. One of CenterLink's fundamental missions is to help its member centers improve their organizational and service delivery capacity. CenterLink sues on its own behalf and on behalf of affected member centers that operate in Orange County, Duval County, and Palm Beach County.

## II.  Defendants

17.    Defendants Thomas R. Grady, Ben Gibson, Monesia Brown, Esther Byrd, Grazie P. Christie, Ryan Petty, and Joe York (collectively, "SBOE Members") are members of the Florida State Board of Education, a body corporate that serves as head of the Florida Department of Education. FLA. CONST., art. IX, § 2; Fla. Stat. § 20.15(1). The Board of Education, through official action by SBOE Members, has the authority to implement the provisions of law conferring duties upon it for the improvement of the State system of public education, including to adopt comprehensive educational objectives, approve plans for cooperation with other public agencies in the development of rules and enforcement of laws for which it and such agencies are responsible, enforce systemwide education goals and policies, and adopt and periodically review and revise the Next Generation Sunshine State Standards, which are the core content of the curricula to be taught in the state in K-12 public schools. Fla. Stat. §§ 1001.02-.03, 1003.41. SBOE Members, acting as the Board of Education, enforce the Law, including by delegating responsibilities for enforcement to the Commissioner of Education and the Florida Department of Education. *Id.* §§ 1001.02, 1001.20, 1001.23. The Board of Education is also required to review and approve or reject any recommendation of a special magistrate as to whether a school district is in compliance with the Law, and to adopt rules necessary to implement the foregoing procedure. *Id.* § 1001.42(8)(c)(7)(b)(I). Defendants SBOE Members are each a person acting under color of state law within the meaning of 42 U.S.C. § 1983 and sued in their official capacities for prospective equitable relief to end continuing violations of federal law.

18.    Defendant School Board of Orange County, Florida, is the governing body

of the OCPS, organized and operated under sections 1001.34 through 1001.453, Fla. Stat. The School Board of Orange County is charged with implementing the terms of the Law. Fla. Stat. § 1001.42 (district school boards "shall … perform all duties listed" in the statute). As a political subdivision of the State of Florida, the School Board of Orange County is subject to civil suits pursuant to section 1001.41(4), Fla. Stat., and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983. Plaintiffs P.C., M.C., S.C., and N.C., and Plaintiff Will Larkins attend public school in Orange County. A member center of Plaintiff CenterLink provides services to LGBTQ+ students in OCPS.

19. Defendant School Board of Indian River County, Florida, is the governing body of the SDIRC, organized and operated under sections 1001.34 through 1001.453, Fla. Stat. The School Board of Indian River County is charged with implementing the terms of the Law. Fla. Stat. § 1001.42 (district school boards "shall … perform all duties listed" in the statute).  As a political subdivision of the State of Florida, the School Board of Indian River County is subject to civil suits pursuant to section 1001.41(4), Fla. Stat., and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983. Plaintiffs K.R.D. and R.R.D. attend public school in Indian River County.

20. Defendant School Board of Duval County, Florida, is the governing body of the Duval County Public School District ("**DCPS**"), organized and operated under sections 1001.34 through 1001.453, Fla. Stat. The School Board of Duval County is charged with implementing the terms of the Law. Fla. Stat. § 1001.42 (district school boards "shall … perform all duties listed" in the statute). As a political subdivision of the State of Florida, the School Board of Duval County is subject to civil suits pursuant to section 1001.41(4), Fla. Stat., and is a "person" acting under color of state law within the meaning of 42 U.S.C.

§ 1983. A member center of Plaintiff CenterLink provides services to multiple schools and LGBTQ+ students in DCPS.

21.     Defendant School Board of Palm Beach County, Florida, is the governing body of The School District of Palm Beach County ("**SDPBC**"), organized and operated under sections 1001.34 through 1001.453, Fla. Stat. The School Board of Palm Beach County is charged with implementing the terms of the Law. Fla. Stat. § 1001.42 (district school boards "shall … perform all duties listed" in the statute). As a political subdivision of the State of Florida, the School Board of Palm Beach County is subject to civil suits pursuant to section 1001.41(4), Fla. Stat., and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983. A member center of Plaintiff CenterLink provides services to LGBTQ+ students in SDPBC.

<u>**FACTUAL ALLEGATIONS**</u>

**I.      The Law's Requirements and Enforcement Structure**

22.     The Law, which took effect on July 1, 2022, provides that "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." Fla. Stat. § 1001.42(8)(c)(3).

23.     The Law also imposes the following duties and limits upon district school boards:

> (c)(1). In accordance with the rights of parents enumerated in ss. 1002.20 and 1014.04, adopt procedures for notifying a student's parent if there is a change in the student's services or monitoring related to the student's mental, emotional, or physical health or well-being and the school's ability to provide a safe and supportive learning environment for the student. The procedures must reinforce the fundamental right of

parents to make decisions regarding the upbringing and control of their children by requiring school district personnel to encourage a student to discuss issues relating to his or her well-being with his or her parent or to facilitate discussion of the issue with the parent. . . .

(c)(2). A school district may not adopt procedures or student support forms that prohibit school district personnel from notifying a parent about his or her student's mental, emotional, or physical health or well-being, or a change in related services or monitoring, or that encourage or have the effect of encouraging a student to withhold from a parent such information. School district personnel may not discourage or prohibit parental notification of and involvement in critical decisions affecting a student's mental, emotional, or physical health or well-being. This subparagraph does not prohibit a school district from adopting procedures that permit school personnel to withhold such information from a parent if a reasonably prudent person would believe that disclosure would result in abuse, abandonment, or neglect. . . .

Fla. Stat. § 1001.42(8)(c)(1)-(2).

24.     The Law does not define "classroom instruction," "sexual orientation," "gender identity," "school personnel," "third party," "age-appropriate," "developmentally appropriate," "standards," "services," "monitoring," or "well-being."

25.     The Law provides two enforcement mechanisms for parents who are unsatisfied with any school district's handling of speech, expression, and information concerning sexual orientation and gender identity. Subsection 8(c)(7) provides for a parent to wait merely 30 days after notifying the district of any concern that falls under the law and then, if the concern is not resolved, authorizes parents to either: (1) request the assignment of a special magistrate to investigate the parent's claims and make a recommended decision to the State Board of Education for resolution, or (2) exercise a new private right of action to sue their child's school district for declaratory and injunctive relief if they believe the Law is being violated. Fla. Stat. § 1001.42(8)(c)(7).

11

26.     The Law places the burden of paying the costs of the special magistrate process on the school district. Fla. Stat. § 1001.42(8)(c)(7)(b)(I). And it provides that, if a parent's lawsuit is successful, the school district may be required to pay a monetary award in addition to mandatory attorney fees and court costs. Fla. Stat. § 1001.42(8)(c)(7)(b)(II). The Law's enforcement scheme poses little risk for parents who desire to litigate against their child's school district, and it incentivizes school districts to bend to any single parent's demands rather than to prioritize student safety and education.

27.     Section 2 of the Law states that "[b]y June 30, 2023, the Department of Education shall review and update, as necessary, school counseling frameworks and standards; educator practices and professional conduct principles; and any other student services personnel guidelines, standards, or frameworks in accordance with the requirements of this act." Although parents are empowered to sue at any time, there is no indication which "state standards" will apply before these standards are developed.

28.     Implementing the Law, the Florida Department of Education has issued rule 6A-1.094125, effective September 20, 2022, detailing the process by which a parent can request a special magistrate. The rule requires all school districts adopt procedures for two distinct levels of review of a parental complaint under the Law, further incentivizing school districts to bend to a single parent's demand to avoid the costs of litigation or a special magistrate.

## II.     The Law's vague language restricts such a broad range of discussion as to be infeasible.

29.     The Law's vagueness inevitably has led to, and continues to lead to,

discriminatory and arbitrary application and enforcement across various school districts.[2] As noted above, the Law fails to define numerous terms that are integral to its scope, including "classroom instruction," "third parties," "sexual orientation," "gender identity," "age-appropriate," and "developmentally appropriate." These terms and concepts are fundamental to understanding the confines of the Law yet are open to numerous interpretations. The failure to define them results in confusion for anyone tasked with following the Law.

30.     It is also unclear who the Law binds. The law restricts "classroom instruction" by "school personnel or third parties." It is unclear whether parents or students are "third parties" whose discussion of their own sexual orientation on school grounds could constitute instruction.

31.     The forbidden subjects of instruction are equally unclear. Without a definition of "sexual orientation" in the Law's text, it is unclear whether it prohibits an assignment to draw a family tree or a kindergarten teacher reading her class a book that references a character's "mommy" and "daddy." Because sexual orientation and gender identity infuse all family and romantic relationships, references to "brother," "aunt," or "wife" can communicate information about gender identity or sexual orientation. It is unclear whether the Law prohibits the mention of a non-binary family member, or whether a high school student can offer a class presentation about LGBTQ+ historical events or

---

[2] The inconsistent actions of all Florida school districts in implementing the Law are relevant to demonstrating the vagueness of the law's text and the reasonableness of Plaintiffs' fears that they cannot predict or rely upon one particular interpretation when deciding whether or how to express themselves; thus, Plaintiffs include select examples of interpretation and implementation by both Defendant and non-Defendant school districts.

historical or current public figures, regardless of whether the figures are known for achievements unrelated to their sexual orientation or gender identity.

32.     Because the Law does not define "gender identity," a reasonable person cannot tell what type of instruction is prohibited.[3] Every person has a gender identity, whether or not it corresponds with their sex assigned at birth. It is unclear whether the Law bans a discussion on stereotypical gender roles or gender expression. For example, it is not clear whether a kindergarten teacher can still read the class a book where Jane wants to play football. Even if this is permitted, a reasonable person cannot tell where to draw the line. Surely the Law was not intended to ban all use of pronouns or gendered terms for people. But the Law does not address, for example, whether transgender students may request the use of accurate pronouns by teachers and other students in the classroom, particularly if such a change may require explanation to other students in the class.

