**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JENNIFER COUSINS, et al.,

　　　　　*Plaintiffs*

v.

THOMAS R. GRADY, et al.,

　　　　　*Defendants,*

and

ASHLEY MOODY, Attorney General,

　　　　　*Defendant-Intervenor.*

**Challenge to**
**Constitutionality of Fla. Stat.**
**Ann. § 1001.42(8)(c) (2022)**

**Preliminary Injunctive Relief**
**Requested**

**Case No.: 6:22-cv-01312-**
**WWB-LHP**

---

**PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION**
**AND MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 6.02, Plaintiffs move for an Order enjoining Defendants from enforcing or taking action to enforce section 1001.42(8)(c) (2022), Florida Statutes ("the Law").

1.　　　Plaintiffs challenge the Law because it violates the First and Fourteenth Amendments of the U.S. Constitution.

2.　　　Plaintiffs' claims are likely to succeed on the merits. First, the Law impermissibly chills the exercise of all Plaintiffs' constitutionally protected speech and expression based on content and viewpoint, ECF 82 ¶¶ 131-149; violates student plaintiffs' constitutional right to receive information and ideas, ECF 82 ¶¶ 150-158; and is overbroad in violation of the First Amendment, ECF 82 ¶¶ 159-166. Second, the Law is unconstitutionally vague, as it infringes upon Plaintiffs' constitutionally protected right to

free speech and provides inadequate notice of the conduct it purports to prohibit, in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* ¶¶ 167-179. Third, the Law discriminates against Plaintiff students and parents on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* ¶¶ 180-194.

3.     If this Court fails to grant the requested preliminary injunctive relief, Plaintiffs will be subjected to further loss of their constitutional rights. Plaintiffs have already suffered and will face irreparable harm and have no adequate remedy at law. The balance of equities and the public interest favor granting relief because the irreparable constitutional injuries far outweigh any marginal burden on Defendants that might result from enjoining the Law pending an adjudication on the merits.

4.     A preliminary injunction will maintain the status quo and is consistent with the proper mission of public schools: "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

5.     Plaintiffs request that the Court waive the requirement of bond in Fed. R. Civ. P. 65(c). *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (whether to require bond is within court's discretion). Public interest litigation is a recognized exception to the bond requirement, especially where, as here, requiring a bond would injure the constitutional rights of Plaintiffs and the relief sought would not pose a hardship to government Defendants. *See Univ. Books & Videos, Inc. v. Metro. Dade Cnty.*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999).

**WHEREFORE,** Plaintiffs move this Honorable Court for an Order preliminarily enjoining Defendants from enforcing section 1001.42(8)(c) (2022), Florida Statutes, because it violates the First and Fourteenth Amendments of the U.S. Constitution.

## MEMORANDUM OF LAW

### I. INTRODUCTION AND FACTUAL BACKGROUND

Section 1001.42(8)(c) (2022), Florida Statutes, by design, deters speech by and about lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") people in schools. To achieve this end, the Law employs undefined terms that restrict an absurdly broad scope of speech and activity, casting a broad chilling effect and leaving school officials to draw arbitrary and discriminatory lines in their attempts to implement the Law. The Law combines this vague text with a private right of action that empowers parents to sue the school district directly if they are dissatisfied with where the school has drawn that line. The impact of the Law has been immediate and severe, and significant constitutional harm will persist absent injunctive relief to restore the status quo ante.

### A. The Law Was Enacted with Intentionally Undefined Terms

The Law, which took effect on July 1, 2022, prohibits "[c]lassroom instruction" regarding "sexual orientation or gender identity" for students in kindergarten through grade 3, or that is "in a manner that is not age-appropriate or developmentally appropriate" for other grades. Fla. Stat. § 1001.42(8)(c)(3). It also requires parental notification for changes in student services related to a student's "well-being" and imposes requirements regarding "encourag[ing]" or "discourag[ing]" students to discuss their well-being with their parents. § 1001.42(8)(c)(1)-(2). The Law fails to define any of these terms. The Law also encourages schools to err on the side of broad censorship by empowering any parent to sue a school district and collect attorney's fees and costs if they are dissatisfied with the

district's implementation of the law, while denying districts a reciprocal right to recover fees and costs if they prevail in the dispute. § 1001.42(8)(c)(7).

The legislative history shows that legislators understood and intended that schools, children, teachers, and parents would interpret "sexual orientation" and "gender identity" to mean "mention of LGBTQ+ people." During debate on the bill underlying the Law, Florida House Bill 1557, one Republican legislator proposed an amendment to replace those terms with "human sexuality" and "sexual activity." Amendment 546314.[1] He explained, "if the intent of this bill isn't to marginalize anyone, let's make sure we aren't by passing this amendment." Ex. 11, *Transcript: Hearing on H.B. 1557 Before the S. Comm. on Appropriations*, 2022 Leg. R. Sess. 52-53 (Fl. Feb. 28, 2022) (statement of Sen. Jeff Brandes, Comm. Member). The bill's sponsor responded that this change "would significantly gut the effort of the bill," and the amendment failed. *Id.* at 66 (statement of Sen. Dennis Baxley, Comm. Member). The legislature also rejected an amendment clarifying that "sexual orientation" includes heterosexuality. Amendment 290096. Lawmakers further rejected amendments that would have specified that the Law did not bar discussions between students. Amendments 734244 and 600607. Perhaps most alarmingly, a proposed amendment to specify that the Law did not prevent discussion of families or "bullying prevention" also failed. Amendment 755282.

