**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA**

**JENNIFER COUSINS**, et al.,

     *Plaintiffs*,

     v.                    No. 6:22-cv-1312-WWB-LHP

**THOMAS R. GRADY**, et al.,

     *Defendants*.

_____/

**STATE DEFENDANTS' SECOND MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW**

The State Defendants (the members of the State Board of Education and Intervenor, Attorney General Ashley Moody) move to dismiss with prejudice for failure to plead standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).

Plaintiffs' effort to convince the public that HB 1557 forecloses "any acknowledgment whatsoever of the existence of LGBTQ+ people," ECF 82 ¶ 1, is fearmongering at best. All the statute does is eliminate "classroom instruction" for the youngest public-school students "on" the concepts of "sexual orientation" and "gender identity." Fla. Stat. § 1001.42(8)(c)(3). The statute neutrally leaves those concepts to parents rather than state officials until fourth grade, at which point the concepts may be introduced in a manner consistent with "state standards" that have not yet been adopted.

For the reasons discussed below, Plaintiffs have failed to cure the standing problems that the Court identified in dismissing their First Amended Complaint. There is, in any event, nothing unlawful about HB 1557. The complaint should therefore be dismissed.

**ARGUMENT**

I.   **STATUTORY CONSTRUCTION**

The proper interpretation of HB 1557's regulation of classroom instruction cuts across every issue in the case. The statute provides, in pertinent part: "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards," which must be adopted by the Department of Education by "June 30, 2023." Fla. Stat. § 1001.42(8)(c)(3); HB 1557 § 2.

As a threshold matter, only the instructional restriction applicable to kindergarten through third grade is in effect. For older children, the statute ties the prohibition of instruction that is not "age-appropriate" or "developmentally appropriate" to "state standards" that have not yet been adopted and need not be adopted until next year. In other words, for those older children, the statute "takes effect only after the Florida Department of Education (Department) develops rules or guidance on age-appropriate and developmentally appropriate instruction." *See* Memo from J. Oliva to School District Superintendents, *House Bill 1557, Parental Rights in Education, School District Responsibilities*, FLORIDA DEPARTMENT OF EDUCATION at 1 (June 6, 2022), https://info.fldoe.org/docushare/dsweb/Get/Document-9559/dps-2022-68.pdf.

There remains the prohibition of "classroom instruction . . . on sexual orientation or gender identity" in grades K–3. Fla. Stat. § 1001.42(8)(c)(3). "Instruction" is "the action, practice, or profession of teaching." *Instruction*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/instruction (last visited Dec. 16, 2022).

2

The statute is concerned, moreover, only with "*classroom* instruction," *i.e.*, the formal work of teaching that occurs in a classroom setting.

That reading of "classroom instruction" is reinforced by the prepositional phrase that follows: The statute limits "classroom instruction" only if it is "on sexual orientation or gender identity." Fla. Stat. § 1001.42(8)(c)(3). In that grammatical structure, the preposition "on" "indicate[s] the subject of study, discussion, or consideration." *On*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/on (last visited Dec. 16, 2022). And classroom instruction "on" particular "subject[s] of study"— "sexual orientation" and "gender identity"—means formal classroom teaching about those subjects, nothing more or less.

Accordingly, just as a unit on quadratic functions is quintessential "instruction on mathematics," teaching a particular view of marriage equality or modern gender theory would be "instruction on sexual orientation or gender identity." But just as bare references to numbers in a history book are not "instruction on mathematics," HB 1557 does not prohibit literary references to a gay or transgender person or to a same-sex couple. More generally, as both this Court and Judge Winsor have explained, teachers having photos of same-sex spouses on their desks, intervening in bullying, engaging with a student's same-sex parents, and the like, "are not classroom instruction on sexual orientation or gender identity, even if they involve[] parties who mention a sexual orientation or gender identity." *Equality Florida v. Fla. State Bd. of Educ.*, No.4:22-cv-134, ECF 120 at 11 (N.D. Fla. Sept. 29, 2022) *(Equality Fla*.); *see* ECF 81 at 22.

HB 1557 is also neutral. The law's proscription applies equally, regardless of viewpoint. For example, it would violate the statute to instruct students that heterosexuality is superior or that gender identity is immutable based on biological traits.

Finally, the limited scope of the law's proscription informs the meaning of the phrase "school personnel or third parties," Fla. Stat. § 1001.42(8)(c)(3), which Plaintiffs mistakenly suggest broadly expands the statute's reach not only to teachers and other school personnel, but also to students and parents acting in the ordinary course. *See* ECF 82 ¶ 30. The law prohibits only formal classroom teaching about sexual orientation and gender identity. Such formal teaching can be carried out only by school personnel or those to whom the school has delegated responsibility for such teaching—*i.e.*, agents of the public school system, not parents or students acting in the ordinary course.