33.     The Law also fails to clarify what constitutes "classroom instruction." The Law uses the term "instruction" instead of "curriculum." The preamble to the bill underlying the Law, Florida House Bill 1557, framed the Law broadly as "prohibiting classroom discussion about sexual orientation or gender identity." Multiple school districts, including SDIRC and OCPS, have also interpreted the Law to prohibit classroom "discussion," including things that may "elicit discussion" on the prohibited topics of sexual orientation and gender identity.

---

[3] Defendant school districts are already implementing inconsistent definitions for these terms. For example, at least one DCPS documents defines sexual orientation in terms of attraction to others and defines gender identity in terms of self-perception. On the other hand, at least one OCPS document defines sexual orientation in terms of self-identity and defines gender identity in terms of behavior that can be shown through evidence.

34.     Whether a teacher can answer a student's question about another student's family structure without running afoul of the Law is unclear. The Law is vague, leaving school districts to decide whether or not teachers and classroom visitors or chaperones, such as parents, must refrain from answering students' questions on the forbidden topics—to the extent those can even be ascertained. Similarly, it is unclear whether a teacher must censor students from discussing their own sexual orientation or gender identity, or that of their LGBTQ+ parents, family members, or friends, and whether or not to silence, censor, or even discipline students who do so.

35.     Florida's board-approved K-3 state education standards are replete with examples of assignments requiring instruction and discussion of family structures, familial relationships, historical individuals, and proper pronoun usage.[4] For example, a kindergarten theater standard requires students to "create a story about an everyday event involving family members and/or pets using body movements, sounds, and imagination."[5] A kindergarten social studies standard asks students to "compare children and families of today with those in the past."[6] A first grade social studies standard requires students to "create a timeline based on the student's life or school events, using primary

---

[4] "CPALMS is the State of Florida's official source for standards." Florida Department of Education, Standards & Instructional Support, available at https://www.fldoe.org/academics/standards/.

[5] CPALMS, Standards, Theater Standard TH.K.C.1.1, available at https://www.cpalms.org/PreviewStandard/Preview/4210.

[6] CPALMS, Standards, Social Studies Standard SS.K.A.2.1, available at https://www.cpalms.org/PreviewStandard/Preview/2879.

sources."[7] The standard suggests examples of primary sources including "photographs, birth certificates, … and diaries."[8] English standards in grades 1-3 all require students demonstrate increasing awareness and use of proper pronouns.[9] A kindergarten English standard asks students to "describe familiar people … and, with prompting and support, provide additional detail."[10] The Law's vague and overbroad terms chill the participation of children with same-sex parents or transgender or non-binary family members in such assignments.

36.    These questions arise even if "classroom instruction" is limited to the designated classroom and class time. But without a definition, it is not clear that "classroom instruction" is so limited. The Law chills and censors speech between individual students, parents, and school personnel in numerous contexts, including during extracurricular activities, such as student-led GSAs and other clubs.

37.    The Law also creates uncertainty about the extent to which library books must be policed because they may constitute "classroom instruction." The Law has already caused Defendant school districts in at least Orange County and Palm Beach County to remove LGBTQ+ materials from their libraries. A policy adopted by Defendant School Board of Palm Beach County places library media specialists on the committee to review parent complaints under the Law, indicating that it deems library materials to fall

---

[7] CPALMS, Standards, Social Studies Standard SS.1.A.3.2, available at https://www.cpalms.org/PreviewStandard/Preview/2912.

[8] Id.

[9] CPALMS, Standards, English Language Arts Standard LAFS.3.L.1.1, available at https://www.cpalms.org/PreviewStandard/Preview/5926.

[10] CPALMS, Standards, English Language Arts Standard LAFS.K.SL.2.4, available at https://www.cpalms.org/PreviewStandard/Preview/5855.

within the scope of the Law. Defendant School Board of Palm Beach County has also put forth a proposed policy to restrict student access to library books and reading lists in grades K-3 "if such materials instruct on sexual orientation or gender identity" because of the Law. Guidance and forms implemented by both SDPBC and SDIRC since the effective date of the Law mandate that books be submitted to media specialists for review if "a character questions their own gender or sexual orientation." In guidance provided to district staff regarding compliance with the Law, OCPS instructed that books that "make written or pictorial reference" to sexual orientation or gender identity are prohibited from being accessible, including outside of the classroom.

38.     The Law chills schools from responding effectively to bullying based on a student's sex, sexual orientation, and gender identity. For example, in the proposed revision it made to its LGBTQ+ student support guide in response to the Law, DCPS removed guidance to teachers on how to respond to anti-LGBTQ+ bullying, including sample responses to students using "gay" as an insult. DCPS also has removed for legal review an anti-bullying video that taught middle and high school students how to support their LGBTQ+ peers and create a safe environment. SDPBC likewise has removed from its website a support guide for LGBTQ+ students that contained similar anti-bullying language and, on information and belief, is currently in the process of revising the guide due to the Law.

39.     For grades other than K-3, the Law restricts instruction where not "age-appropriate or developmentally appropriate." These terms are not defined, despite the fact that their interpretation will likely vary widely between grade levels, and no standards or guidance is due until June 30, 2023. Although no guidance has yet been issued, as of

September 20, 2022, parents can use the state-issued form "Parental Request for Appointment of a Special Magistrate" to allege a school district's violation of this restriction. Until then, schools are incentivized to chill and censor speech, expression, and access to information according to the standard of the parent most hostile to the existence of LGBTQ+ people, simply to avoid a lawsuit. For example, at least two Florida school districts have restricted content from 12th grade curricula due to concern that such content may violate the vague restrictions imposed by the Law.

40.     The Law is vague as to whether a student merely discussing their sexual orientation with their teacher constitutes a "change in the student's services or monitoring related to the student's mental, emotional, or physical health or well-being and the school's ability to provide a safe and supportive learning environment for the student." The phrase includes multiple terms that are undefined and unclear, including "well-being," which is used repeatedly throughout subsections 8(c)(1) and 8(c)(2). For example, on July 11, 2022, Defendant School Board of Duval County adopted a procedural policy for parental notification but provided no clarification on the meaning of the vague terms.

41.     On June 15, 2022, Defendant School Board of Palm Beach County adopted Policy 5.735 implementing the Law. Despite the vagueness of various terms described above, including "classroom instruction," "sexual orientation," and "gender identity," Policy 5.735 does not define those terms. Instead, it inserts additional vagueness by subjecting employees to disciplinary action for "attempt[ing] to encourage" a student to withhold information from their parents. Teachers in Palm Beach County schools have already been instructed to review all classroom books and remove any that instruct on sexual orientation or gender identity for grades K-3 and any that are not age or developmentally

appropriate for grades 4-12, including those about which the teacher is "unsure." A member of Defendant School Board of Palm Beach County stated that avoiding litigation from parent complaints is one of the district's "biggest concerns" because they need "to be fiscally responsible."[11] On information and belief, a SDPBC administrator who questioned the decision to remove books before standards were put in place has been transferred and demoted.

42.     On August 29, 2022, SDIRC adopted Policy 5710, "Student and Parent Complaints," implementing the Law. The District Policy sets forth the rights of parents to exercise the private right of action afforded by the Law, and details the steps for going about doing so for "[a]ny parent or legal guardian with a concern regarding the implementation of the provisions of F.S. 1001.42 (8)(c) at their child's school." The OCPS official district website similarly reflects a recent procedure implementing the Law, a procedure related to "alleged violations of Parental Rights in Education (HB1557) (2022)."

## III.    The Law was enacted to shame and silence LGBTQ+ children and families, stigmatizing them, subjecting them to adverse treatment, and barring them from full and equal participation in their school communities.

43.     The Law's purpose is to silence LGBTQ+ people and their families based on their identities and the content and viewpoint of their speech and expression. The Law's sponsor in the Senate stated that the law addresses concerns about students "coming out" as LGBTQ+ in school, and parents' concerns about a "departure [from] core

---

[11] See WLRN, Palm Beach County school district tells teachers to review classroom library books for references to racism, sexism and oppression, https://www.wlrn.org/education/2022-06-09/palm-beach-county-teachers-are-being-told-to-review-classroom-library-books-for-references-to-racism-sexism-oppression (last visited November 3, 2022).

belief systems and values."

44.     The Florida Governor's spokesperson has called the Law an "Anti-Grooming Bill" and has stated that any person opposed to the law is "probably a groomer." And the Florida Governor has articulated the Law's purpose of suppressing particular viewpoints across all grade levels by stating that "things like woke gender ideology have no place in the schools, period."

45.     The Law's imprecision exacerbates its chilling effect, pushing school districts to broadly restrict speech about LGBTQ+ students and families under threat of private lawsuits and accompanying expenses.

46.     Unsuccessful amendments proposed during debate on underlying Florida House Bill 1557 show that the legislature intentionally failed to clarify the Law's vague terms and intended to target the LBGTQ+ community. Most tellingly, proposed Amendment 973790 would have replaced "sexual orientation" and "gender identity" with "human sexuality" and "sexual activity." Its sponsor clarified that the amendment was designed to avoid discrimination against LGBTQ+ children: "If the intent of this bill isn't to marginalize anyone, let's make sure we aren't by passing this amendment." As one colleague noted: "The other advantage to the senator's amendment is that it takes out the words that target a minority group. . . . We do not want children and others to get the impression we think it is wrong to be gay or to be transgender." Critically, the bill's sponsor in the Senate stated that the amendment should not be supported because it "would significantly gut the effort of the bill." The amendment failed.

47.     Proposed Amendments 734244 and 600607 to Florida House Bill 1557 would have clarified that the Law "does not apply to any discussion between a student

who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBTQ and their peers." The proposed amendments failed. And amendment 290096, which would have defined "sexual orientation" and "gender identity" to clarify that the terms encompass identities other than LGBTQ+ identities, such as heterosexuality, also failed.

48.     Proposed amendment 755282 to Florida House Bill 1557 would have limited the Law's definition of "classroom instruction" to exclude discussions of family structures, objective historical events, and bullying prevention; student IEP or 504 plans; facilitating discussion between students; and asking and answering questions by students. The proposed amendment failed.

49.     The Law's nebulous and overbroad terms achieve the intended, discriminatory goal of erasing all mention of LGBTQ+ people and families in schools. The Law creates lose-lose situations for parents, teachers, and students. A school either can avoid any conversation acknowledging LGBTQ+ people or face a lawsuit by any parent hostile to the presence of LGBTQ+ students and families.