### B. Plaintiffs Have Been Harmed by the Law

Plaintiffs Jen and Matt Cousins have four children, N.C., S.C., M.C., and P.C., who all attend Orange County Public Schools ("OCPS"). Among other harms, their non-binary

---

[1] All amendments available at https://www.flsenate.gov/Session/Bill/2022/1557/?Tab=Amendments.

child S.C. has experienced bullying based on their gender identity since the Law went into effect that they had never experienced at school before. They fear that bullying will continue to increase as long as the Law remains in effect. Ex. 1, Cousins Decl. ¶¶ 19, 28, 30. S.C. fears that critical lifelines, such as their school's LGBTQ+ student group, will be impacted by the Law, *id.* ¶¶ 15, 32, a reasonable fear, as teachers have already been told to remove safe-space stickers and have been chilled from serving as sponsors of these groups since the Law's enactment.[2] *See, e.g.*, Ex. 1, Attach. 2, Camp Legal Clarifications; Ex. 1, ¶¶ 22, 33; Ex. 2, Larkins Decl. ¶ 28, 30; Ex. 4, Watson Decl. ¶ 18; Ex. 8, Woods Decl. ¶¶ 8, 18, 29, 33. Each family member supports and loves S.C. and wants to be able to discuss their family freely and equally at school. Ex. 1, ¶¶ 5, 9-10, 21, 23, 31, 34. The Law inhibits Jen, Matt, N.C., S.C., M.C., and P.C. from fully expressing themselves. For example, Jen and Matt worry that P.C. and M.C., in first and third grades, respectively, will be prevented from completing assignments about their family and made to feel shame if their teacher deems their non-binary sibling too "inappropriate" for discussion. *Id.* ¶¶ 34, 11; *see also* Ex. 1, Attach. 2 (OCPS interpreting discussion as instruction). Jen wants to participate in school events such as "Teach-In Week," where parents are invited to talk with students in the classroom about their careers and other topics, including by reading a book or talking about a favorite vacation, hobby, or teacher. Ex. 1, ¶ 10. Jen wants to read "Pride: the Story of Harvey Milk and the Rainbow Flag," a book for K-3 children that will help others understand her family, but fears she will not be allowed to do so because the Law prohibits "third parties" from discussing sexual orientation and gender identity at

---

[2] *See also* https://www.k12insight.com/Lets-Talk/Dialogue.aspx?k=PR6Y67N7B8LT@W N7N2FLT@DY8Z9K8LT (Pasco County school district interprets the Law to preclude safe spaces and safe space stickers "to avoid a potential violation of the law.")

school, even though other parents will be able to present books about their families or experiences. *Id.* ¶¶ 11-13. N.C. wants to be able to access books that include non-binary characters to help him understand his sibling's experience, but because of the Law, materials with LGBTQ+ characters have been removed and are unavailable. *Id.* ¶ 14.

Plaintiff Will Larkins is a high school senior in OCPS who identifies as gay and non-binary. Ex. 2, Larkins Decl. ¶¶ 2-3. He was the president and co-founder of his school's Queer Student Union, which was effectively disbanded as an official group in October 2022 because the group could not find a teacher who was willing to risk sponsoring the group in light of the Law. *Id.* ¶¶ 2, 28, 30.  Will wants to learn about LGBTQ+ history and wants to engage in ongoing debate and discourse with his teachers and peers about LGBTQ+ issues and about critical moments in United States history that include LGBTQ+ individuals or issues. *Id.* ¶¶ 8, 11. Enforcement of the Law makes Will reluctant to fully express his views. *Id.* ¶¶ 12-15. For example, Will wants to do a presentation on the Stonewall Uprising this year, but he fears he will be censored or get in trouble. *Id.* ¶¶ 13-15, 23. His fear is based on being disciplined previously for presenting about the Stonewall Uprising shortly after the Law's passage, and knowing other Florida school districts have interpreted the Law to limit high school history curriculum. *Id.* ¶¶ 14-15, 20-23. His access to counselor services has also been impeded by the parental notification provisions of the Law. *Id.* ¶ 32.