## II.   PLAINTIFFS LACK STANDING.

As this Court has explained, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." ECF 81 at 12 (cleaned up). Plaintiffs seek declaratory and injunctive relief against both HB 1557 on its face and particular actions allegedly "taken to implement the law" by the School Board Defendants. ECF 82 at 62–63. Those are distinct forms of relief, although the Complaint mushes them together at every turn. As discussed more fully below, Plaintiffs lack standing to bring their facial challenge because they have not adequately pleaded that they are injured by the enforcement of HB 1557. Instead, they object to actions taken by schools and school districts, none of which is even arguably required by the statute. To the extent Plaintiffs contend that those actions—not HB 1557—are unconstitutional, their claims have nothing to do with this statute. But to the extent Plaintiffs challenge the statute, even on an as-

applied basis, they plainly lack standing as to all Defendants. Plaintiffs doubly lack standing to sue the State Defendants, because it is parents—not the State Defendants— who sue to enforce HB 1557. A judgment against the State Defendants would thus leave the enforcing parties free to continue causing the injuries that Plaintiffs allege.

### A.    Injury-in-Fact

To plead injury-in-fact, Plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [demonstrate that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Put differently, Plaintiffs must allege injuries that are attributable to HB 1557, not that are "fanciful, paranoid, [and] otherwise unreasonable." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (citation omitted).

> *i.    Plaintiffs have not adequately pleaded any specific actions they wish to take that are arguably prohibited by HB 1557.*

**1.** As a threshold matter, Plaintiffs' allegations almost universally do not concern "classroom instruction by school personnel or third parties on sexual orientation or gender identity." Fla. Stat. § 1001.42(8)(c)(3). For example, the statute does not even arguably restrict students' ability to "be open about their" identities, ECF 82 ¶ 54, the completion of a "family tree" that includes a gay or transgender family member, ECF 82 ¶ 63, the placement of a safe-space sticker, ECF 82 ¶ 66, Larkins' desire to "educate his peers," ECF 82 ¶ 76, Dinan's desire to mention Gongidi on a field trip, ECF 82 ¶ 93, "seek[ing] out a book in a school library that contains a non-binary character," ECF 82 ¶ 57, or intervention against bullying, ECF 82 ¶ 98–99. *See supra* Part I.

Plaintiffs' only allegation that even approaches "classroom instruction" is Jennifer Cousins' claim that she wishes to read a book about "Harvey Milk and the Rainbow Flag" to her child's K-3 class during a "teach-in" week. ECF 82 ¶ 56. But Ms. Cousins does not allege that she asked to read the book at the event, let alone that she was denied. "With or without [HB 1557], school districts direct teachers as to what they may and may not teach." *Equality Fla.* at 6. Plaintiffs "do not allege . . . that Florida's public-school teachers" (let alone parents at a teach-in event) "may teach whatever lessons they wish." *Id.* Nor could they. HB 1557 notwithstanding, Florida law prohibits classroom material that "is inappropriate for the grade level and age group for which the material is used." Fla. Stat. § 1006.28(2)(a)(2)(b). Ms. Cousins alleges that the book at issue was "written for K-3 children" and that it is "age-appropriate." ECF 82 ¶ 56. But those conclusory allegations do not establish that her child's teacher (let alone her child's school district) would find the book appropriate. Accordingly, Ms. Cousins "can only speculate as to whether" the government would have used HB 1557 (as opposed to "other methods") to bar her participation. *Clapper*, 568 U.S. at 412.

**2.** Beyond that shortcoming, Plaintiffs Larkins, S.C., and K.R.D. are middle- or high-school students. ECF 82 ¶¶ 3–5, 70. As explained above, the challenged provision does not take effect for those grade levels until June 2023, when the State must promulgate standards for what "classroom instruction" may be "age-appropriate [and] developmentally appropriate . . . in accordance with state standards." *Supra Part* I. Until then, the statute regulates classroom instruction only for grades K-3, and any concerns about possible regulation of later grades are at best "conjectural or hypothetical." *I.L. v. Alabama*, 739 F.3d 1273, 1278 (11th Cir. 2014) (cleaned up). Put differently, the statute

does not prohibit Larkins from learning about "LGBTQ+ history" in high school, ECF 82 ¶ 73, or S.C. from participating in a middle-school gay-straight alliance field trip, ECF 82 ¶ 61, and it is speculative to think it ever will.

> ii.   *The Student and Parent Plaintiffs have not sufficiently pleaded a chilling effect or denial of information.*

**1.** Because Plaintiffs have not alleged "an intention to engage in a course of conduct" that is arguably "proscribed by a statute" they challenge, they have not sufficiently pleaded a chilling effect on them. *Driehaus*, 573 U.S. at 159. Likewise, because Plaintiffs have not alleged that they wish to access any information prohibited by the statute, they have not sufficiently pleaded a denial of information injury.