50.     In practice, the Law tells all children that there are certain subjects about which they cannot learn, and it tells all people that LGBTQ+-identifying people are not human beings worthy of acknowledgment and discussion. It interferes with the ability of LGBTQ+ students to obtain affirming support services in school, undermines protections from bullying based on their identities and the structure of their families, and deprives them of literature and resources vital to their development, education, and mental health.

**IV.     The Law harms Plaintiffs by impermissibly chilling speech and expression, obstructing communications, sowing confusion, depriving young people of vital support services, and stigmatizing children.**

**1. The Law has harmed and will continue to harm Plaintiffs Jennifer and Matt**

**Cousins, and Plaintiffs P.C., M.C., S.C., and N.C.**

51.     Jen and Matt Cousins are the parents of four children.  The family lives in Orlando, Florida.

52.     Jen and Matt's children are N.C., who is 14 years old and is in the ninth grade; S.C., who is 13 years old and is in the seventh grade; M.C. who is 8 years old and is in the third grade; and P.C., who is 7 years old and is in the first grade. Each of the children attends public school in OCPS.

53.     Jen and Matt's child, S.C., came out as non-binary last year, and uses "they/them" pronouns. The family supports S.C. completely, and loves that S.C. is comfortable in their own skin and confident in who they are.

54.     Jen and Matt have views that some individuals in OCPS, including parents, find controversial, unpopular, offensive, or unwelcome. They believe LGBTQ+ people are part of the fabric of their community and deserve to be discussed equally in school. They want their children to be able to freely discuss their family. They want S.C. to be able to be open about their identity, and they want their other children to be able to speak openly about their non-binary sibling. The Law, and OCPS's duty to enforce the Law, makes N.C., S.C., M.C., and P.C. reluctant and afraid to express their opinions and acknowledge their family structure.

55.     Jen and Matt want to be able to speak freely about their family, including their non-binary child, and to encourage others to understand the diversity of their family. The Law, and OCPS's duty to enforce the Law, forces them to self-censor and miss out on important opportunities.

56.     For example, Jen wants to participate in "Teach-In Week" during the week of November 14, 2022, and similar events in the future. During that week, parents are

invited to talk with students in the classroom about their careers and other topics, including by reading a book, sharing an educational experience, or talking about a favorite vacation, hobby, or teacher who touched their life. Jen wants to bring in and read a book that is written for K-3 children, which helps others better understand her family. The book is called "Pride: the Story of Harvey Milk and the Rainbow Flag," by Rob Sanders. Jen fears she will not be allowed to do so because the Law prohibits "third parties" from discussing sexual orientation and gender identity at school, even though other parents will be able to present similarly age-appropriate books about their families or experiences.

57.   Jen and Matt wish for their children to be able to access information that depicts diversity and literature that reflects their lived experiences. For example, they want S.C. and their siblings to be able to seek out a book in a school library that contains a non-binary character, so that they can better understand that S.C. is not alone. OCPS's enforcement of the Law prevents their children from accessing such information. Jen and Matt's fear is grounded in documents created and utilized for training by OCPS, as well as the children's personal experiences in the classrooms where these books have been removed.

58.   For example, an OCPS document recently utilized in training at the school district, "Legislative Updates May 2022," instructs staff that library "books that make written or pictorial reference to sexual orientation or gender identity should not be available to K-3 students to browse or check out" and further states that "hundreds" of materials will need to be reviewed. An OCPS document titled "Legislative Media Center Changes," states that "we encourage elementary media specialists to conduct a review of books available to students in grades K through 3, making note of any books that

include written or pictorial references to sexual orientation or gender identity." An OCPS document titled "Instructional Materials Library Media 2022 Legislation" poses the question: "A book is used for instructional purposes to teach about families. The book includes references and pictures of a family with two moms and two dads. Since the lesson is about families and not sexual orientation or gender identity, is it okay to use that book?" It answers: "Book can be viewed as introducing sexual orientation to K-3 kids if it is used as part of instruction in K-3."

59.    N.C. wants to read books that help him understand his sibling's experience as a non-binary adolescent, but because of the Law, OCPS is reviewing all books containing LGBTQ+ characters and they are unavailable for students to access.

60.    Jen and Matt have always fostered empathy and inclusivity in their children, and they want their children to learn in school the importance of representation, especially for people from marginalized communities. They have witnessed how the Law has increased demands from members of their community to erase LGBTQ+ voices and stories from the literature currently available to young people in their schools.

61.    S.C. is completely "out" at school and is an active member of their school's GSA student club. The GSA has been a lifeline for S.C. at school, and provides a sense of belonging, community, and acceptance for S.C. and other LGBTQ+ students. S.C. wants to have the same experiences and opportunities members of the GSA have had in previous years. For example, last year GSA students were taken on a field trip to the Orlando Art Museum for a free family day, where they were able to learn about the contributions of LGBTQ+ artists to art history. This year, the students do not think this will be possible because of the Law's operation, which intimidates participants and required

sponsors.

62.     The Law attacks not only S.C. but the entire Cousins family. All members of the family are proud of S.C. and wish to be able to speak openly and with love for S.C. in school, including by explaining S.C.'s non-binary identity to friends, classmates, teachers, and others. S.C. wishes to advocate for themself and asks to have others refer to them with they/them pronouns. The Law paints their family as abnormal. The law shames, chills, and silences such communications by threatening to label them as "inappropriate"; and it portrays S.C., a kind and thoughtful child, as someone who should be feared or ostracized. For example, given the uncertainty of the Law, Jen and Matt's youngest children, Plaintiffs P.C. and M.C., who are in first and third grade, are afraid they will get in trouble for speaking about their own sibling in class and explaining their sibling's gender identity and pronouns. P.C. and M.C. are also afraid their teacher will not be able to support their speech by answering other student's questions about their sibling's identity and pronouns, leaving them open to bullying for having an LGBTQ+ family member.

63.     Jen and Matt proudly display and preserve the school projects and artwork completed by their children, and in looking over the beautiful keepsakes from S.C. and N.C.'s K-3 years, they realize that P.C. and M.C. may not be able to complete the same kinds of assignments. For example, S.C. completed a family tree in kindergarten that included pictures and details about their family members, and a first-grade project, "About [S.C.]," that stated, "I have 1 sister and 2 brothers." Jen and Matt worry what their two youngest children will be prohibited from sharing in similar assignments, or coerced into not sharing details about their family, because S.C. is neither their "sister" nor their

"brother." A first-grade assignment asked N.C. "Who is worth more to you than gold?" N.C. drew pictures of mom, dad, M.C., and S.C. The K-3 curriculum is full of instruction on and discussion about family, and Jen and Matt do not want their two youngest children to be excluded from the benefits of these assignments and discussions due to the censorship and intimidation imposed by the Law.

64.     For Plaintiff S.C., the Law sends a particular message of shame, telling them that there is something so wrong with them that they and their identity cannot be discussed in a classroom setting, and that it is in fact "inappropriate" to do so. The Law coerces them to stay silent if they don't want to be labeled as "inappropriate." Internalizing this message at such a young, formative age results in profound stigma and dignitary harm.

65.     For Plaintiffs M.C. and P.C., the Law tells them that their sibling is someone who cannot be spoken about at school, that their sibling is wrong for who they are, and that they and other children in grades K-3 need to be protected from people like their own sibling. This notion being instilled in their children though the district's implementation of the Law is contrary to everything that Jen and Matt have raised them to understand, and antithetical to the values that they, as parents, have instilled in their children.

66.     Jen and Matt are concerned the Law will require them to explain to their two youngest children why their teacher may have to shut down conversations about their non-binary sibling while permitting conversation about other siblings. This concern has grown as documents and guidance from the school district have continued to surface. For example, a training for OCPS staff "recommended that the safe space stickers be removed from K-3 classrooms so that classroom instruction did not inadvertently occur

on the prohibited content of sexual orientation or gender identity." Similar guidance was provided regarding teachers with same-sex partners displaying family photos and teachers' clothing with affirming or "pride" messages, focusing on teachers avoiding anything that may elicit prohibited discussion on sexual orientation or gender identity. Jen and Matt are also aware that other districts have interpreted the Law to require the removal of "safe space" stickers and similar messages of inclusion for LGBTQ+ students. For instance, in September, 2022, Pasco County School District updated their official website to state: "Due to recent legislation concerning parental rights, our school district will no longer utilize 'safe spaces' and will no longer display 'safe space' stickers[,]" explaining it could result in a parent bringing "an action in court for 'damages . . . attorney fees and court costs' stemming from a violation of these parental rights."

67.     This school year, since the Law went into effect, S.C. has experienced bullying based on gender identity that they had never before been subjected to at school. S.C. fears that if they ask a teacher to address anti-LGTBQ+ bullying in the classroom and the teacher is unable to address the bullying because of the Law, the bullies will feel validated and the bullying will get worse.

68.     On information and belief, a group of anti-LGBTQ+ parents requested the names of every GSA club sponsor at public schools in the state of Florida, including those in the OCPS, to weaponize the Law to get those teachers fired. S.C. and N.C. feel that their schools are not safe this year, particularly with the targeting of GSAs and affirming and welcoming items such as safe space stickers and LGBTQ+ inclusive library materials under the Law. Removal of supportive groups and messages is also likely to embolden those students, and even parents, who seek to harass them or do them harm.

69.     Teachers have always been one of the most valuable and important resources for S.C., N.C., P.C., and M.C. Jen and Matt know that the Law has created a barrier to building positive relationships and interactions between their children/themselves and the teachers tasked with educating their children. Their two youngest, M.C. and P.C., have already expressed concerns about getting in trouble themselves, as well as "getting their teachers in trouble" by talking about their non-binary sibling in classroom settings. Without safe space stickers, M.C. and P.C. do not know which teachers would be supportive resources for them at school.

**2. The Law has harmed and will continue to harm Plaintiff Will Larkins.**

70.     Will is a senior at Winter Park High School in Orange County, Florida, a part of the OCPS. He identifies as gay and non-binary and is the president and a co-founder of his school's Queer Student Union.