Plaintiffs David Dinan and Vik Gongidi are a same-sex married couple with two children, K.R.D. and R.R.D., a fourth grader and third grader, respectively, both of whom attend schools within the School District of Indian River County ("SDIRC"). Ex. 3, Dinan Decl. ¶¶ 2, 5.  David, Vik, K.R.D., and R.R.D. want to be able to speak freely about their

family and encourage others to understand their family. *Id.* ¶¶ 7, 11. However, the Law has impacted their ability to express themselves fully. For example, Plaintiff R.R.D. wanted to tell his third-grade class about a London Pride parade he attended with his brother and dads this summer, and his dads struggled to prepare and protect him in doing so. *Id.* ¶ 10. If R.R.D. told his class about the parade, and especially if it generated questions, the discussion could be shut down because of the Law. *See* Ex. 12, SDIRC Parent Informational Guide, p. 19, ("Prohibits classroom discussion about sexual orientation or gender identity in certain grade levels or in a specified manner."). This would be confusing and harmful to a young child entering a new classroom who is proud of his family, so they suggested that he skip this portion of their family story. Ex. 3, ¶ 10. K.R.D. and R.R.D. will continue to have to guess how much detail they can put into family-related assignments without being labeled inappropriate under the Law. *Id.* ¶ 12. David does not know whether he can allow K.R.D. and R.R.D. to wear LGBTQ-related shirts that used to be some of their favorites on "dress down" days. *Id.* ¶ 13. David also has censored his own expression under the Law. On a field trip with K.R.D.'s class in October, 2022, David did not mention Vik when interacting with students and other parents, even though other parents mentioned their spouses. *Id.* ¶ 8. David feared his expression on this or future field trips could be considered prohibited "not age-appropriate" instruction by a "third party" under the Law, or could invite questions from K.R.D.'s classmates that would put him, K.R.D., or a teacher in a position to run afoul of the Law by explaining the family's structure. *Id.* He did not want K.R.D. to witness a teacher struggle with a response, silence K.R.D.'s classmates, or be penalized for affirming K.R.D.'s family. *Id.*

Plaintiff CenterLink is a member-based coalition that supports the development of sustainable LGBTQ+ community centers across the country, including the Orlando Youth Alliance ("OYA"), Compass Community Center ("Compass"), and the Jacksonville Area Sexual Minority Youth Network ("JASMYN"). Ex. 7, Spivak Decl. ¶¶ 4, 5, 14. Since July 1, 2022, CenterLink staff has had to spend a couple of hours a week responding to member inquiries about questions such as what the law means, what members can or cannot do, and how members can connect to teachers and school board members, including from JASMYN, Compass and OYA. CenterLink also has expended resources on conducting seminars for Florida members, and anticipates these activities to continue as long as the Law is enforceable. *Id.* ¶ 11.

The Law also has directly obstructed services traditionally performed by CenterLink's member centers in tandem with schools, and has caused a corresponding increase in demand for direct services at those centers. Ex. 4, Watson Decl. ¶¶ 15-18; Ex. 6, Seaver Decl. ¶ 15-20; Ex. 8, Woods Decl. ¶ 18. For example, OYA operates facilitated peer-to-peer counseling sessions for LGBTQ+ youth, including those that attend OCPS. Ex. 5, Slaymaker Decl. ¶¶ 6, 10. Since the Law's enactment, attendance at OYA support groups has doubled and staff are struggling to meet the needs of youth and parents who have expressed increased anxiety and distress as a result of the Law. *Id.* ¶¶ 13-15. In Palm Beach County, over 93% of Compass members are enrolled in School District of Palm Beach County ("SDPBC"). Ex. 6, ¶ 9. As a result of the Law, some teachers no longer feel comfortable referring students to Compass, especially in light of warnings from SDPBC that they will lose their teaching licenses if they fail to comply with the Law. *Id.* ¶ 21-22; Ex. 8, ¶ 18, 32-33. As the Law decreases the support and level of

safety for LGBTQ+ students at school, Ex. 6, ¶ 18, Compass has experienced a corresponding increase in demand from parents and local students for its mental health services, resources, and support services as a result of the Law. *Id.* ¶¶ 15-17. The increased demand has required Compass to hire a new full-time mental health therapist and to increase spending for additional contracted therapists, diverting resources from other core programmatic activities. *Id.* ¶¶ 16-17, 23.

In Duval County, for at least the last nine years—including the last four years under a federally funded grant from the Centers for Disease Control and Prevention's Division of Adolescent and School Health ("DASH grant")—JASMYN has provided subcontracted services to Duval County Public Schools ("DCPS") in its areas of expertise, including teacher training; advice on student support and anti-bullying policies; development and support for student LGBTQ+ clubs; and acceptance of referrals for support, housing, and health and wellness services. Ex. 4, ¶¶ 9, 12, 14. Upon enactment of the Law, and since the Law took effect, DCPS has cancelled meetings that are part of JASMYN's DASH grant responsibilities and are necessary to coordinate its subcontracted work under the grant for the current school year. *Id.* ¶¶ 17-19. In addition, at least one student referral has been blocked, cooperative meetings to support students and teachers have been hindered, and teacher sponsors of student LGBTQ+ groups have been chilled from participating in planning meetings with JASMYN. *Id.* ¶¶ 20, 24.