**2.** Plaintiffs have failed to plead a chilling effect for the additional reason that they have not demonstrated "a credible threat of prosecution." *Driehaus*, 573 U.S. at 159. They allege that they "have been chilled and/or forced to self-censor by taking care not to mention their own or a family member's sexual orientation and/or gender identity in school contexts," ECF 82 ¶ 145, but they do not and cannot allege any threat that the law will be enforced against them. As Judge Winsor observed, the statute can be enforced only through private claims brought by parents against school districts. *See Equality Fla.* at 9–10. The statute simply does not provide for enforcement against students or parents.

To the extent Plaintiffs allege that school or school district employees may seek to enforce the statute against them, they lack standing because allegations of a "chilling effect" are insufficient when they are attributable not to the challenged provision but instead to fear of "some *other* and additional action detrimental to that individual." *Clapper*, 568 U.S. at 418 (cleaned up). Plaintiffs' denial-of-information claim, too, is premised not on the implementation of the statute, but instead on the administrative acts

of school officials. For example, they allege that Orange County officials are instructing staff that "library books that make written or pictorial reference to sexual orientation or gender identity should not be available to K-3 students to browse or check out." ECF 82 ¶ 58 (cleaned up). But the statute regulates only "classroom instruction," not the availability of library books. Indeed, a separate provision of Florida law regulates library books, *see* Fla. Stat. § 1006.28(2)(a)(2), and Plaintiffs do not challenge that provision.

**3.** Plaintiffs lack standing to bring their denial-of-information claim for the additional reason that HB 1557 merely shifts instruction from early to late grades, and the right to receive information does not regulate *when* a school provides information. A ninth grader does not suffer constitutional injury when a school teaches physics in ninth grade and chemistry in tenth, even if the student would prefer the periodic table to Newton. *See Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir. 1980). No Plaintiff, therefore, suffers a constitutionally cognizable injury when they are made to wait until fourth grade or later to learn about gender identity or sexual orientation.

        *iii.   Plaintiffs fail to allege a cognizable Equal Protection injury.*

Plaintiffs allege that HB 1557 "shames and stigmatizes" gay and transgender individuals. ECF 82 ¶ 189. "There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action." *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). But as the Supreme Court has explained, "such injury accords a basis for standing only to those persons who are personally denied equal treatment." *Id.* (cleaned up).

For example, in *Moore v. Bryant*, a black plaintiff sued various officials alleging that the state flag, which included the confederate battle flag, "violate[d]" the Equal Protection Clause. 853 F.3d 245, 248 (5th Cir. 2017). Despite his allegations that the flag's "message . . . ma[de] him 'feel like a second-class citizen'" and "cause[d] him both physical and emotional injuries,'" the Fifth Circuit held that he lacked standing because "exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury." *Id.* at 249–50. Likewise, in *Penkoski v. Bowser*, white plaintiffs challenged a government-sanctioned Black Lives Matter mural. 486 F. Supp. 3d 219, 228–29 (D.D.C. 2020). They lacked standing because they "made no showing [of] . . . discriminatory *treatment*," only a "discriminatory message." *Id.*

Plaintiffs' case is indistinguishable. They readily admit that they challenge the "message" conveyed by the State under HB 1557. ECF 82 ¶ 191. And notwithstanding their conclusory allegation that HB 1557 "denies them equal educational opportunities," ECF 82 ¶ 189, the statute does not subject Plaintiffs (or anyone else) to differential treatment. Like other curricular standards, it applies the same standard to all "classroom instruction" at each grade level and thus operates equally on students at that grade level. Although Plaintiffs allege that the statute increases the likelihood that they will experience bullying and thus "harms their long-term health and well-being," ECF 82 ¶ 189, those are speculative downstream effects of the same alleged stigmatic harm, not denials of equal treatment. *See Moore*, 853 F.3d at 252 (rejecting "hostile workplace" theory of equal protection standing); *Hollander v. Inst. for Research on Women & Gender*, 372 F. App'x 140, 141 (2d Cir. 2010) (male plaintiff's alleged injury from university's lack of a Men's Studies Program was too speculative).

*iv.   CenterLink does not allege an injury in fact.*

Plaintiff CenterLink claims that its mission has been impaired and that it has spent money as a result of HB 1557. ECF 82 ¶¶ 100, 102–04. But an organization's general interest in a preferred result is not cognizable. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) (Democratic Party groups lacked a concrete interest in laws that helped elect Democrats). Harm to "abstract social interests" is not concrete injury. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Nor may an organization manufacture standing by expending resources absent a credible threat of enforcement. *See Clapper*, 568 U.S. at 415–16. "[A]n organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020). That is because an organization cannot "convert its ordinary program costs into an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). And thus, unless it points to some threat of enforcement, "an organization's expenditure of resources to educate its members and others regarding government action . . . does not present an injury in fact." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 925 (D.C. Cir. 2015) (Henderson, J., concurring) (cleaned up).