71.     Will is openly a member of the LGBTQ+ community and has views some individuals in the OCPS community, including parents of students, find controversial, unpopular, offensive, or unwelcome in schools.

72.     Will believes no one should be discriminated against on the basis of sexual orientation or gender identity, that LGBTQ+ people should have equal rights, and that learning about the history of LGBTQ+ civil rights is important and appropriate in schools. He believes students should have their affirmed names and pronouns respected at school. Some people disagree with these opinions.

73.     Will wants to learn about LGBTQ+ history and wants to engage in debate and discourse with his teachers and peers about critical moments in United States history that include LGBTQ+ individuals or issues. But the Law tells him that LGBTQ+ identities and existence are things he should not speak about and that are not "appropriate" for the

classroom.

74.     Will attends a public high school because he wants to learn in an environment where students and teachers bring diverse experiences to the table, and where students and teachers are free to engage in debate about different ideas and issues.

75.     Because he is a member of the LGBTQ+ community and an advocate for LGBTQ+ rights, Will wants to speak passionately and repeatedly about these topics. He wants to point out the flaws in fellow students' arguments and encourage them to understand his perspective and lived experience so they can better understand these important issues.

76.     Will wants to speak about LGBTQ+ issues and educate his peers because of his personal experiences. Will knew from a very young age that he was different from other boys his age, and he struggled for acceptance both internally and externally with his peers. Will lacked the language to understand what it was about him that made him different. He was not familiar with the concepts of sexual orientation or gender identity and expression that would help him understand why he felt the way he did. By the fourth grade, he was convinced that he was broken. He did not know how to respond or defend himself when he was bullied by other kids, and because he did not know anyone who shared his experience, he assumed that what the bullies said about him was true.

77.     Will came to understand what LGBTQ+ meant the summer before seventh grade. With that life-changing understanding came the language to describe this critical aspect of his identity and the realization that he was not alone in the way that he felt. He finally believed that he was not abnormal or wrong, that he was not a tragic anomaly or a

strange fluke that needed to be fixed. It was as if a weight was lifted off his shoulders. Will then became fascinated with learning about LGBTQ+ history and culture, and the more he learned about other people's experiences, the more he came to understand himself and to love himself. Through education on these concepts, he developed a sense of self-worth, community, and belonging.

78.     The Orange County School Board's enforcement of, and authority to enforce, the Law makes Will reluctant to openly express his opinions.

79.     Will does not fully express himself or talk about LGBTQ+ issues in class because he fears he will be censored or get in trouble. His fears are grounded in his own personal experiences at his high school, including being disciplined after educating his fellow students on the Stonewall Uprising (an uprising of LGBTQ+ people in New York City in 1969 that is commonly understood to mark the beginning of the modern LGBTQ+ civil rights movement) in response to the Law's passage.

80.     After the Law's enactment this past spring, Will's history class was studying pivotal historical events from the 1960s and early 1970's. Will asked his teacher if the class was going to learn about the Stonewall Uprising. His teacher responded that she was not familiar with Stonewall. Will created and delivered a Google Slides presentation on the Stonewall riots to his class on the significance of the uprising to LGBTQ+ history. Will's friend, who was also a student in the class, filmed the presentation. The video of Will's lesson went viral on social media, and an article about it was published in a national news outlet.

81.     After the news story was published, Will's history teacher complained to administrators. School officials then placed Will under "investigation" for the presentation

30

on the Stonewall Riots. Ultimately, he was told that he was being moved to another history class, and that he had no choice in the matter. Given that it was close to the end of the year and moving into a new and unfamiliar class so close to finals was challenging, Will's grades suffered in the new class as a result. Will's friend also was disciplined for filming his presentation.

82.     Will wants to do a presentation on the Stonewall Uprising this year, but he fears he will be disciplined and his teachers will lose their teaching certificates as a result. In October 2022, a new rule to mandate compliance with the Law was adopted, updating the code of conduct for Florida educators to include the language from the Law about sexual orientation and gender identity. The rule states that a "[v]iolation of any of these principles shall subject the individual to revocation or suspension of the individual educator's certificate, or the other penalties as provided by law."

83.     Will's fears are also grounded in watching other Florida school districts implement the same Law. For example, in September of 2022, the Miami-Dade County School Board cited the Law as the basis for their vote against giving teachers the option to teach the landmark pivotal Supreme Court cases *Obergefell* and *Bostock* in 12th grade social studies classes.

84.     Will also has witnessed an increase in anti-LGBTQ+ bullying and harassment since the Law's enactment. During a student-organized walk-out, for which Will had sought and obtained permission from the principal in advance, a student walked up and tore a pride flag out of the hand of another student and ripped it up. A second student stomped on a pride flag they took from another student who had been holding it. Will has also experienced more bullying against him personally since the start of the new

school year after the Law went into effect than he ever experienced previously. For example, recently a group of students chased Will and his sister, who also identifies as LGBTQ+, after a football game, hurling homophobic and transphobic slurs at them as they ran. Upon reporting this incident and others, rather than addressing the bullying itself, OCPS offered Will the option to transfer to another school. Will feels less safe at his OCPS school as a result of the Law.

85.     As President of the Queer Student Union, Will has spoken to his fellow club members about how they feel in light of the Law. Many have also experienced a significant increase in bullying based on sexual orientation and gender identity. The rhetoric perpetuated by the state in support of this bill, including the Governor's Press Secretary calling it the "Anti-Grooming Bill" and stating that those opposed to the bill, like Will, support "the grooming of 4-8 year old children," is being mimicked by students who are increasing their bullying of and hostility toward LGBTQ+ students.

86.     Because LGBTQ+ teachers are also self-censoring under the Law and risk violating the Law by supporting students, more students now rely on peers such as Will for support, especially in his role as president of the Queer Student Union student group. It is a heavy burden, and one that would be reduced if the Law was enjoined.

87.     Teachers have been one of the most wonderful resources for Will and for other LGBTQ+ students who are struggling to find their place at school. One supportive teacher can make all the difference, as Will experienced when his teacher comforted him regarding an incident at a Halloween party where his male classmates threatened him with physical violence and shouted homophobic slurs. The teacher provided safety for Will at school when he most needed it, and Will fears that under the Law, LGBTQ+

students like him will be deprived of this safety as teachers will have to actively censor themselves.

88.     Will wants to be himself in school. He wants to talk about LGBTQ+ history without fear of being penalized again. As a high school senior with college prospects on the horizon, Will cannot afford to be disciplined and have his grades suffer for speaking accurately in class about relevant LGBTQ+ historical and current events. He wishes to acknowledge to other students, to teachers, and to his community that he is queer. He wants to go to school and not be shamed and silenced simply for who he is.

**3. The Law has harmed and will continue to harm Plaintiffs David Dinan, Vik Gongidi, and Plaintiffs K.R.D. and R.R.D.**

89.     David and Vik are a married couple. The freedom to marry under Florida law was a defining moment for them in being officially recognized in the same way as other couples.

90.     In 2013, David and Vik adopted K.R.D., who is currently 10 years old. In 2014, they adopted R.R.D., who is currently 8 years old. They have had K.R.D. in their family from approximately 4 months old and R.R.D. from a few days old.

91.     K.R.D. is in the fourth grade and R.R.D. is in the third grade. Both attend public school in the SDIRC.

92.     David and Vik want their children to feel supported and safe at their school. David, Vik, K.R.D., and R.R.D. feel strongly that all families, including their own, should be respected and discussed equally in school. They want to be able to speak freely about their family and encourage others to understand their family.

93.     The Law makes David and Vik reluctant to fully express their opinions and acknowledge their family structure. For example, David has chaperoned multiple field

trips and wishes to do so for both K.R.D. and R.R.D. in the future. In the past, David has been open about mentioning Vik and wants to continue to express his opinion that their family is something he and his children can be proud of. But on a field trip with K.R.D.'s class in October 2022, David did not fully express himself or mention Vik when interacting with students and other parents because of the Law. David feared his expression could be considered prohibited "not age-appropriate" instruction by a "third party" under the Law. David also feared that reference to Vik could invite questions from K.R.D.'s classmates that would put him, K.R.D., or a teacher in a position to run afoul of the Law by explaining the family's structure. He did not want K.R.D. to witness a teacher struggle with a response, silence K.R.D.'s classmates, or be penalized for affirming K.R.D.'s family, so he censored himself. Although David has expressed himself freely in the past, the Law has changed his behavior because he feels that the Law has given the school and other parents a state-sanctioned pass to target and intimidate him and his family. His fears are grounded in personal experiences on campus and in the school community. The chill, shame, and stigma caused by the Law harms David and Vik, in addition to their children.

94.     Even if K.R.D. and R.R.D. were allowed to reference the fact that they have two dads, and that their dads are gay, the Law nonetheless restricts a teacher's ability to answer questions by classmates the way they would about another child's family, explain that their family is as worthy as any other family, and protect K.R.D. and R.R.D. from feeling alone, ashamed, exposed, and bullied as a result of their family structure. K.R.D. and R.R.D. have had to guess how much detail they could put into family-related assignments without being labeled inappropriate under the Law. They will continue to

have to debate and guess how much detail they can share as they complete future assignments, as long as SDIRC is required to enforce the Law. The Law harms their children, threatening to label them and their family as a topic too shameful or "inappropriate" for their teachers and classmates to discuss.

95.     David, Vik, K.R.D., and R.R.D. now censor their appearance and speech at school and when they attend school events, avoiding reference to sexual orientation or other topic that might be deemed "inappropriate" by parents that could threaten to sue the school under the Law. For example, David now feels uncomfortable wearing LGBTQ-related shirts at school events as a result of the Law. K.R.D. and R.R.D. now steer away from wearing LGBTQ-related shirts that used to be some of their favorites on "dress down" days for charity. David is aware that he or his kids' wearing shirts to school celebrating the LGBTQ+ community could be considered by some as "gender ideology" or "grooming" that should be targeted for enforcement under the Law.