## II. PLAINTIFFS MEET THE PRELIMINARY INJUNCTION STANDARD

This Court may issue a preliminary injunction where the movant demonstrates a substantial likelihood of success on the merits; that irreparable injury will be suffered unless the injunction issues; the threatened injury to the movant outweighs any damage the proposed injunction may cause the opposing party; and the injunction would not be

adverse to the public interest. *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

### A. Plaintiffs Are Likely to Prevail on the Merits

           **1.**    **Plaintiffs Have Standing to Bring their Claims Against Defendants; They Continue to Suffer Irreparable Injury Traceable to and Redressable by the Defendants.**

Each Plaintiff has suffered and will continue to suffer irreparable harm absent an injunction. "[T]he loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983); *see also Cone Corp. v. Hillsborough Cnty.*, 723 F. Supp. 669, 678 (M.D. Fla. 1989) (irreparable harm shown from continuation of equal protection violation). A First Amendment plaintiff has standing when "the operation or enforcement" of a challenged government policy "would cause a reasonable would-be speaker to self-censor," even absent a direct prohibition. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). And the injury requirement is most loosely applied where First Amendment rights are involved because speech can be chilled "even before the law, regulation, or policy is enforced." *Id.* (internal quotation omitted); *see also Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015) (litigants chilled from speech suffer harm apart from enforcement that forms basis of court's jurisdiction).

Plaintiffs' harms are traceable to Defendants because they have authority to enforce the Law. On a challenge to a law's constitutionality, traceability and redressability depend on whether law contemplates enforcement by the defendant. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201-02 (11th Cir. 2021). A plaintiff must show at least "that the official has the authority to enforce the particular provision that he has challenged." *Id.* at 1201; *League of Women Voters of Fla., Inc. v. Lee*, No. 4:21cv186-

MW/MAF, 2022 WL 969538, at *8 (N.D. Fla. Mar. 31, 2022) (injury traceable to Supervisor because "Florida law tasks the Supervisors with implementing the law"). Here, Defendants are tasked with implementing the Law. *See* Fla. Stat. § 1001.42; *see also* Fla. Stat. §§ 1001.02-03, 1001.20, 1001.23, 1003.41; ECF 82 ¶¶ 17-21.

Although Defendants' duty and authority to enforce is sufficient to confer standing, Defendants' have also taken various actions to implement the Law that connect to Plaintiffs' harms. For example, under the Law, DCPS, SDIRC, and SDPBC reduced or eliminated LGBTQ+ student support guides and LGBTQ+ anti-bullying guidance for grades K-12.[3] In SDPBC, professional development workshops on LGBTQ+ issues were suspended and, in many districts, books with LGBTQ+ characters for students in K-12 have been removed or are being reviewed under the Law.[4] Teachers have been encouraged to avoid anything that might generate discussion about LGBTQ+ people.[5] And, organizations that have traditionally provided LGBTQ+ training and other services

---

[3] Ex. 4, ¶¶ 21-22; School Board of Duval County, *Workshop on Student Support Guide Update*, https://duvalcosb.civicclerk.com/Web/Player.aspx?id=2632&key=-1&mod=-1&mk=-1&nov=0; Ex. 3, ¶ 16; Ex. 8, ¶ 25; Ex. 6, ¶ 18.

[4] Ex. 6, Attach. 2, SDPBC Instructional Guidance for Legislative Compliance (July 21, 2022) *and* Ex. 9, SDIRC County Classroom Library Selection Form for Instructional Staff (August 4, 2022), (both SDPBC and SDIRC forms instruct that books where a character "questions" their sexual orientation or gender identity must be reviewed); Ex. 6, Attach. 1, SDPBC Memos, Classroom Library Guidance; Ex. 1, Attach. 1, OCPS Legislative Updates (books that "make written or pictorial reference" to sexual orientation or gender identity are prohibited from being accessible, including to check out for reading outside of the classroom); Ex. 8, ¶¶ 17, 19-20; Ex. 6, ¶ 18-19; Ex. 1, ¶¶ 13, 17.

[5] Ex. 1, Attach. 2, Camp Legal Clarifications (avoid discussion); Ex. 8, ¶ 18 (avoid discussion); Ex. 12, IRCSD Parent Informational Guide (prohibits classroom discussion); Ex. 14, PBCSB Workshop, Policy 5.735 ("Classroom instruction in Grades K-3 will not include *discussions* on gender identity or sexual orientation. *Discussions* or lessons on these topics in grades 4-12 will be age appropriate and developmentally appropriate.")

to schools are being blocked from completing their work.[6] Equivalent support guides, trainings, and services for non-LGBTQ+ students have not been targeted under the Law or the districts' corresponding policies.