Plaintiffs have not, in any event, sufficiently alleged a diversion of resources attributable to the implementation of HB 1557. They say that they have spent more time "responding to calls" from member centers "requesting assistance in interpreting the Law and creating educational materials." ECF 82 ¶ 102. But CenterLink alleges that its staff "spent an average of four to eight hours per week responding to calls" "[a]fter the Law's passage," and that, "[s]ince the Law became effective . . . , CenterLink staff continue to

spend a couple of hours per week responding to member inquiries." *Id.* In other words, as this Court previously determined, Plaintiffs allege only that their actions are "in response to the existence of the law," not its enforcement or implementation, and that is not enough. ECF 81 at 14; *see, e.g., Texas State LULAC v. Elfant*, 52 F.4th 248, 255 (5th Cir. 2022) (finding no standing when "Plaintiffs did not show that the diversion was a direct response to S.B. 1111 specifically, as opposed to an undifferentiated group of recent election laws in Texas and elsewhere").

That leaves CenterLink's claim that its member centers have been injured. ECF 82 ¶¶ 110–30. But the activities of CenterLink's members—"youth programs," "mental health services," "bullying" resources, or "training" regarding gay-straight alliances, ECF 82 ¶¶ 106–07—are not "classroom instruction" and thus are not regulated by the statute. To the extent schools and school districts are declining to work with CenterLink's members, that may well be "officials . . . acting in line with whatever sentiment they thought was underlying HB 1557's passage," but not conduct *required* by the statute and thus no basis to enjoin its operation. *Equality Fla.* at 5; *see* ECF 81 at 16 ("To the extent JASMYN cites the ongoing lack of meetings and referrals, it has offered nothing to indicate that this is the result of an effort to enforce the new law."). The same is true of CenterLink's allegation that HB 1557 has "heightened" anxiety, causing more students to use its member centers. ECF 82 ¶¶ 121–23. That is the kind of injury untethered from HB 1557's enforcement that both this court and Judge Winsor found insufficient. ECF 81 at 17–18; *Equality Fla.* at 3–4.

### B.    Traceability and Redressability

**1.** Plaintiffs' central theory of injury seems to be that school boards, fearing litigation, are taking measures not actually required by HB 1557. *See* ECF 82 ¶ 28. Even

if that is true, and even if that injures Plaintiffs, it is not traceable to the operation of HB 1557. Plaintiffs have thus failed to plead an injury-in-fact attributable to the challenged provision rather than "some *other* and additional action detrimental to" them, *Clapper*, 568 U.S. at 418 (cleaned up)—here, the actions of "officials . . . acting in line with whatever sentiment they thought was underlying HB 1557's passage," *Equality Fla.* at 5.

**2.** Plaintiffs have likewise failed to plead redressability. As discussed above, "[w]ith or without [HB 1557], school districts direct teachers as to what they may and may not teach," *Equality Fla.* at 6. HB 1557 notwithstanding, Florida law prohibits classroom material that "is inappropriate for the grade level and age group for which the material is used." Fla. Stat. § 1006.28(2)(a)(2)(b). Because Plaintiffs have not alleged that any future action they wish to take or information they wish to access at school would be found appropriate under applicable standards, they have failed to plead that declaratory and injunctive relief against the operation of HB 1557 would redress their alleged grievances.

**3.** Nor, in any event, would Plaintiffs have standing to sue the State Defendants. "[T]raceability and redressability . . . often travel together, and where, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (citation omitted). But under HB 1557, it is parents, not governmental entities, who initiate litigation. An injunction against the State Defendants would leave parents free to enforce the statute. So even if Plaintiffs were correct that HB 1557 is causing school districts to "bend" to demands "to avoid the costs of litigation," ECF 82 ¶ 28, an injunction against the State

Defendants would not diminish the incentive for school districts to do so. Accordingly, the relief Plaintiffs seek would not redress the injuries they allege. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021); *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1304–05 (11th Cir. 2019) (en banc).

**III.   PLAINTIFFS FAIL TO STATE A CLAIM ON THE MERITS.**

**A.   Count IV - Vagueness**

"[A] civil statute is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard at all.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)). HB 1557 does not even approach that standard. As this Court previously explained, "the law only prohibits 'classroom instruction by school personnel or third parties.'" ECF 81 at 22 (quoting Fla. Stat. § 1001.42(8)(c)(3)), and no "reasonable person" could "believe that the law prohibits students from discussing their families and vacations at school or even on a school assignment, or that it would prohibit a parent from attending a school function in a 'pride' t-shirt or generally discussing their family structure in front of other people." *Id.* Judge Winsor agreed, concluding that HB 1557 is not even "arguably vague," as the phrase "[c]lassroom instruction . . . on sexual orientation or gender identity" is readily understandable to "someone of ordinary intelligence." *Equality Fla.*, at 10–11. And that is dispositive because it supplies the requisite "rule or standard." *Leib*, 558 F.3d at 1310.