96.     Based on David's experience and involvement at previous school board meetings, he is particularly worried about the way this Law causes censorship of materials from K.R.D. and R.R.D.'s schools because of the content and viewpoint of these materials. For example, there was a recent effort by parents in his children's school district to remove over 150 books, including those that mentioned LGBTQ+ people. Before the Law was in effect, the school district was able to hear those concerns, undertake its review, and then decide that nearly all of those books—although described by some parents as "pornography"—were appropriate for school. But under the Law, the most extreme of those same parents may censor school instruction and books by threatening legal action for the inclusion of anything they deem "inappropriate," forcing schools to

adopt a standard of complete LGBTQ+ erasure to avoid costs and liability. R.R.D.'s teacher recently reported that she had to reduce the students' reading goals because of issues with accessing libraries and reading centers this year. K.R.D. and R.R.D. deserve to be able to access books that show that other children their age also have same-sex parents and David and Vik want them to be able to access those books in school.

97.     The enactment of the Law already has impacted the way in which mental health support services have been delivered to K.R.D. and R.R.D. Since the Law's passage, David has observed that school counselors are seeking additional permission from him before interacting with his children, and he worries that his children cannot access timely and appropriate services the way they have previously been able to do.

98.     The Law harms David and Vik and their children for the additional reason that the Law inhibits school officials' ability to respond effectively to anti-LGBTQ+ bullying and slurs targeting their children because their dads are gay and comprise a married same-sex couple.

99.     The Law prevents school officials from protecting students effectively because any reasonably supportive intervention may be characterized as violating the vague and overly broad Law, inviting lawsuits by private parties. This makes it less safe for their children to attend school. At its May 2022 meeting, as a result of the Law, Defendant School Board of Indian River County discussed proposals from at least one board member to completely rescind an LGBTQ+ Administrative Resource Guide that, since at least the 2019-2020 school year, has provided guidance to school administrators in establishing safe and inclusive schools and promoting academic success for LGBTQ+ students. The LGBTQ+ Administrative Resource Guide is under review and unavailable.

**4. The Law has harmed and will continue to harm Plaintiff CenterLink and its member centers.**

100.    CenterLink's mission is to strengthen, support, and connect LGBTQ+ community centers. CenterLink works to develop strong, sustainable community centers that provide LGBTQ+ people of all ages with the building blocks of well-being that all people need to thrive, such as healthy social connections, safe places to live and work, support to do well in school and prepare for careers, enriching cultural experiences, and timely health and mental health services. With over 300 member LGBTQ+ community centers across the country and internationally, including 27 in Florida, CenterLink assists newly forming community centers and helps strengthen existing centers through networking opportunities for leaders, peer-based technical assistance and training, and a variety of capacity-building services. CenterLink's efforts are based on the belief that LGBTQ+ community centers lay the foundation for a national movement working to ensure that all LGBTQ+ people can live happy and healthy lives in communities that honor and support them.

101.    LGBTQ+ community centers work very closely with their LGBTQ+ constituency and engage community leaders and decision-makers. These centers are often the only staffed non-profit LGBTQ+ presence in a given area and the first point of contact for people seeking information, coming out, accessing services, or organizing for social change.  According to CenterLink's survey of LGBTQ+ centers, over 60% provide some direct health services (including counseling, peer-led programs, and support groups, as well as physical health and other mental health services). At the same time, those centers remain thinly staffed: over 30% operate solely with volunteers, and over 60% employ five or fewer paid staff. CenterLink's members pay a sliding-scale

membership fee. Once a center becomes a member, it has access to services such as the CenterLink resource portal, newsletter, programming and listservs, annual leadership and staff conferences, and professional advice about operation and services.

102.    After the Law's passage, CenterLink staff spent an average of four to eight hours per week responding to calls from Florida member centers requesting assistance in interpreting the Law and creating educational materials about the law. Since the Law became effective on July 1, 2022, CenterLink staff continue to spend a couple of hours per week responding to member inquiries—including inquiries from member centers in Duval County, Orange County, and Palm Beach County—asking what the law means, what members can or cannot do, and how members can connect with teachers and school board members. CenterLink also has expended resources conducting two seminars for Florida members on this law since July 1, 2022, and is planning another for January 2023. CenterLink anticipates that these activities will be ongoing as long as the Law is enforceable.

103.    If CenterLink staff did not have to spend time responding to inquiries about the Law and helping member centers respond to its implementation, they would use those resources serving other member centers by connecting member centers with lawmakers, planning advocacy trainings, working on a healthcare enrollment awareness project, contributing comments to federal rulemaking processes, or reaching out to members to join their advocacy efforts. CenterLink also would like to and would be able to more evenly allocate its time between members in other states and countries rather than spending a disproportionate amount of time on Florida centers that are trying to determine how to operate under the Law.

104.    If the Law were enjoined and not enforced, CenterLink would be able to spend more time fulfilling its mission. The continued enforcement of the Law requires CenterLink to have ongoing discussions with members about the Law, and to collect information from its members about the status of the Law's local interpretation and enforcement. If the Law were not enforceable, there would be less uncertainty about what the Law means and less need for ongoing education and member support.

105.    Among the services provided to member centers by CenterLink is YouthLink, a program offers networking opportunities for youth center leaders and youth program staff, peer-based technical assistance and training, webinars on a variety of topics of interest to youth programming staff, a monthly resource e-newsletter, a member portal with documents, and templates. It also provides other practical assistance, including coaching and consultation for youth programming staff, needs assessment research, and a safe chat space for LGBTQ+ youth facilitated by staff at CenterLink and member centers nationwide. CenterLink receives funding from federal subcontracts, individual and corporate donors, and private foundations to support this work.

106.    An important aspect of CenterLink's mission is to strengthen its member centers' ability to support and empower LGBTQ+ youth, which member centers accomplish in part by communicating to young people that they are loved and supported, affirmed in their identities, confident in their future, and that they are valued assets in their communities. Many of CenterLink's member centers—including multiple centers in Florida—offer youth programs that bring LGBTQ+ teens together to create safer schools, support one another, build future leaders, and to have fun. These member centers also provide mental health services and resources to LGBTQ+ youth. When a youth seeks

support from a member center, staff at the center provide the young person with support, resources, and information. Member centers also receive a combination of public funding, individual and corporate donations, and financial support from private foundations.

107.    Some of CenterLink's member centers, including at least two Florida member centers, also assist school districts on policies and procedures to prevent bullying, including bullying based on students' LGBTQ+ identities. Multiple centers provide trainings in schools and facilitate the development and functioning of GSAs, which are youth-led organizations that seek to create safe spaces for LGBTQ+ youth and address anti-LGBTQ+ harassment, bullying, and discrimination in schools. Member centers act as a resource for students and teacher facilitators, which can include assisting with training and meeting facilitation, providing micro-grants for GSA events and materials, offering trainings for interested parents of LGBTQ+ youth on topics including how to provide a safe and supportive environment, and connecting local GSA youth leaders to national conferences. Many member centers also provide health and wellness services for LGBTQ+ teens, including access to HIV testing, linkage to care as needed, drop-in counseling services, and group support meetings both for LGBTQ+ youth and their families. Certain member centers also offer housing support services for homeless youth, including access to hot meals, shower and laundry facilities, bus passes, computer labs, and one-on-one staff support.

108.    When LGBTQ+ youth are unable to feel safe or unable to be themselves at school, they suffer. LGBTQ+ students who are victimized based on their identity are nearly three times more likely to miss school, have lower grade point averages, are twice as likely to report they have no post-secondary education aspirations, and have lower

self-esteem and higher rates of depression. These problems can be lessened by practices that foster an affirming learning environment. Youth who have a supportive school environment created by staff and administrators report fewer homophobic or transphobic comments, are more likely to report that school personnel intervene when issues arise, feel a greater sense of community, and are more likely to graduate high school.

109.   Research specifically links the presence of GSAs to greater feelings of school connectedness, positive youth development, and increasing sense of purpose, self-esteem, and agency among LGBTQ+ youth. GSAs also have been linked to improved public health outcomes for school-aged young people, including reduced risk across health outcomes related to HIV and other sexually transmitted infections, violence, illicit drug use and prescription drug misuse, and suicidal ideation. Prevention benefits from the presence of GSAs have been documented for non-LGBTQ+ youth as well as LGBTQ+ youth.

110.   The Law already has interfered with, and obstructed work performed by, CenterLink and several of its Florida member centers, frustrating the mission of CenterLink and these member centers, interfering with activities they wish to continue in furtherance of their missions and their obligations under federally-funded contracts, consuming and diverting their resources, and harming the LGBTQ+ youth that they serve.

   **a.  CenterLink member center in Duval County**

111.   The Jacksonville Area Sexual Minority Youth Network ("**JASMYN**"), a CenterLink member center in Duval County, provides training for parents and teachers on safe and supportive environments for LGBTQ+ students; assists DCPS on policies

and procedures for student support and anti-bullying; communicates with and provides support to GSAs and their advisors; and supports individual students directly referred from staff at DCPS. This center is subcontracted by Defendant School Board of Duval County to perform these services under a federal collaborative grant, and private donors and foundations provide additional funding support for its work.

112. Over the course of a long-standing relationship for at least the last five years, JASMYN received multiple referrals of students from DCPS. Within the first few weeks after the Law was passed, however, DCPS blocked at least one youth referral to JASMYN because the DCPS staff feared the referral might run afoul of the Law. Consequently, the center's staff were unable to follow up with this student, provide information, answer questions, and offer resources and assistance. Indeed, since passage of the Law, JASMYN has not received any referrals from any DCPS school. JASMYN expects this issue to continue as long as the Law is enforceable.

113. Over the course of the last nine years, employees of DCPS held regular meetings that enabled CenterLink's Duval County member center to plan teacher trainings, establish and maintain referrals, coordinate the collection of data that is required under grants, and meet other requirements for the upcoming school year ("LGBTQ Leadership Committee meetings"). After the Law's passage, and in anticipation of the law being in effect this school year, DCPS cancelled those standing meetings. Absent the Law, as in years past, the member center would have used those DCPS-led meetings to plan summer teacher training, identify prospective GSA teacher sponsors, and plan for a student leadership retreat, as it has done in prior summers. Because of the Law, the collaboration has been stalled and that work has been put on hold.