Defendants continue to issue varied and rapidly-changing guidance under the Law, amplifying confusion and chill. On October 5, 2022, SDIRC revised its Parent Informational Guide to state that the Law "prohibits classroom *discussion* about sexual orientation or gender identity in certain grade levels or in a specified manner" (Ex. 12). On August 3, 2022, SDPBC adopted a checklist, "Instructional Materials, Media Center, and Classroom Library Materials Checklist" (PBSD 2671), which makes clear that SDPBC interprets the Law to broadly apply to "all school-based purchases, library media center materials, and classroom libraries" including "software applications and digital media." (Ex. 13). On October 12, 2022, SBPBC approved for development a policy restricting access to "school library materials and reading lists…because of [the Law]"; *See also* Rule 6A-1.09415, effective September 20, 2022 (contrary to the state's assertion that the Law is not yet applicable in grades 4-12, on September 20, 2022, the Florida Department of Education adopted a procedure and form, "Parental Request of Appointment of a Special Magistrate," through which a parent can request a special magistrate for an alleged violation of the Law in *any* grade). Injunctive relief remains necessary to stem these harms in the midst of evolving voluntary state interpretations. Defendants should be enjoined from these and further implementation actions. *See Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988) ("[a]ll that is required [for injunctive relief against a state official] is that the official [sued] be responsible for the challenged action.").

---

[6] Ex. 4, Watson Decl. ¶¶ 15-18, 22; Ex. 6, Seaver Decl. ¶ 23.

An injunction would restore the *status quo ante*, when Plaintiffs were able to speak more freely and without fear of reprisal. *See supra*, Section IB; *See Support Working Animals, Inc.*, 8 F.4th at 1202–03 ("Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.") While such an order may not prevent *all* bullying or other discriminatory actions that could result in chilled speech, it would "provide at least partial redress," which is all that is required. *Honeyfund.com, Inc. v. DeSantis*, No. 4:22cv227-MW/MAF, 2022 WL 3486962 at *4 (N.D. Fla. Aug. 18, 2022) (granting injunctive relief against state defendants with enforcement authority even if others may also act in ways harmful to the plaintiff); *see also Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (plaintiff had standing to sue even if only "a small part of the [total] injury [was] attributable to" the defendant).

The particular injury to CenterLink's member centers also would decrease if the Law was enjoined. In addition to addressing the harm to their mission and speech, OYA and Compass anticipate that restoring resources and support in schools, including referrals for tandem support, would alleviate at least some of the increased demand for direct services at the centers since the Law went into effect. Ex. 6, ¶¶ 16-17, 21, 23; Ex. 5, ¶¶ 13-14, 16-19. Their experience reflects research in this area, showing that LGBTQ+ youth who do not feel safe and affirmed at school are more likely to experience depression, anxiety, suicidal ideation, and psychological distress, and are more likely to drop out of school. *Id.* ¶ 20.[7] The centers want to reallocate diverted resources back to

---

[7] For a consensus study report summarizing relevant research, *see* National Academies of Sciences, Engineering, and Medicine, *Understanding the Well-Being of LGBTQI+ Populations*, Chapter 9, Educational Environments at 233-34 (bullying), 236-37 (school

their core programs. Ex. 4, ¶ 31; Ex. 5, ¶ 19; Ex. 6, ¶ 23; Ex. 7 ¶¶ 12-13.

> **2. Plaintiffs Are Likely to Succeed on the Merits of their Claims that the Law Violates the First Amendment**.

Not only does the Law cause a reasonable would-be speaker to self-censor, but Plaintiffs already have been silenced and disciplined, have censored themselves or their children, and have lost access to library materials that acknowledge the existence of LGBTQ+ people. *See supra*, Section I(B). It is reasonable that LGBTQ+ students and families could decide they are "better off just keeping [their] mouth shut," given the sheer breadth and ambiguity of the law. *See Speech First*, 32 F.4th at 1122. This is especially true for young students who would not want to run the risk of being accused of being "inappropriate" by discussing their LGBTQ+ families when students discussing their non-LGBTQ+ families would not be. *See id.* at 1124 (it is reasonable, even absent direct threat of punishment, that student would not want to risk being labeled "offensive"). Because the law lacks even a rational relationship to any legitimate interest, let alone the narrow tailoring required in service of a compelling interest, it violates the First Amendment.

> **a. Targeting LGBTQ+ speech and content for special restriction impermissibly chills and restricts protected speech and expression based on content and viewpoint.**

The Law is a one-sided law that restricts protected speech based on content and viewpoint. It impermissibly chills LGBTQ+ people from engaging in speech disclosing their sexual orientation and gender identity and that of their family members (i.e., "coming-out speech") and expressing themselves in a manner consistent with their sexual orientation and gender identity, but does not suppress comparable speech and expressive conduct

---

policies); 237-41 (school climate, including teacher training, student clubs, and curriculum) (Charlotte J. Patterson, et al. eds., 2020), http://doi.org/10.17226/25877.

by non-gay and non-transgender people in school-related settings. It has also been used to target library books and materials that acknowledge LGBTQ+ people.