If anything, HB 1557 provides far more guidance than other provisions the courts have upheld against vagueness challenges. For example, in *Fowler v. Board of Education of Lincoln County*, the Sixth Circuit held that a school rule that proscribed "conduct unbecoming a teacher" was not unconstitutionally vague because it gives "adequate

notice" to teachers. 819 F.2d 657, 664–66 (6th Cir. 1987). And in *Arnett v. Kennedy*, the Supreme Court held that the phrase "for such cause as will promote the efficiency of the service" gave federal employees constitutionally sufficient notice of possible grounds of termination. 416 U.S. 134, 158–64 (1974) (plurality op.). The language at issue in those cases was sufficiently clear because it was deployed only to regulate internal government operations, not private behavior. And HB 1557 provides far greater notice of its scope in "terms of common understanding." *Cal. Teachers Ass'n*, 271 F.3d at 1152–53.

Like every statute, there will be interpretive questions about HB 1557, but that is no constitutional defect. *See Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994). Instead, Plaintiffs must plausibly plead that HB 1557 is truly standardless. They have not done so.

### B.    Counts I and III – First Amendment Expression and Overbreadth

Plaintiffs allege that HB 1557 violates the First Amendment by chilling their "affirming speech and expression concerning their own or others' sexual orientation and gender identity in school contexts and with students." ECF 82 ¶ 145. That is wrong.

**1.** The statute restricts only curricular choices in public schools. *See supra* Part I. And as the Eleventh Circuit has explained, in public schools, "expression delivered directly through the government or indirectly through private intermediaries" is government speech in which the "government is free to make subject-matter-based choices." *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004).

The State's plenary control of its own message extends even to certain student activities, such as cheerleading and mental-health counseling. *See Dean v. Warren*, 12 F.4th 1248, 1265–66 (11th Cir. 2021) (rejecting first Amendment right to protest while cheering); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (rejecting First Amendment right to exceed scope of counseling practicum). It even more obviously

14

extends to public-school classroom instruction. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022) (explaining that the government-speech doctrine applies to coaches "instructing" players). Accordingly, curricular choices like those at issue here— those that "direct teachers as to what they may and may not teach," *Equality Fla.* at 6— do not abridge the freedom of speech, *see Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (Easterbook, J.); *Marshall v. Bd. of Educ. Of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) (Sutton, J.); *Nampa Classical Acad. v. Goesling*, 447 F. App'x 776, 778 (9th Cir. 2011).[1] Put differently, "where the [State] is selecting textbooks for use in the classroom, students have no constitutional right to compel the [State] to select materials of their choosing." *Chiras*, 432 F.3d at 620.

**2.** Apart from the government-speech doctrine, the Supreme Court has said that schools can restrict even *student* speech during "activities [that] may fairly be characterized as part of the school curriculum" if doing so is "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 271, 273. As the Court explained, restrictions advance a "legitimate pedagogical concern" when they shield students from topics that are "inadequately researched" or "unsuitable for immature audiences," including "potentially sensitive topics, which might range from the existence

---

[1] *Virgil v. School Board of Columbia County*, 862 F.2d 1517 (11th Cir. 1989), is not to the contrary. There, the Eleventh Circuit applied rational-basis scrutiny to a school's decision to remove a textbook from an elective course's curriculum. *Id.* at 1521. But *Virgil* predates the Supreme Court's government-speech cases. *See Chiras v. Miller*, 432 F.3d 606, 617 (5th Cir. 2005) (discussing *Virgil*). The court worked with the best "guidance" it had in 1989. *Virgil*, 862 F.2d at 1520–21. Since then, the Supreme Court has clarified "the government's authority over its own message," *Chiras*, 432 F.3d at 617, and (as explained above) subsequent Eleventh Circuit cases have applied the government-speech doctrine to government messaging in public schools.

of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting," or "matters of political controversy." *Id.* at 271–72.

HB 1557 advances those interests. As discussed above, the statute neutrally limits public education on "gender identity" and "sexual orientation" conducted from any point of view. The Legislature reasonably concluded that legislation would thereby advance the State's interest in educational "neutrality on matters of political controversy," *Hazelwood*, 484 U.S. at 272, which sexual orientation and gender identity plainly are, regardless of one's preferred orthodoxy. Indeed, the Supreme Court has acknowledged that "sexual orientation and gender identity" are "controversial subjects" and "sensitive political topics." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 & n.20 (2018) (citation omitted).