114.   JASMYN's ability to plan and meet with DCPS staff continues to be hindered since the Law took full effect. Since July 1, 2022, the LGBTQ Leadership Committee has met only once.  A meeting was planned for July to develop training under the new Law, but—unlike past meetings—no member of JASMYN staff was informed of the meeting time and date or invited to attend. No LGBTQ Leadership Committee meeting was held in August. A meeting was convened on September 22, 2022, by the Office of Equity and Inclusion, but few of the regular LGBTQ Leadership Committee members were present, especially those from DCPS that have historically represented seven DCPS departments, and the collaborative work has stopped.  JASMYN expects this harm to continue as long as the Law is enforceable.

115.   JASMYN wishes to continue speaking with and supporting teachers and students through this work.

116.   As part of its subcontracted work under the federal collaborative grant, JASMYN worked for many years with DCPS and other community stakeholders to create an LGBTQ+ student support guide so that students, including the member center's participants, could expect a safe environment at any school across the district. However, DCPS staff charged with updating the guide to comply with the Law have proposed to cut the length of the guide from 37 pages to 8 pages, removing critical sections including those that guide teachers in responding to name-calling and bullying of LGBTQ+ students and that provide guidelines to protect students' personal information about their sexual orientation and gender identity. These changes forced by the District's interpretation of the Law will leave students vulnerable to unequal treatment and harm.

117.   In the past, JASMYN (as part of the collaborative federal grant) had been in

contact with most or all of the GSA advisors for approximately 18-22 GSAs throughout DCPS, including at summer meetings leading up to the school year. This summer, by contrast, only two advisors attended the most recent meeting. They explained that they and their colleagues are afraid to communicate through school email accounts or otherwise about GSA involvement because of the Law. Several GSA sponsors in Florida school districts have expressed concern that the mere attendance at a GSA meeting by students could trigger the parental notification requirement under the Law. These problems have extended into the school year. In the past, JASMYN has been called into meetings with their DCPS partners to provide tandem support to students and teachers, including to support GSA development. Because communication with DCPS partners has been limited by the Law, JASMYN has been unable to communicate with interested teachers or students through these contacts as it has in the past. The DCPS Microsoft Teams page for LGBTQ+ contact persons at each school has been disbanded, and the new Microsoft Teams page for GSA sponsors is not an effective replacement because it is not widely used. JASMYN wishes to continue speaking with these advisors and potential advisors, and it expects the harm to its communications to continue as long as the Law is enforceable.

118.   The obstruction of JASMYN's work by DCPS in implementing the Law harms the center itself by rendering the center unable to fulfill all of its subcontracted obligations, in addition to frustrating its mission and diverting its resources. The Law has silenced JASMYN, prevented its staff from fully communicating with students, teachers, and school officials to the extent it has in the past to provide them with support, and otherwise obstructed its mission and its federally-funded work to support individual

LGBTQ+ students and GSAs.

119.   As a result of the Law, JASMYN has had to reallocate staff and program resources to increase online support and develop satellite locations for student support services. This diversion of resources has continued and will continue unless the Law is enjoined and not enforced.

120.   If the Law is enjoined, JASMYN could return to its traditional work in DCPS schools, resume direct communication with school employees, and connect with GSA groups. JASMYN would be able to rebuild communications and referrals, receive calls from schools regarding LGBTQ+ bullying, and provide supportive resources to students. Based on its long relationship and current agreement with DCPS, JASMYN is confident it would be able to resume its collaborative work absent the Law.

**b.  CenterLink member center in Orange County**

121.   Orlando Youth Alliance ("OYA") is a CenterLink member center in Orange County that also has experienced harm as a result of the Law. OYA operates facilitated peer-to-peer counseling sessions for LGBTQ+ youth. Before the Law's passage, these sessions averaged 7 to 10 youth in attendance. Since the Law's enactment, the number of student attendees at these sessions has doubled. Students at these sessions have stated that the Law has made them nervous and heightened their anxiety. Parents have sought out these services for their teens specifically because of the Law. As a result of the Law, their teens express no longer feeling as though they have an inclusive, welcoming, and safe environment at school. OYA expects this harm to continue as long as the Law is enforceable.

122.   To make clear that students have an alternate safe space at OYA despite

the Law, this member center has spent approximately $6,250 to advertise the availability of its services to LGBTQ+ youth, in addition to the resources expended as a result of greater demand for its counseling sessions. This increased demand for counseling sessions for youth in Orange County, and the enhanced need for advertising the existence of a safe space and availability of resources, have diverted funding away from other areas of focus. For example, OYA has historically provided monthly social, educational, and recreational activities to help their youth develop a core group of friends and peer supporters, as well as classes on LGBTQ+ history and culture, and assistance with scholarships and career exploration. Because of the Law, and its impact on LGBTQ+ youth in Orange County, OYA has had to divert resources away from these activities.

123.   If the Law was enjoined, OYA anticipates that demand for its support services would decrease because safe spaces at schools would be restored and would provide additional support for those youth as they have in the past. This would allow OYA to redirect resources and efforts to other programmatic areas and efforts.

### c. CenterLink member center in Palm Beach County

124.   Compass Community Center ("Compass") is a CenterLink member center in Palm Beach County that has experienced and continues to experience harm as a result of the Law and its implementation by SDPBC. As a result of the Law, Compass has had to divert significant resources to address the increased need for mental health services among the youth it serves, has been unable to rely upon teacher referrals for students in need of Compass' services, and has been impeded in its collaboration with SDPBC. Compass expects these harms to continue as long as the Law is enforceable.

125.   Since the enactment of the Law, Compass has experienced a significant

increase in demand for its mental health services, resources, and support for local young people and families. The Law has exacerbated a mental health crisis for LGBTQ+ youth, who—even before passage of the Law—were already four times more likely to attempt suicide or think about suicide than their non-LGBTQ+ peers. Compass staff have spent an inordinate amount of time and resources on mitigating the impacts of the Law on students' mental health and quelling the anxiety of youth and families.  The increased demand from LGBTQ+ youth and their families for direct services, driven by the Law, has exceeded the capacity of the center's staffing and funding. Given Compass's limited resources, directing a large percentage of the staff to address concerns raised by the Law has hindered Compass's ability to perform other program work, frustrated its mission, and hindered its ability to meet the needs of the LGBTQ+ community more generally.

126.   Compass has diverted resources from other core programmatic areas and services in order to meet the additional demand for youth mental health services since the Law went into effect. Compass spent significantly more money this year on youth mental health, forcing them to go over budget and use unrestricted funds on these services, which required them to divert resources from other areas such as events like Equality Prom, the Lavender Graduation ceremony, holiday dinners for youth and families, community events, and assisting families experiencing food insecurity. Compass expects this diversion of resources to continue.

127.   At least some teachers in SDPBC who previously would refer students and their families to Compass or direct them to resources provided by the center are no longer comfortable doing so in light of the Law's vague language, including the Law's parental notification requirements, interfering with the center's ability to communicate with students

who are not otherwise aware of the center. Since the start of the new school year after the effective date of the Law, these teachers have been warned by SDPBC that they will lose their license if they fail to comply with the Law. This fear among teachers has been exacerbated by the new rule promulgated by the Department of Education in October of 2022 reinforcing the Law's prohibitions regarding sexual orientation and gender identity in classrooms through the threat of "revocation or suspension of the individual educator's certificate, or the other penalties as provided by law."

128.   SDPBC has cancelled several long-standing diversity and inclusion trainings for teachers on LGBTQ+ history and curriculum inclusion, removed inclusive materials in high school courses from the curriculum and several books with LGBTQ+ content from all classrooms, and is revising affirming policies for LGBTQ+ students in response to the Law. For example, a teaching tool titled the "Genderbread Person," which is a component of the Human Growth and Development curriculum for high school students, was removed from curriculum materials in response to the Law. Further, teachers were instructed to restrict access to the books Call Me Max, I am Jazz, and Flamer, a list that has only grown since the effective date of the Law. Additionally, the "LGBTQ+ Critical Support Guide," for which Compass is one of the lead contributors, and which has long served as a vital resource for LGBTQ+ students in Palm Beach County's public schools, was removed from the website and revised in response to the Law's enactment, and since the Law went into effect it has again been removed from public access and revised to further ensure compliance with the Law. Finally, Compass has provided trainings in the past, and would like to be able to perform trainings in the future, for SDPBC staff relating to best practices for working with LGBTQ+ youth.

129.    If the Law was enjoined, Compass anticipates that school staff would resume student support and referrals to Compass for supplemental support and programming as they did before the Law was in effect, allowing Compass to serve youth as it has in the past and to reallocate its diverted resources back to its core programs. Specifically, this would permit Compass to return to the status quo where unrestricted funds were able to be used to support programmatic activities long deemed "rights of passage" for Compass youth members, including Equality Prom, Lavender Graduation, holiday dinners, community events, and assisting families with food insecurity. It would also allow Compass to resume offering critical trainings to SDPBC staff to assist them in better meeting the needs of SDPBC's LGBTQ+ youth.

130.    OCPS, SDIRC, DCPS, and SDPBC continue to implement the Law and the facts regarding implementation in each school district continue to evolve.

## COUNT I

### Deprivation of Freedom of Speech and Expression
### First Amendment to the U.S. Constitution
### 42 U.S.C. § 1983

131.    All Plaintiffs state this cause of action against SBOE Members, and reallege and incorporate by reference paragraphs 1-130 as if fully stated herein.

132.    Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C. state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference paragraphs 1-13, 17-18, 22-69, and 83 as if fully stated herein.

133.    Plaintiff Will Larkins states this cause of action against Defendant School Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12, 14, 17-18, 22-50, 58, 66, 68, and 70-88 as if fully stated herein.

134.    Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. state this cause of

Case 6:22-cv-01312-WWB-LHP   Document 82   Filed 11/03/22   Page 50 of 66 PageID 855

action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 17, 19, 22-50, 66, 68, 83, and 89-99 as if fully stated herein.

135.    Plaintiff CenterLink, on behalf of itself and its members, states this cause of action against Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and re-alleges and incorporates by reference paragraphs 1-12, 16-18, 20-50, 66, 68, 83, and 100-130 as if fully stated herein.

136.    All Plaintiffs seek preliminary and permanent injunctions, and challenge the Law, and any action by Defendants or their agents seeking to implement it both facially and as applied to them.