The Law targets and chills two forms of protected First Amendment expression. First, it chills LGBTQ+ students and parents from disclosing their sexual orientation and transgender status by speech such as "I am gay," "I am transgender," or "I am a girl." By contrast, a female student who is neither a lesbian nor transgender may disclose these facts without consequence. Thus, the Law attaches different consequences to the same speech based on who the speaker is, constituting impermissible viewpoint discrimination. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Second, and equally impermissible, the Law chills speech and gendered expressive conduct that reveals or conforms with a person's sexual orientation and gender identity, even implicitly (e.g., a student's depiction of two same-sex parents in a drawing, or a transgender girl's choice to wear a dress). The Law does not similarly chill speech and conduct that reveal or conform to the sexual orientation and gender identity of a heterosexual cisgender person. The Law furthers its goal of suppressing speech by inviting people to pursue legal actions and recover attorneys' fees and other penalties against school districts if they do not agree with Defendants' application of the law, allowing those parents most hostile to acknowledgement of the existence of LGBTQ+ people to dictate the scope of the Law. *See* Fla. Stat. § 1001.41(8)(c)(7).

Courts long have held that coming-out speech, including in school settings, constitutes protected First Amendment activity. *See, e.g., Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652 (1st Cir. 1974) (student speech); *Henkle v. Gregory*, 150 F. Supp. 2d 1067, 1075-77 (D. Nev. 2001) (same); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp.

2d 1279, 1284-85 (D. Utah 1998) (coming-out speech by teacher); *Karnoski v. Trump*, 2017 WL 6311305, at *9, vacated by stipulation, Case No. 2:17-cv-01297 (W.D. Wash., Aug. 5, 2019); *Log Cabin Republicans v. U. S.*, 716 F. Supp. 2d 884, 926 (C.D. Cal. 2010), vacated as moot, 658 F.3d 1162 (9th Cir. 2011). Expression of gender identity through one's appearance also is protected expression. *See Doe ex rel. Doe v. Yunits*, 2000 WL 33162199, at *3 (Mass. Super. Oct. 11, 2000).

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Content-based regulation is subject to "the most exacting scrutiny." *Texas v. Johnson,* 491 U.S. 397, 412 (1989) (citation omitted). Such enactments "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

"When the government targets particular views taken by speakers on a subject and not the subject matter, the First Amendment violation is all the more blatant." *Rosenberger*, 515 U.S.at 829. Indeed, "[i]n the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011); *see also, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others'") (quotations omitted); *McCullen v. Coakley*, 134 S. Ct. 2518, 2549 (2014) (Alito, J., concurring) ("[I]f the law discriminates on the basis of viewpoint, it is unconstitutional"); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98,106 (2001).

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Under the First Amendment, schools may not restrict student speech merely to avoid controversy or to avoid the "discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. The Constitution allows schools to control student speech only in very narrow circumstances, none of which are present here. *Mahanoy Area School Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) (noting exceptions for lewd student speech, speech advocating for illegal drug use, and speech bearing the imprimatur of the school). Indeed, schools have a strong interest and obligation to protect a student's unpopular expression in particular because "America's public schools are the nurseries of democracy." *Id.* at 2046.

CenterLink's member centers' speech also enjoys protection. The centers speak with students who seek information about sexual orientation and gender identity, including mental health resources and referrals, and they communicate with school district partners to create policies to address bullying. Providing training, expert advice or assistance, referrals, and other services, as CenterLink member centers do, constitutes protected First Amendment activity. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010). Communications that impart a specific skill or convey advice based on specialized knowledge are a form of pure speech. *Id.* "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)). First Amendment protections also cover

17

would-be recipients of such training and assistance, and this right is particularly vital in schools. *Kleindiesnst v. Mandel*, 408 U.S. 753, 762-63 (1972).

### b. The Law violates Plaintiff students' First Amendment right to receive information and ideas.

Schools may not remove books containing LGBTQ+ content from school libraries to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Bd. of Educ. v. Pico*, 457 U.S. 853, 855 (1982) (quoting *Barnette*, 319 U.S. at 642). "[T]he Constitution protects the right to receive information and ideas," a right that extends to students with respect to materials in a school library. *Id.* (quoting S*tanley v. Georgia*, 394 U.S. 557, 564 (1969)). Restrictions on this right constitute a cognizable First Amendment injury. *Id.*

### c. The Law Is Unconstitutionally Overbroad.

By prohibiting "classroom instruction" related to "sexual orientation or gender identity," the law creates a "substantial risk" that it "will have an impermissible chilling effect on protected speech." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1302 (11th Cir. 2017) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973)). To determine whether a law is overbroad, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment [because] ambiguous meanings cause citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505-06 (11th Cir. 1990) (internal quotations omitted). Such a chilling effect already has occurred. In addition to the struggles Plaintiffs face regarding whether they can speak about themselves and their families, *see supra* Section I(B), students are unsure if they can use their own pronouns or if they can report bullying based on their LGBTQ+ identity. Ex. 8, ¶¶ 8, 32; Ex. 1, ¶ 27.

They don't know. The law's vagueness and "imprecision exacerbates its chilling effect." *Speech First*, 32 F.4th at 1121; *see infra* Section II(A)(3).