For much the same reason, HB 1557 advances the State's interest in shielding students from topics that are "potentially sensitive" and "unsuitable for immature audiences." *Hazelwood*, 484 U.S. at 271–72. If "the existence of Santa Claus" is too "sensitive" for students "in an elementary school setting," *id.* at 272, then the State certainly was reasonable in concluding that sexual orientation and gender identity are too sensitive for the youngest children in the same setting. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 288–89 (4th Cir. 2021) (holding that fourth grader had no First Amendment right to present a "LGBTQ-themed essay").

**3.** In support of their First Amendment claims, Plaintiffs suggest that HB 1557 does not advance a "legitimate" interest because it was motivated by "animus." ECF 82 ¶ 157. As discussed more fully below, Plaintiffs have not come close to showing that the Legislature acted out of animus. *See infra* pp. 19–23. But the argument fails for a more

basic reason: The First Amendment does not authorize the courts to "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see In re Hubbard*, 803 F.3d 1298, 1313–14 (11th Cir. 2015); *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1224 (11th Cir. 2022).

**4.** The above discussion resolves Plaintiffs' overbreadth claim as well. ECF 82 ¶¶ 159–166. A "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). Because HB 1557 "does not regulate [private] speech, it does not violate the First Amendment rights of persons not before the court" and "Plaintiffs' 'overbreadth' argument is nothing more than a restatement of the First Amendment argument they make on their own behalf." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 (10th Cir. 2006) (en banc).

### C.    Count II - First Amendment Right to Information

Plaintiffs also contend that HB 1557 violates their right to receive information. But "[t]he listener's right to receive information is reciprocal to the speaker's right to speak." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015); *accord Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality op.). And as discussed above, it is the State's right to determine what message to disseminate through its public schools, whether under the government speech doctrine or under *Hazelwood*'s rational-basis standard.

Plaintiffs contend that the State exercised its authority "for narrowly partisan or political reasons," the standard drawn from the plurality opinion in *Pico*. First of all, *Pico* was "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues." *ACLU of Fla.*, 557 F.3d at 1199–1200 (quotations omitted). In any event, Plaintiffs overread *Pico* on its own terms. The case was about the

removal of books from a school library, and the plurality was clear that classroom instruction is different, expressing "full agreement" that States "must be permitted to establish and apply their curriculum in such a way as to transmit community values, and that there is a legitimate and substantial community interest in promoting respect for . . . traditional values be they social, moral, or political." 457 U.S. at 864 (cleaned up). The plurality observed that States may well have "absolute discretion in matters of *curriculum*" given "their duty to inculcate community values." *Id.* at 869 (emphasis in original). *Pico* is therefore consistent with the State's position that classroom instruction is government speech. Even if that were not so, for the reasons discussed above, HB 1557 would easily pass muster under *Hazelwood*. *See supra* pp. 14–16. Finally, even taking *Pico* as Plaintiffs frame it, the right to receive information does not prohibit schools from delaying to later grades instruction on sensitive topics, *Zykan*, 631 F.2d at 1306, and that is all HB 1557 does.

### D.    Count V – Equal Protection of the Law

**1.** Plaintiffs allege that HB 1557 "was enacted with the purpose to discriminate and has the effect of discriminating against" gay and transgender individuals. ECF 82 ¶ 188. As discussed above, that claim must be dismissed for lack of standing because Plaintiffs allege only exposure to a discriminatory government message (although even in message, the law is neutral), not differential treatment. *See supra* pp. 19–23. The claim fails on the merits for the same reason: Plaintiffs must establish both "discriminatory effect" and "discriminatory purpose." *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1321 (11th Cir. 2021). Here, Plaintiffs have adequately alleged neither.

**2.** Plaintiffs' equal protection claim fails for the additional reason that HB 1557 regulates only how public-school teachers will deliver the government's message in the classroom, and the Equal Protection Clause does not apply to government speech." *Fields v. Speaker of Penn. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019); *accord Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 (6th Cir. 2013); *Bloomberg v. Blocker*, 586 F. Supp. 3d 1251, 1258 (M.D. Fla. 2022). "[I]t is the very business of government to favor and disfavor points of view," and "a government entity is entitled to say what it wishes and to select the views it wants to express," with a notable exception for the establishment of religion. *Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 760 F.3d 227, 246 (2d Cir. 2014) (cleaned up) (rejecting equal protection claim alleging animus in the adoption of the September 11 Memorial at Ground Zero).

**3.** Count V fails for the additional reason that Plaintiffs have not plausibly "plead[ed] animus." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). To do that, they "must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Id.* Here, that means ascertaining the underlying motivation for the decision of "the legislature as a whole," *Brnovich v. DNC*, 141 S. Ct. 2321, 2350 (2021), a task that is demanding because "determining the intent of the legislature is a problematic and near-impossible challenge," *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d at 1324. Plaintiffs must also overcome "the presumption of legislative good faith" to which the Legislature is entitled when charged with invidious discrimination. *Id.* at 1325.