137.    In addition to the affirmative implementation efforts referenced in paragraphs 131-136 above, Defendants School Board of Orange County, School Board of Indian River County, School Board of Duval County, and School Board of Palm Beach County each have the authority to enforce the Law within their respective school districts.

138.    The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983, provides in part that the government "shall make no law . . . abridging the freedom of speech."

139.    The Law impermissibly chills the exercise of all Plaintiffs' constitutionally protected speech, based on the content and viewpoint of their speech and is therefore unconstitutional under the First Amendment.

140.    Discrimination against speech based on its content and viewpoint is a

violation of the First Amendment. Efforts to suppress speech based on the government's opposition to the speaker's view are unconstitutional absent narrow tailoring in service of a compelling justification.

141.   The purpose and effect the Law is to chill and suppress constitutionally protected First Amendment activity by targeting specific content and viewpoints for suppression. As its legislative history indicates, the Law is a façade for viewpoint-based discrimination and is therefore facially unconstitutional under the First Amendment.

142.   In pre-enforcement First Amendment challenges to laws, regulations, or policies that chill or suppress speech, the injury requirement is loosely applied because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced. Litigants who are being chilled from engaging in constitutional activity suffer a discrete harm independent of enforcement, and that harm creates a basis for jurisdiction. Plaintiffs assert pre-enforcement challenges to the Law, in addition to challenging actions by Defendants or their agents seeking to implement it.

143.   A First Amendment plaintiff has standing when the operation or enforcement of a challenged law, regulation, or policy would cause a reasonable person to self-censor, even where the policy falls short of a direct prohibition against the exercise of First Amendment rights. Although the threat of formal discipline or punishment is relevant to the inquiry, it is not decisive. The fundamental question is whether the challenged policy objectively chills protected expression. Defendants' authority to impose sanctions on Plaintiffs for engaging in prohibited speech may be sufficient to prove the requisite chill but is not necessary because informal sanctions, such as coercion, persuasion, and intimidation can sufficiently inhibit expression to violate the First

Amendment and provides Plaintiffs with standing to sue.

144.   The Law on its face, and the manner in which the Defendants are implementing the Law, censor messages of inclusion, affirmation, and support with respect to students' LGBTQ+ sexual orientation and gender identity and are therefore unconstitutional under the First Amendment.

145.   Plaintiffs Jen Cousins, Matt Cousins, P.C., M.C. S.C., N.C., Will Larkins, David Dinan, Vik Gongidi, K.R.D., and R.R.D. have engaged in affirming speech and expression concerning their own or others' sexual orientation and gender identity in school contexts and with students, and wish to continue to do so. These Plaintiffs already have been chilled and/or forced to self-censor by taking care not to mention their own or a family member's sexual orientation and/or gender identity in school contexts when they otherwise would engage in such speech and expression as a result of the implementation of the Law and enforcement authority of Defendants School Board of Orange County and School Board of Indian River County. The Law impermissibly chills the exercise of these Plaintiffs' constitutionally protected speech and expression, based on content and viewpoint.

146.   Plaintiff CenterLink's members have engaged and want to continue engaging in speech that affirms students' sexual orientation and gender identity in communications with school officials, parents of LGBTQ+ students, and students themselves. Plaintiff CenterLink's members wish to continue engaging in speech that affirms students' sexual orientations and gender identity and believe that their communications and the information they provide to students, parents of LGBTQ+ youth, and school staff, are critical to their mission and the well-being of students.

147.   The decision by Plaintiff CenterLink's members to communicate a message of inclusion, affirmation, and support with respect to students' LGBTQ+ sexual orientation and gender identity—consistent with their mission—constitutes protected First Amendment activity.

148.   The Law, as enforced by Defendant School Boards of Duval and Palm Beach Counties, has penalized Plaintiff CenterLink's members by preventing their staff from engaging in affirming and inclusive speech and communications about sexual orientation and gender identity; the Law, on its face and as enforced by Defendant School Boards of Orange and Palm Beach Counties, has penalized Plaintiff CenterLink's members by forcing them to spend additional resources on the mental health of young people at these school districts; and Defendant School Board of Duval County has penalized a Plaintiff CenterLink's member by interfering with its ability to comply with certain grant obligations and to seek future funding to do this mission-driven work.

149.   As a direct and proximate result of Defendants' authority and conduct (including enforcement of the Law), Plaintiffs have suffered and will continue to suffer irreparable harm and damages.

## **COUNT II**

### **Right to Receive Information and Ideas**
### **First Amendment to the U.S. Constitution**
### **42 U.S.C. § 1983**

150.   Plaintiffs P.C., M.C., N.C., S.C., Will Larkins, K.R.D., and R.R.D. (collectively, "Plaintiff Students") state this cause of action against SBOE Members, and reallege and incorporate by reference paragraphs 1-130 as if fully stated herein.

151.   Plaintiffs P.C., M.C., N.C., and S.C. state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference

paragraphs 1-13, 17-18, 22-69, and 83 as if fully stated herein.

152.   Plaintiff Will Larkins states this cause of action against Defendant School Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12, 14, 17-18, 22-50, 58, 66, 68, and 70-88 as if fully stated herein.

153.   Plaintiffs K.R.D., and R.R.D. state this cause of action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 17, 19, 22-50, 66, 68, 83, and 89-99 as if fully stated herein.

154.   The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983, protects a student's right to receive information and ideas.

155.   A student's constitutional right to receive information is violated when a law, its enforcement, or an officials' exercise of discretion deprives a student access to ideas, instruction, debate, books, and other materials is curtailed for narrowly partisan or political considerations, animus, or for reasons not reasonably related to legitimate pedagogical concerns.

156.   The Law, its enforcement, and the exercise of discretion by Defendants SBOE Members, School Board of Orange County, and the School Board of Indian River County violate Plaintiff Students rights to access information and ideas in violation of the First Amendment. More specifically, Plaintiff Students are deprived of ideas, instruction, debate, books, and other materials concerning the sexual orientation and gender identity of LGBTQ+ people, even when such information serves essential pedagogical purposes.

157.   The Law's restrictions on students' rights to receive information and ideas concerning sexual orientation and gender identity are unrelated to legitimate pedagogical

concerns, and serve no other legitimate state purpose. Instead, the Law is rooted in animus against LGBTQ+ individuals, as demonstrated by the public record and by its enforcement to bar only discussion and recognition of LGBTQ+ people and issues, while imposing no restrictions on the discussion of heterosexual and non-transgender people and issues. The Law is also the result of partisan or political decision-making.

158.   As a direct and proximate result of Defendants' authority and conduct (including enforcement of the Law), Plaintiffs have suffered and will continue to suffer irreparable harm and damages.

### COUNT III

**Overbreadth**
**First Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**

159.   All Plaintiffs state this cause of action against SBOE Members, and reallege and incorporate by reference paragraphs 1-130 as if fully stated herein.

160.   Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C. state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference paragraphs 1-13, 17-18, 22-69, and 83 as if fully stated herein.

161.   Plaintiff Will Larkins states this cause of action against Defendant School Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12, 14, 17-18, 22-50, 58, 66, 68, and 70-88 as if fully stated herein.

162.   Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. state this cause of action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 17, 19, 22-50, 66, 68, 83, and 89-99 as if fully stated herein.

163.   Plaintiff CenterLink, on behalf of itself and its members, states this cause of

action against Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and re-alleges and incorporates by reference paragraphs 1-12, 16-18, 20-50, 66, 68, 83, and 100-130 as if fully stated herein.

164.    The First Amendment overbreadth doctrine is applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983.  A law may be invalidated as overbroad when a substantial number of its applications are unconstitutional, judged in relation to any permissible applications of the statute.

165.    Because a substantial number of the applications of the Law are unconstitutional, judged in relation to its legitimate sweep, the Law is also overbroad, and its enforcement should be enjoined.

166.    As a direct and proximate result of Defendants' authority and conduct (including enforcement of the Law), Plaintiffs have suffered and will continue to suffer irreparable harm and damages.

## COUNT IV

**Deprivation of Due Process of Law: Void for Vagueness**
**Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**

167.    All Plaintiffs state this cause of action against State Board Members, and reallege and incorporate by reference paragraphs 1-130 as if fully stated herein.

168.    Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C. state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference paragraphs 1-13, 17-18, 22-69, and 83 as if fully stated herein.

169.    Plaintiff Will Larkins states this cause of action against Defendant School

Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12, 14, 17-18, 22-50, 58, 66, 68, and 70-88 as if fully stated herein.

170.    Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. state this cause of action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 17, 19, 22-50, 66, 68, 83, and 89-99 as if fully stated herein.

171.    Plaintiff CenterLink, on behalf of itself and its members, states this cause of action against Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and re-alleges and incorporates by reference paragraphs 1-12, 16-18, 20-50, 66, 68, 83, and 100-130 as if fully stated herein.

172.    All Plaintiffs seek preliminary and permanent injunctions, and challenge the Law, and any action by Defendants seeking to implement it both facially and as applied to them.

173.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[no] state shall . . . deprive any person of life, liberty, or property, without due process of law." A law is void for vagueness if its prohibitions are not clearly defined.

174.    A governmental enactment like the Law is unconstitutionally vague if it either fails to provide a person of ordinary intelligence fair notice of what is prohibited or if the lack of explicit standards authorizes or encourages arbitrary and discriminatory enforcement. Particularly, as here, where First Amendment freedoms are concerned, restrictions on speech require a more stringent vagueness test to ensure the ambiguity does not chill protected speech.

175.    The Law is unconstitutionally vague because it fails to provide fair notice. The Act is replete with vague and subjective terms, like those referenced in paragraph 24, such that no person of ordinary intelligence can discern what is prohibited. *See, e.g.*, ¶¶ 29-42. Although standing alone there are no intelligible standards for the Law, the ambiguity is only amplified by the legislative history including several rejected amendments designed to mark clear boundaries of the Act; statements by the Governor; multiple and conflicting interpretations by school districts across Florida; and certain unpromulgated "guidelines," "standards," "frameworks," and "conduct principles" by the Department of Education that need not occur until June 30, 2023—a year after the law went into effect. The Law fails to provide adequate notice as to which information, concepts, and ideas may or may not be discussed, raised, responded to, or included in school settings in communications by everyone (e.g., "third parties"), including Plaintiff students, Plaintiff parents, or by the staff of CenterLink and its member centers.