### 3. The Law Is Unconstitutionally Vague.

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. A law that "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement" is vague and violates the Fourteenth Amendment. *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319-20 (11th Cir. 2017) (en banc); *see Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1281 (N.D. Fla. 2021) (enjoining law because "an individual of ordinary intelligence could read the [statute] and not be sure of its real-world consequence"). "'When speech is involved, rigorous adherence to [notice and precision] requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Id.* at 1320 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012)). "Content-based regulations thus require a more stringent vagueness test" to ensure that the government regulates protected speech "only with narrow specificity," *id.* (internal quotations omitted).

Many critical terms in the statute are undefined and subject to multiple interpretations. For example, the term "classroom instruction" could refer solely to in-classroom lessons, class assignments, or books selected by the teacher. The preamble to the bill underlying the Law, however, described the Law as "prohibiting classroom *discussion* about sexual orientation or gender identity" (emphasis added). And the legislature notably declined to use a narrower term such as "curriculum." This, along with the failure of several amendments that sought to exclude student speech and questions

and responses to student questions from the law's scope, has left the language susceptible to an interpretation that "classroom instruction" covers activity beyond lesson plans, instructions, or assignments. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 871 n.37 (1997) (in holding statute unconstitutionally vague, court cited absence of statutory definitions and Congress's rejection of clarifying, limiting amendments). Indeed, Defendants and other school districts have issued conflicting interpretations of the Law and some have interpreted "classroom instruction" to include classroom discussion (Ex. 12, at p. 19; Ex. 1, Attach. 2; Ex. 14) and library books, leading to the removal of LGBTQ+ library materials. (Ex. 6, Attach. 1, Attach. 2; Ex. 13; Ex. 1, Attach. 1; Ex. 9; Ex. 8, ¶ 17).

The Law invites discriminatory enforcement because its failure to provide reasonable notice as to what conduct is prohibited gives those tasked with policing it—Defendants' teachers, administrators, and other employees—wide discretion to decide how, when, and against whom to apply it. *See Graynard v. City of Rockford*, 408 U.S. 104, 108 (1972). By delegating this authority and encouraging hostile parents to sue with one-sided fee-shifting, the Law invites arbitrary and discriminatory enforcement. *See, e.g.*, *League of Women Voters of Fla., Inc.*, 2022 WL at *70 (statute encouraged discriminatory enforcement where officials interpreted law based on their own understanding of vague terms). This is especially true here, where any attempt to apply the Law neutrally would be absurdly unworkable. For example, setting aside for a moment that the Law targets LGBTQ+ people and content, a prohibition on "classroom discussion" of "sexual orientation or gender identity" could foreclose family tree assignments altogether because whether children have a mom and a dad, or a sister or brother, can reflect sexual orientation and gender identity. School officials are left to draw arbitrary and

discriminatory lines to avoid such extreme applications. The Law's failure to establish any meaningful guidelines permits a "standardless sweep [that] allows [teachers and other administrators] to pursue their personal predilections" in determining whether certain instruction and discussion is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citing *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

### 4. Plaintiffs Are Likely to Succeed on the Merits of their Claim that the Law Violates the Equal Protection Guarantee.

The Law violates the Fourteenth Amendment, which ensures "equal protection of the laws." U.S. Const. amend. XIV, § 1. Classifications based on sex, sexual orientation, and transgender status all warrant heightened scrutiny. *See*, *e.g.*, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017) (sex); *Baskin v. Bogan*, 766 F.3d 648, 654-657 (7th Cir. 2014) (sexual orientation); *SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 484 (9th Cir. 2014) (sexual orientation); *Windsor v. United States*, 699 F.3d 169, 181-85 (2d Cir. 2012) (sexual orientation), *aff'd*, 570 U.S. 744 (2013);[8] *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610-13 (4th Cir. 2020) (transgender status); *Karnoski v. Trump*, 926 F.3d 1180, 1199-1201 (9th Cir. 2019) (transgender status); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (transgender status). Because these traits "generally provide no sensible ground for differential treatment," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), government must provide an "exceedingly

---

[8] This Circuit has never independently analyzed the appropriate level of scrutiny for classifications based on sexual orientation. In *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, the court stated only that other Circuits had declined to treat sexual orientation classifications as suspect. 358 F.3d 804, 818 (11th Cir. 2004). Yet those cases turned on *Bowers v. Hardwick*, 478 U.S. 186 (1986), and were necessarily abrogated when the Supreme Court overturned *Bowers* in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003). *See Pedersen v. Off. of Pers. Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012); *Golinski v. U.S. Off. of Pers. Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012).

persuasive justification" for legislation that differentiates on those bases, *United States v. Virginia*, 518 U.S. 515, 531 (1996). Classifications based on sexual orientation and transgender status warrant such scrutiny both in and of themselves and as forms of sex discrimination. As the Supreme Court recognized in *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020), discrimination on the bases of sexual orientation and transgender status "necessarily entails discrimination based on sex." And the Eleventh Circuit has explicitly recognized that discrimination against a transgender person constitutes sex discrimination under the Equal Protection Clause. *Glenn*, 663 F.3d at 1317. Because the Law lacks adequate tailoring in furtherance of even a legitimate governmental purpose, let alone the exceedingly persuasive one required, it violates the equal protection guarantee of the Constitution.