Plaintiffs' allegations do not even approach that high bar.

As the Supreme Court has explained, "discrimination is not a plausible conclusion" from the allegations in a complaint where there are "'obvious alternative explanation[s]'" for the alleged conduct. *Iqbal*, 556 U.S. at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). Here, the challenged provision is "neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue." *Washington v. Davis*, 426 U.S. 229, 246 (1976). The Legislature adopted HB 1557 to safeguard parents' right to educate their children about two sensitive topics, irrespective of the parents' viewpoints. *See* Fla. H.R., CS/CS/HB 1557 (2022) Final Staff Analysis at 4–5 (Mar. 28, 2022), https://www.flsenate.gov/Session/Bill/2022/1557/Analyses/h1557z.EEC.PDF; *see also Greater Birmingham Ministries*, 992 F.3d at 1323 (crediting the state's account of intent). The statute does exactly that, prohibiting classroom instruction on those topics for the youngest children (those in kindergarten through third grade) and, thereafter, permitting such instruction if it is "age-appropriate [and] developmentally appropriate for students." *See* Fla. Stat. § 1001.42(8)(c)(3). Plaintiffs' charge of animus is also irreconcilable with the fact that the statute evenhandedly restricts instruction that (for example) opposes same-sex marriage as much as instruction that embraces it.

The motive for the curricular restriction is underscored by the bill's structure. Plaintiffs articulate no constitutional quarrel with the bulk of the bill, which advances parental rights by ensuring that parents have transparency into the wellbeing of their children at school. *See* Fla. Stat. §§ 1001.42(8)(c)(1), (2), (5). The remedial scheme, too, is focused on parental rights, which is why it empowers only "parents" to seek relief when school boards establish policies or procedures that are inconsistent with the statute. *See*

*id.* § 1001.42(8)(c)(7). Likewise, the title ("An Act Relating to Parental Rights in Education") and the staff analysis (which extensively discusses a "parent's fundamental right to make decisions") reinforce the focus on empowering parents, which was repeatedly echoed during debate in the House and Senate. *E.g.*, Fla. H., recording of proceedings, at 2:37, 2:41, 2:47, 2:51, 3:12, 3:13, 4:16 (Feb. 22, 2022);[2] Fla. H., recording of proceedings, at 2:18, 2:20, 2:45, 2:47–49, 2:51–52, 3:04, 3:11, 3:13, 3:17 (Feb. 24, 2022);[3] Fla. S., recording of proceedings, at :36–:37, :44–:45, 1:00–01, 1:02, 1:47, 2:07–09, 2:13–14, 2:19–21, 2:43, 2:46, 3:09, 3:11, 3:32 (Mar. 7, 2022);[4] Fla. S., recording of proceedings, at 1:53; 1:56; 2:26; 2:31 (March 8, 2022).[5] The curricular restriction—like the rest of the bill—was designed to protect parental rights, not to demean or disparage.

When, as here, "there [a]re legitimate reasons for the . . . Legislature to adopt and maintain" a law, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298–99 (1987). Accordingly, courts should "ordinarily defer to the legislature's stated intent," and "only the clearest proof will suffice to override" that consideration. *Smith v. Doe*, 538 U.S. 84, 92 (2003) (cleaned up).

Plaintiffs respond with a single cherrypicked statement from Senator Baxley, HB 1557's Senate sponsor, suggesting that the bill was needed because students were "coming out" at school. ECF 82 ¶ 43. First of all, the statements of individual legislators do not "demonstrate discriminatory intent by the state legislature." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022). "[L]egislators

---

[2] https://thefloridachannel.org/videos/2-22-22-house-session/.
[3] https://thefloridachannel.org/videos/2-24-22-house-session-part-1/.
[4] https://thefloridachannel.org/videos/3-7-22-senate-session-part-3/.
[5] https://thefloridachannel.org/videos/3-8-22-senate-session/.

who vote to adopt a bill are not the agents of the bill's sponsor or proponents," *Brnovich*, 141 S. Ct. at 2350, so their statements are not sufficient to support an inference of discriminatory purpose on the part of the body as a whole. In any event, the presumption of legislative good faith requires that such statements be taken at their best, not their "worst." *See League of Women Voters of Fla.*, 32 F.4th at 1373. HB 1557 was adopted against a background of Florida schools hiding from parents that their children had "come out" at school, which is why, in context, Senator Baxley was talking about ensuring that parents "have a seat at the table" when their kids come out, Fla. S., recording of proceedings, at 3:53–56 (Mar. 7, 2022), https://tinyurl.com/58v787fy.