176.    Independently, the Law is also unconstitutionally vague because it authorizes and encourages arbitrary and discriminatory enforcement by the Department of Education and school districts across Florida. Upon information and belief, school districts have and will continue to exercise their general powers of enforcement and invoke existing school policies, such as the student code of conduct or visitor policy, to avoid a range of penalties if a parent seeking recourse under the Law were not satisfied with their child's school's or school district's handling of a complaint. LGBTQ+ students and parents, as well as students with LGBTQ+ family members are more likely to be targeted for arbitrary and discriminatory enforcement than their peers.  Absent clear boundaries, the Act impermissibly delegates standardless discretionary power to

Defendants for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

177.   As a result of vague and undefined terms in the Law, Florida teachers, district staff, students, and parents, among others, have and will continue to self-censor and refrain from constitutionally protected speech. Plaintiff students and Plaintiff parents do not know which of their activities are prohibited by the Law and the uncertain meaning of the law has resulted in their self-censorship, including chilling speech or conduct that could be penalized by Defendants School Board of Orange County and School Board of Indian River County. Plaintiff CenterLink and its member centers are justifiably fearful that their communications and activities will be prohibited by Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and their ability to perform their contractual obligations and seek future funding will be threatened, despite these activities' centrality to their mission and their ability to serve and support LGBTQ+ youth. The Law has burdened, and will continue to burden, the innocent associations of Plaintiff CenterLink and its member centers.

178.   The Law violates the Due Process Clause of the Fourteenth Amendment and is void for vagueness because it chills Plaintiffs' constitutionally protected right to free speech, provides inadequate notice of the conduct it purports to prohibit, and authorizes or encourages arbitrary and discriminatory enforcement..

179.   As a direct and proximate result of Defendants' authority and conduct (including enforcement of the Law), Plaintiffs have suffered and will continue to suffer irreparable harm and damages.

## **COUNT V**

### **Deprivation of Equal Protection of the Laws**

**Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**

180.    All Plaintiffs state this cause of action against SBOE Members, and reallege and incorporate by reference paragraphs 1-130 as if fully stated herein.

181.    Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C.  state this cause of action against Defendant School Board of Orange County, and re-allege and incorporate by reference paragraphs 1-13, 17-18, 22-69, and 83 as if fully stated herein.

182.    Plaintiff Will Larkins states this cause of action against Defendant School Board of Orange County, and re-alleges and incorporates by reference paragraphs 1-12, 14, 17-18, 22-50, 58, 66, 68, and 70-88 as if fully stated herein.

183.    Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D. state this cause of action against Defendant School Board of Indian River County, and re-allege and incorporate by reference paragraphs 1-12, 15, 17, 19, 22-50, 66, 68, 83, and 89-99 as if fully stated herein.

184.    Plaintiff CenterLink, on behalf of itself and its members, states this cause of action against Defendants School Board of Orange County, School Board of Duval County, and School Board of Palm Beach County, and re-alleges and incorporates by reference paragraphs 1-12, 16-18, 20-50, 66, 68, 83, and 100-130 as if fully stated herein.

185.    All Plaintiffs seek preliminary and permanent injunctions, and challenge the Law, and any action by Defendants seeking to implement it both facially and as applied to them.

186.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

187.    The Law and its enforcement violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating against students and parents based on sex, sexual orientation, gender identity, and transgender status, both facially and as applied.

188.    The Law was enacted with the purpose to discriminate and has the effect of discriminating against students who have LGBTQ+ parents and family members, LGBTQ+ students, and LGBTQ+ parents, subjecting them to differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, and transgender status, and/or the sex, sexual orientation, gender identity, and/or transgender status of their parents or family members.

189.    The Law shames and stigmatizes these students and families; invites school officials, teachers, and classmates to view them as inferior; harms their long-term health and well-being; and denies them equal educational opportunities on the basis of their sex, sexual orientation, gender identity, and transgender status.

190.    The Law has contributed to the creation of an anti-LGBTQ+ climate in the public schools operated by Defendants. It fosters a culture of silence and non-acceptance of LGBTQ+ students and LGBTQ+ families and discourages school officials from complying with their obligations to treat all students equally.

191.    For example, the Law effectively precludes teachers and school officials (1) from answering questions by students about the sexual orientation, family structure, and/or gender identity of Plaintiffs S.C., Will Larkins, David Dinan, Vik Gongidi, K.R.D., and R.R.D. in the same way teachers and school officials would answer questions about non-LGBTQ+ students or their families, (2) from intervening to explain that these Plaintiffs

and their families are as worthy as any other family, and (3) from protecting Plaintiffs P.C., M.C., S.C., N.C., Will Larkins, K.R.D., and R.R.D. from stigma and bullying as a result of their sexual orientation and gender identity or the sexual orientation and gender identity of their family members. The Law harms these Plaintiffs, sending a message that they and/or their families are a topic too shameful or "inappropriate" for their teachers and classmates to discuss.

192.    Discrimination based on sex, sexual orientation, gender identity, and transgender status each warrant at least heightened scrutiny.

193.    The Law does not serve any legitimate purpose, pedagogical or otherwise, let alone the exceedingly persuasive or compelling one required, and is instead rooted in animus toward and moral disapproval of LGBTQ+ people. The Law lacks adequate tailoring in service of any such government purpose.

194.    As a direct and proximate result of Defendants' authority and conduct (including enforcement of the Law), Plaintiffs have suffered and will continue to suffer irreparable harm and damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A.      A declaratory judgment that Fla. Stat. § 1001.42(8)(c) (2022) and the actions taken to implement the law deprive Plaintiffs of their rights under the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution;

B.      Preliminary and permanent injunctive relief enjoining enforcement of Fla. Stat. § 1001.42(8)(c) (2022) by Defendants and their respective officers, board members

agents, servants, employees, attorneys, and successors, as well as all other persons who are in active concert or participation with any of the Defendants or under any of the Defendants' supervision, direction, or control;

C.      Award nominal and compensatory damages, in an amount to be determined at trial for garden variety emotional distress, including humiliation, embarrassment, shame, loss of opportunity to speak, and other damages that flow naturally from events that are an affront to dignity, against Defendant School Board of Orange County (for Plaintiffs Jen and Matt Cousins, P.C., M.C., N.C., and S.C., and Plaintiff Will Larkins) and Defendant School Board of Indian River County (for Plaintiffs David Dinan, Vik Gongidi, K.R.D., and R.R.D.) for injury caused by such defendants' respective conduct and for the violation of the rights of the Plaintiffs specified herein under the First and Fourteenth Amendment to the U.S. Constitution.

D.      Award nominal and compensatory damages in an amount to be determined at trial for loss of opportunity to speak, mission frustration and loss of funding opportunities, and any other damages as permitted by law to Plaintiff CenterLink, on behalf of itself and its members, against each of the Defendants, the School Board of Orange County, the School Board of Duval County, and the School Board of Palm Beach County, for violation of CenterLink's rights under the First and Fourteenth Amendment to the U.S. Constitution.

E.      Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and,

F.      Grant all other and further relief as the Court deems appropriate, just, and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs demand a jury trial on all issues triable of right by a jury.

Respectfully submitted this 3rd day of November 2022.

By:  <u>/s/ Debra Dandeneau</u>
Debra Dandeneau, Esq. (FBN 978360)
L Andrew S. Riccio, Esq. (FBN 91978)
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018
(212) 626-4100
debra.dandeneau@bakermckenzie.com
andrew.riccio@bakermckenzie.com

By:  <u>/s/ Angela Vigil</u>
Angela Vigil, Esq. (FBN 38627)
Baker McKenzie LLP
1111 Brickell Avenue
Suite 1700
Miami, Florida 33131
(305) 789-8900
angela.vigil@bakermckenzie.com

By: <u>/s/ Simone Chriss</u>
Simone Chriss, Esq. (FBN 124062)
Jodi Siegel, Esq. (FBN 511617)
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601
(352) 271-8890
simone.chriss@southernlegal.org
jodi.siegel@southernlegal.org

By: <u>/s/ Jennifer Vail</u>
Jennifer Vail, Esq.
*(admitted Pro Hac Vice)*
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL. 36104
jennifer.vail@splcenter.org

Bacardi Jackson, Esq. (FBN 47728)
Scott McCoy, Esq. (FBN 1004965)
Sam Boyd, Esq. (FBN 1012141)
Southern Poverty Law Center

By: <u>/s/ Camilla B. Taylor</u>
Camilla B. Taylor, Esq.
*(admitted Pro Hac Vice)*
Lambda Legal Defense
and Education Fund, Inc.
Midwestern Regional Office
65 E. Wacker Pl., Suite 2000
Chicago, IL, 60601
(312) 663-4413
ctaylor@lambdalegal.org

By: <u>/s/ Kell L. Olson</u>
Kell L. Olson, Esq.
*(admitted Pro Hac Vice)*
Lambda Legal Defense
and Education Fund, Inc.
Western Regional Office
4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010-3512
(313)605-3222, ext. 4342
kolson@lambdalegal.org

By: <u>/s/ Paul D. Castillo</u>
Paul D. Castillo, Esq.
*(admitted Pro Hac Vice)*
Lambda Legal Defense
and Education Fund, Inc.
South Central Regional Office
3500 Oak Lawn Ave., Ste. 500
Dallas, TX 75206
(214) 219-8585
pcastillo@lambdalegal.org

2 Biscayne Boulevard, Suite 3750
Miami, Florida 33131
bacardi.jackson@splcenter.org
scott.mccoy@splcenter.org
sam.boyd@splcenter.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 3, 2022, I electronically served the foregoing document through the Court's CM/ECF filing system for counsel who have filed an electronic notice of appearance and will serve the parties below pursuant to the pertinent rules.

By: */s/ Debra A. Dandeneau*
Debra A. Dandeneau

Monesia Brown
Esther Byrd
Grazie Christie
Ben Gibson
Ryan Petty
Joe York
Thomas Grady
**Members of the State Board of Education**
Turlington Building
325 West Gaines Street
Tallahassee, FL 32399