### a. The Law Lacks Adequate Tailoring and Any Permissible Justification, Let Alone the Compelling or Exceedingly Persuasive Justification Required.

The erasure of LGBTQ+ students and parents from Florida schools serves no valid educational purpose, let alone the compelling one required. As the Law's sponsor acknowledged, its purpose is to prevent students "coming out" as LGBTQ+ at school and to impose a particular moral value judgment about LGBTQ+ people. *See* ECF 82 ¶¶ 43-44; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (facially neutral law may nonetheless violate Equal Protection Clause if it has a discriminatory purpose and effect).

Even under the lowest level of scrutiny, governmental action must not disadvantage a disfavored group for its own sake, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and must bear at least a rational relationship to a legitimate

governmental interest, *City of Cleburne*, 473 U.S. at 446. In *Romer v. Evans*, 517 U.S. 620 (1996), the Supreme Court struck down a statewide referendum that precluded state or local government from taking actions to protect the status of persons based on sexual orientation. The Court held that protecting the interests of people with personal or religious objections to gay people was not a valid rationale for the law, finding that the law was "a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Id.* at 635. The law's classification of gay, lesbian, and bisexual people was "not to further a proper legislative end but to make them unequal to everyone else." *Id.*

Florida may no more make LGBTQ+ people unequal than Colorado could. The Law was enacted with the purpose and effect of discriminating against LGBTQ+ students and students with LGBTQ+ family members, subjecting them to differential and adverse treatment, including an invitation to arbitrary enforcement and a private right of action for hostile parents. Nor may the State justify the law as promoting "parental rights in education." *See* Fla. Stat. § 1001.42(8)(c)(1). Government may not endorse the hostility of certain parents to acknowledging in school that LGBTQ+ people exist. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("private biases" are not "permissible considerations for" government action); *see also Obergefell v. Hodges*, 576 U.S. 644, 672 (2015) (personal religious or philosophical objections to gay people may not constitutionally be given the imprimatur of the Government). "The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." *Shelley v. Kraemer,* 334 U.S. 1, 22 (1948). The Supreme Court rejected similar rationales proffered by the state of Colorado in *Romer* (including the

"respect for … personal or religious objections to homosexuality"). 517 U.S. at 634. As noted *supra* Section I(A), the invidious intent of the Law is apparent from the legislative history, including floor statements from the bill's co-sponsors and its failed amendments.

The Law is not an appropriate restriction on curriculum. Its purpose and effect are to chill speech based on viewpoint in contexts well outside of any textbook or course offering, including student speech, library materials, and student services. Moreover, even curricular decisions violate the First Amendment when they serve no pedagogical purpose, or if the decision was taken to suppress a particular speaker's viewpoint. *Searcey v. Harris*, 888 F.2d 1314, 1322 (11th Cir. 1989). Indeed, courts have recognized that the Constitution places limits on curricular decisions. *See, e.g.*, *Meyer v. Neb.*, 262 U.S. 390, 403 (1923) (due process guarantee prohibits state from barring teaching of German in schools because "no emergency" rendered the knowledge "so harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed").

### B. The Balance of Equities Favors Plaintiffs

The balance of equities and the public interest favor Plaintiffs because the irreparable constitutional injuries described above far outweigh any marginal burden on Defendants that might result from delaying the Law from continuing in effect pending an adjudication on the merits. Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1293 (M.D. Fla. 2021) (cleaned up). Governmental entities have "no legitimate interest in enforcing an unconstitutional" law. *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006); *see Gilio ex rel. J.G. v. Sch. Bd. of Hillsborough Cnty., Fla.*, 905 F. Supp. 2d 1262, 1275 (M.D. Fla. 2012)

(balance of equities and public interest weighed in favor of enjoining school board policy restricting proselytizing literature). As here, where constitutional rights hang in the balance, the serious and substantial injury that even a temporary loss of such rights for Plaintiffs must outweigh any potential harm to the Defendants. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001) ("the public interest is always served in promoting First Amendment values").

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin enforcement of the Law until the present matter is resolved.

Respectfully submitted this 21st day of November 2022.

By:  */s/ Simone Chriss*
**Simone Chriss, Esq.** (FBN 124062)
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601
(352) 271-8890
simone.chriss@southernlegal.org

**Kell L. Olson, Esq.**
(admitted *pro hac vice*)
Lambda Legal Defense
and Education Fund, Inc.
800 South Figueroa St, Ste 1260
Los Angeles, CA 90017
kolson@lambdalegal.org

**Debra Dandeneau, Esq.** (FBN 978360)
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018
debra.dandeneau@bakermckenzie.com

**Jennifer Vail, Esq.**
(admitted *pro hac vice*)
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL. 36104
jennifer.vail@splcenter.org

*On behalf of Plaintiffs and all Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 21st, 2022, I electronically served the foregoing document on all counsel of record through the Court's CM/ECF filing system.

By: */s/ Simone Chriss*
Simone Chriss