Plaintiffs' allegations concerning the statements of Governor DeSantis' "spokesperson," ECF 82 ¶ 44, are irrelevant because the "legally dispositive intent" is that of the Legislature, *Greater Birmingham Ministries*, 992 F.3d at 1325. Statements by non-legislators are not probative at all. *Id.* Plaintiffs also allege that the Governor "articulated the Law's purpose of suppressing particular viewpoints across all grade levels by stating that 'things like woke gender ideology have no place in the schools, period.'" ECF 82 ¶ 44. Those statements simply reflect the immediate problem that led to the bill's adoption—a recent history of public-school teachers inappropriately introducing modern gender theory to young children. CS/CS/HB 1557 Final Staff Analysis, *supra*, at 4–5. Nevertheless, the Legislature and Governor adopted neutral statutory language that shields all parents' right to educate their children on these issues in the first instance, regardless of viewpoint.

Plaintiffs next point to various proposed amendments to HB 1557, the rejection of which Plaintiffs say "show that the legislature intentionally failed to clarify the Law's vague terms and intended to target the LBGTQ+ community." ECF 82 ¶ 46. The mere fact,

however, that the "legislature did not include the alternative option[s] that Plaintiffs would have preferred" is not a persuasive allegation of discriminatory intent. *Greater Birmingham Ministries*, 992 F.3d at 1327. Indeed, many of the rejected amendments are not even logically relevant, as most of them would have altered the substantive reach of the bill. For example, Senator Brandes proposed replacing "'sexual orientation' and 'gender identity' with 'human sexuality' and 'sexual activity.'" ECF 82 ¶ 46. Because such amendments would not have achieved the Legislature's objectives, rejecting them is not evidence of animus. *See Easley v. Cromartie*, 532 U.S. 234, 249 (2001) (demanding that alternatives satisfy the Legislature's "nonracial political goals"). Other proposed amendments were simply redundant because they would have excluded items like student-to-student speech, which the enacted bill does not prohibit. ECF 82 ¶ 47.

Plaintiffs' narrative about the amendment history is, in any event, seriously misleading. The Legislature *did* substantially amend the bill to address its opponents' concerns—the original version's restriction on "encourage[ing] classroom discussion" was amended to cover only "classroom instruction." *Compare* HB 1557, *An Act Relating to Parental Rights* (Jan. 21, 2022), *with* Fla. Stat. § 1001.42(8)(c)(3). Against that backdrop, the Court "cannot say that the legislature failed to consider . . . alternatives that would lessen any potentially discriminatory impact," *Greater Birmingham Ministries*, 992 F.3d at 1327—indeed, it *adopted* one such alternative.

Because Plaintiffs have failed to show discriminatory purpose, their equal protection claim must be dismissed.

### E. The Complaint Must Be Dismissed Insofar as Plaintiffs Challenge Non-Curricular Aspects of HB 1557.

Plaintiffs also appear to challenge aspects of HB 1557 that require parental notification if "there is a change in the student's services or monitoring related to the student's mental, emotional, or physical health or well-being." Fla. Stat. § 1001.42(8)(c)(1). Specifically, one Plaintiff alleges that, "[s]ince the Law's passage," "school counselors are seeking additional permission from him before interacting with his children, and he worries that his children cannot access timely and appropriate services the way they have previously been able to do." ECF 82 ¶ 97.

*First*, Plaintiffs lack standing on this claim because they tie their alleged injury to "the Law's passage," not its enforcement. *See* ECF 81 at 16. *Second*, they do not explain how the alleged injury relates to any substantive legal theory. Nor could they. Parents have a right to "direct the upbringing and education of" their "children." *Pierce v. Soc'y of the Sisters*, 268 U.S. 510, 534 (1925). States are thus free to include parents in major decisions affecting their children. *E.g.*, *Lambert v. Wicklund*, 520 U.S. 292, 297 (1997).

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' complaint should be dismissed with prejudice.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

Anita Patel (FBN 70214)                    */s/ Daniel William Bell*
ASSISTANT ATTORNEY GENERAL                 Daniel William Bell (FBN 1008587)*
Office of the Attorney General             CHIEF DEPUTY SOLICITOR GENERAL
The Capitol, Pl-01                         *Lead Counsel
Tallahassee, Florida 32399-1050            Henry C. Whitaker (FBN 1031175)
(850) 414-3300                             SOLICITOR GENERAL
daniel.bell@myfloridalegal.com             *Counsel for the State Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed with the Court's CM/ECF system, which provides notice to all parties, on this 16th day of December, 2022.

*/s/ Daniel William Bell*
Daniel William Bell

## LOCAL RULE 3.01(G) CERTIFICATION

I hereby certify that I have conferred by videoconference with counsel for Plaintiffs, who oppose this motion in its entirety.

*/s/ Daniel William Bell*
Daniel William Bell