**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

JENNIFER COUSINS, et al.,

       *Plaintiffs*

v.

THOMAS R. GRADY, et al.,

       *Defendants,*

and

ASHLEY MOODY, Attorney General,

       *Defendant-Intervenor.*

**Challenge to
Constitutionality of Fla. Stat.
§ 1001.42(8)(c) (2022)**

**Preliminary Injunctive Relief
Requested**

**Case No.: 6:22-cv-01312-
WWB-LHP**

**PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' SECOND *[sic]* MOTION TO
DISMISS AND MEMORANDUM OF LAW**

      Plaintiffs respond to State Defendants' Motion to Dismiss, ECF No. 112 ("Motion"). Because Plaintiffs have established standing and stated claims entitling them to relief, they respectfully ask this Court to deny the Motion.

**MEMORANDUM OF LAW**

**I. THRESHOLD ISSUES REGARDING THE LAW'S SCOPE AND EFFECTIVE DATE**

      **A. State Defendants' narrowing construction is legally improper and
conflicts with actual enforcement of the Law.**

      State Defendants ask the Court to narrow Fla. Stat. § 1001.42(8)(c) ("the Law") so that "instruction" applies only to prepared curriculum unilaterally delivered by a teacher, and excludes discussion, answering questions, student presentations, talking with a class about a bullying incident that arises, or reading or providing a book. ECF 112 at 2-3. State Defendants' approach conflicts with the Law's text and the Court's obligation to analyze

1

the Law's ambiguous scope, especially where chilled speech is asserted. Moreover, State Defendants' innocuous caricature of the Law conflicts with varied enforcement efforts already undertaken by the state and school districts. ECF 82 ¶¶ 33, 66 (multiple districts interpret Law to restrict "discussion," classroom stickers that might "elicit" discussion); *id.* ¶¶ 37, 41, 58, 59, 128 (multiple districts interpret Law to restrict books and library materials referencing LGBTQ+ identities, including those about which the teacher is "unsure"); [1] *id.* ¶ 38 (school districts apply Law to restrict or eliminate anti-bullying guidance, training, and services for students and teachers). State Defendants recently sent enforcement letters to ten school districts, in which they interpreted the Law to require the outing of students and to restrict use of student support guides,[2] and have issued a form for parents to request a special magistrate to review alleged violations of the Law, encouraging school districts to chill expression according to the interpretation of the parent most hostile to the acknowledgement of LGBTQ+ people. *Id.* ¶¶ 28, 39.

### B. The Law is in effect for all grades absent an injunction.

State Defendants argue the instruction provision of the Law, § 1001.42(8)(c)(3), is not "in effect" for students in grades four through twelve by proposing "state standards"

---

[1] State Defendants blame the removals on Fla. Stat. § 1006.28(a)(2), ECF 112 at 8, 12, but that law does not restrict content based on sexual orientation or gender identity and the challenged Law is cited in removal policies.

[2] Letters from and in response to the State Board of Education November 18, 2022 ("SBOE Enforcement Letters"), available at https://www.fldoe.org/policy/state-board-of-edu/meetings/2022/2022-12-14/; *e.g.*, Letter to Duval County Schools, November 18, 2022 at 1 (not requiring mere disclosure of sexual orientation, even "absent other factors" may violate Law). These letters are subject to judicial notice (Joint Notice Regarding Evid. Hearing on Pls.' Second Mot. for Prelim. Inj., ¶ 4, ECF 125, parties stipulating to authenticity of letters), and the Court may consider the fact of those statements without converting the Motion to one for summary judgment. Fed. R. Evid. 201(b)(2); *Chapman v. Abbott Lab'ys*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013).

means standards "that have not yet been adopted." ECF 112 at 2. However, the Law expressly provides that it "shall take effect July 1, 2022," and no portion is excluded. Parental Rights in Education Act, ch. 2022-22, § 3, 2022 Fla. Laws 1, 4 (amending Fla. Stat. § 1001.42 (2022)). The June 30, 2023, deadline states merely that the Department "shall review and update" its standards (including standards unrelated to instruction) "as necessary." *Id.* § 2. Moreover, school districts already have restricted high school content under the Law (*e.g.*, ECF 82 ¶ 39) and have removed books for 4-12 grades under the Law (ECF 82 ¶ 41). Defendants do not dispute that the Law's notification provisions are in effect for grades 4-12 and are being actively enforced in all grades.[3]

### C. Defendants have failed to meaningfully argue for dismissal of Plaintiffs' claims regarding the Law's notification provisions.

Plaintiffs have challenged the constitutionality of multiple provisions in the Law, including portions that impose new notification requirements on school districts. Plaintiffs have alleged these provisions are unconstitutionally vague and overbroad (*e.g.*, ECF 82 ¶¶ 23, 24, 40 (vagueness of "well-being" and whether coming out requires notification)), have impacted student referrals to CenterLink member centers (*id.* ¶ 127), and have caused discriminatory targeting of LGBTQ+ anti-bullying and support guidance and education (*id.* ¶¶ 38, 99, 116, 128). Plaintiffs also have alleged these provisions impact protected expression, including coming out speech and GSA associations. *Id.* ¶ 117 (impact on GSA sponsorship and survival); ¶¶ 61, 68, 109, 119, 123 (injury resulting from loss of GSAs, including overflow demand on community centers).

State Defendants spend two sentences presenting their legal argument asking this

---

[3] ECF 82 at ¶¶ 28, 42 (state and school districts implementing special magistrate process for all grades); SBOE Enforcement Letters, *supra* n. 2.

Court to dismiss all Plaintiffs' claims regarding the Law's notification provisions. They simply state that parents have a right to direct their children's upbringing and may be involved in school decisions but do not apply that general statement of law to any alleged fact. ECF 112 at 24. They do not address the elements of any claim, the Law's language and alleged vagueness, its overbroad impact on coming out speech and student support, or any other alleged injury to Plaintiffs or (in the case of overbreadth) others. Because they have not presented any argument that Plaintiffs have failed to state a claim about the notification provisions of the Law, their Motion should be denied as to these claims.

## II. PLAINTIFFS HAVE STANDING

All Plaintiffs have demonstrated standing. Constitutional standing requires the plaintiff to have (1) "suffered an injury in fact" that is (2) "fairly traceable to the challenged action of the defendant" and that (3) can "likely . . . be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

Defendants argue that Plaintiffs have failed to demonstrate injury, asserting variously that Defendants have not enforced the Law yet (ECF 112 at 6), or that the Law charges parents, and not Defendants, with enforcing the Law through private suits against school districts, (*id.* at 7). Defendants fail to recognize that Plaintiffs have brought a *pre-enforcement facial* challenge to the Law in addition to an as-applied one. Although each Defendant has acted to enforce the Law, Plaintiffs need not demonstrate any enforcement whatsoever to prevail.

It is axiomatic that a First Amendment plaintiff has standing when "the operation or enforcement" of a challenged government policy "would cause a reasonable would-be speaker to self-censor," even absent a direct prohibition. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). The injury requirement for standing is most loosely

4

applied where First Amendment rights are involved because speech can be chilled "even before the law, regulation, or policy is enforced." *Id.* (internal quotation omitted); *see also Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015) (litigants chilled from speech suffer harm apart from enforcement that forms basis of court's jurisdiction); *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). Simply put, injury exists when a plaintiff avoids expression to avert potential legal consequences of the expression. *Wollschlaeger v. Gov'r, Fla.*, 848 F.3d 1293, 1304-05 (11th Cir. 2017). Similarly, for a Fourteenth Amendment vagueness claim alleging chilled speech, a plaintiff must show merely that (1) the plaintiff seriously wishes to speak; (2) such speech would arguably be affected by the challenged prohibition, but the rules are at least arguably vague as they apply to him; and (3) there is at least a minimal probability that the rules will be enforced if they are violated. *See Harrell*, 608 F.3d at 1254 (cleaned up).

A person "c[an] bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution."[4] *Wollschlaeger*, 848 F.3d at 1304 (quotation omitted). Such a plaintiff "does not have to expose himself to enforcement to be able to challenge the law." *Taylor v. Polhill*, 964 F.3d 975, 980 (11th Cir. 2020); *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1264-65 (N.D. Fla. 2021) ("[D]ecades of binding Supreme Court and Eleventh Circuit precedent has held that pre-enforcement review is available for plaintiffs in facial vagueness and overbreadth

---

[4] Neither can any Defendant complain that the case is not yet ripe. This is one of those cases where "Article III standing and ripeness issues ... boil down to the same question," which is simply whether Plaintiffs, in this pre-enforcement posture, are threatened with the harm of self-censorship. *Wollschlaeger*, 848 F.3d at 1304 (quotation omitted).

challenges in the First Amendment context."), *aff'd*, *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879 (11th Cir. 2023).

All Plaintiffs have suffered injury in fact. Plaintiffs have clearly alleged that they "wish to say and do what they believe [the Law] prevents them from saying and doing." *Wollschlaeger*, 848 F.3d at 1304. Plaintiffs Jen and Matt Cousins, and their children, Plaintiffs P.C., M.C., S.C., and N.C., want to speak freely about themselves and their family, but have self-censored or been coerced to remain silent. ECF 82 ¶¶ 54, 62-65, 67, 69. Plaintiff Larkins wants to learn about and deliver class presentations on LGBTQ+ history and wants to engage in debate with teachers and peers (*id.* ¶¶ 73, 75, 82, 88), but the Law causes him to self-censor (*id.* ¶¶ 78, 79, 83, 88). Plaintiffs Dinan, Gongidi, and their children, Plaintiffs R.R.D. and K.R.D., want to speak freely about themselves and their family, including at school. *Id.* ¶¶ 92, 94. But the Law has caused them to self-censor about the composition of their family for fear of being shamed, silenced, and stigmatized. *Id.* ¶¶ 93-94, 95. Student Plaintiffs have alleged a desire to access books and other materials impacted by the Law. *E.g.*, *id.* ¶¶ 57, 59, 96. The Law has made it less safe for Plaintiff students to attend school because it has impacted schools' ability to respond to bullying and slurs. *Id.* ¶¶ 4, 38, 62, 67, 84, 85, 98, 99, 107, 116, 191. CenterLink and its centers have had to divert significant resources from core programming to combat confusion about the Law and to serve the mental health needs of LGBTQ+ young people whose schools are less safe under the Law. *Id.* ¶¶ 102, 110, 119, 121-22, 124-26. The Law has obstructed CenterLink's member center referrals, trainings, and other speech, *id.* ¶¶ 112, 114-18, 127, 128.

Plaintiffs also have alleged facts sufficient for standing under the equal protection guarantee. The Law on its face singles out Plaintiffs' LGBTQ+ identities for disadvantage. Plaintiffs' own speech is chilled, Plaintiff students have been targeted for increased bullying based on their LGBTQ+ identities, (*id.* ¶¶ 67, 84, 85, 98) and resources and materials relating to their LGBTQ+ identities have been suppressed, (*id.* ¶¶ 37, 38, 59 116, 128). By contrast, comparable resources and materials relating to non-gay and non-transgender people have not. *Id.* ¶ 38. These injuries are sufficient for standing. *Heckler v. Mathews*, 465 U.S. 728, 738-40 (1984).

Plaintiffs' harms are traceable to Defendants because Defendants have authority to enforce the Law. A challenge to a law's constitutionality, traceability and redressability depend on whether the law contemplates enforcement by the defendant.[5] *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201-02 (11th Cir. 2021); *Harrell*, 608 F.3d at 1257 (intent to enforce may be inferred by recent enactment of challenged law); *League of Women Voters of Fla., Inc. v. Lee*, No. 4:21cv186-MW/MAF, 2022 U.S. Dist. LEXIS 60368, at *52 (N.D. Fla. Mar. 31, 2022) (injury traceable to Supervisor because "Florida law tasks the Supervisors with implementing the law"). It is undisputed that each Defendant has some manner of enforcement authority under the Law, which is

---

[5] Defendants concede that Plaintiffs complain of harm due to the Law's "existence" independent of any enforcement Defendants may undertake, ECF 112 at 10-11, but fail to acknowledge that enforcement is presumed and unnecessary to a pre-enforcement facial challenge. Additionally, because Plaintiffs mount a facial challenge to a content-based regulation of speech as substantially overbroad, Plaintiffs "are permitted to challenge [the Law] not because their own rights to free expression are violated, but because of a judicial prediction or assumption that the statute's *very existence* may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93, *certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168 (1988) (emphasis added) (quotation omitted).

all that is required in a pre-enforcement facial challenge. *See* Fla. Stat. § 1001.42; *see also* Fla. Stat. §§ 1001.02-03, 1001.20, 1001.23, 1003.41; ECF 82 ¶¶ 17-21. Further, Defendants each have defended the Law against legal challenges, which permits this Court to infer "an intent to enforce [the challenged statute] ...." *Wollschlaeger*, 848 F.3d at 1305 (quoting *Harrell*, 608 F.3d at 1257).

Here, Plaintiffs have alleged not only a credible threat of enforcement, a standard described as "quite forgiving," *Wollschlaeger*, 848 F.3d at 1305, but facts establishing that enforcement already has occurred. Simply put, Defendants cannot defeat standing simply by voluntarily applying a narrowing construction to the Law, and by denying—contrary to the allegations in Plaintiffs' second amended complaint, which must be taken as true— that they are taking steps to implement it. By inserting a private right of action, § 1001.41(8)(c)(7), the legislature expressly contemplated school district enforcement of the Law as written as of July 1, 2022. Parents are not positioned to directly enforce the Law absent the authority of the school districts to do so. The Law gives parents tools to enforce it as written, with powerful financial incentives. Plaintiffs have factored this into their need to self-censor. *E.g.*, ECF 82 ¶ 95. If the State wishes its narrow interpretation to have force, that is reason to support the relief requested by Plaintiffs—not oppose it.

Plaintiffs also have shown redressability, meaning "whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (cleaned up). A "substantial likelihood" of redress satisfies this prong. *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978). Plaintiffs' redress need not be total. *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018). An injunction would restore the *status quo ante*, when Plaintiffs did not self-

censor or fear reprisal from government actors for protected expression. *See Support Working Animals, Inc.*, 8 F.4th at 1202–03 ("Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.") Relief would also at least partially redress CenterLink's injuries, including frustration of its mission and chill to its member centers' speech, e.g., ECF 82 ¶¶ 103, 104, 113, 129, and harm imposed by an increased demand for direct services at the centers as a result of reduced support in schools. *Id.* ¶¶ 119, 123, 129. While such an order may not prevent *all* bullying, censorship, discipline, or other actions that could result in chilled speech, it would "provide at least partial redress," which is all that is required. *Honeyfund.com, Inc. v. DeSantis*, No. 4:22CV227-MW/MAF, 2022 WL 3486962, at *4 (N.D. Fla. Aug. 18, 2022) (granting injunctive relief against state defendants with enforcement authority even if others may also harm plaintiff); *see also Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (plaintiff had standing to sue even if only "a small part of the [total] injury [was] attributable to" the defendant). Accordingly, all Plaintiffs have demonstrated standing.

## III. PLAINTIFFS HAVE STATED CLAIMS ENTITLING THEM TO RELIEF

A plaintiff need not provide "detailed factual allegations" to survive a motion to dismiss under Rule 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the Court must assume that "all the allegations in a complaint are true (even if doubtful in fact)"; those facts must support a plausible right to relief, not a probable one, because such a motion precedes the opportunity for discovery. *Id.* at 555-56.

### A. Plaintiffs have stated a claim for relief under the First Amendment.

All Plaintiffs have stated a claim for deprivation of speech and expression in violation of the First Amendment. The Law is a one-sided statute that restricts protected

speech based on content and viewpoint, explicitly targeting speech and expression about LGBTQ+ topics for suppression. *See infra*, Section III(B)(2). It is reasonable that LGBTQ+ students and families could decide they are "better off just keeping [their] mouth shut," given the sheer breadth and ambiguity of the law. *See Speech First*, *Inc.,* 32 F.4th at 1122. This is especially true for young students who would not want to risk being accused of being "inappropriate" by discussing their LGBTQ+ families when students discussing their non-LGBTQ+ families would not be. *See id.* at 1124 (it is reasonable, even absent direct threat of punishment, that student would not want to risk being labeled "offensive"). Because of the Law, Defendant school boards have deprived Plaintiff students of ideas, debate, and materials absent any legitimate pedagogical interest. And even if the plain text of the Law were ignored in favor of adopting State Defendants' narrowing construction, a substantial number of the Law's applications remain unconstitutional, rendering it impermissibly overbroad. Because the Law lacks even a rational relationship to any legitimate interest, let alone the narrow tailoring required in service of a compelling interest, Plaintiffs have stated a viable claim that it violates the First Amendment.

1. **Plaintiffs have stated a claim that the law impermissibly chills and restricts protected speech and expression based on content and viewpoint.**

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Content-based regulation is subject to "the most exacting scrutiny." *Texas v. Johnson*, 491 U.S. 397, 412 (1989) (citation omitted). Such enactments "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

"When the government targets particular views taken by speakers on a subject and not the subject matter, the First Amendment violation is all the more blatant." *Rosenberger*, 515 U.S.at 829. Indeed, "[i]n the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011); *see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (First Amendment forbids government to regulate speech in ways that favor some viewpoints or ideas at the expense of others).

The content-based Law [6] targets and chills multiple forms of protected First Amendment expression. First, it chills LGBTQ+ students and parents from disclosing their sexual orientation and gender identity. *E.g.* ECF 82 ¶¶ 40, 54, 62, 93, 94, 191 (LGBTQ+ students and family members chilled by Law that threatens to label them as "inappropriate" if their identity sparks censored discussion or questions; students silenced by threat that mere disclosure of LGBTQ+ identity will require notification). By contrast, students who are not LGBTQ+ may disclose their own sexual orientation or gender identity without consequence. Thus, the Law attaches different consequences to the same speech (e.g., "I am a girl" or "this is my husband") based on who the speaker is, constituting impermissible viewpoint discrimination. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Second, the Law chills speech and gendered expressive conduct that reveals or conforms with a person's LGBTQ+ identity, even implicitly (e.g., a student's

---

[6] State Defendants inexplicably argue the Law is "neutral" even though it targets speech on the subjects of sexual orientation and gender identity. ECF 112 at 4. "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Wollschlaeger*, 848 F.3d at 1307. And "'[i]nnocent motives . . . do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech.'" *Id.*, quoting *Reed*, 576 U.S. at 167.

depiction of same-sex parents in a drawing; wearing a dress). *E.g.*, ECF 82 ¶¶ 35, 63, 94. The Law does not similarly chill speech and conduct that reveal or conform to the sexual orientation and gender identity of a heterosexual cisgender person. And the Law selects which issues and identities are worth discussing or protecting, without even a legitimate basis for doing so, let alone the compelling one required. *E.g.*, *id.* ¶¶ 38, 79, 99, 116 (stifling guidance about anti-LGBTQ+ bullying; potential discipline for presenting about LGBTQ+ issues in class). The Law furthers its goal of suppressing speech by inviting people to pursue legal actions against school districts if they do not agree with Defendants' application of the Law, allowing those parents most hostile to acknowledging the existence of LGBTQ+ people to dictate its scope. *See* Fla. Stat. § 1001.41(8)(c)(7).[7]

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Morse v. Frederick*, 551 U.S. 393, 396 (2007) (*quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 506 (1969)). Schools may not restrict student speech merely to avoid controversy or to avoid the "discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. The Constitution allows schools to control student speech only in very narrow circumstances, none of which are present here. *Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021) (noting exceptions for lewd student speech, speech advocating for illegal drug use, and speech bearing the imprimatur of the school); *see also infra*, Section III(C) for discussion of state interest. Indeed, schools have

---

[7] No Defendant disputes that coming out speech, including in school settings, constitutes protected First Amendment activity. *See, e.g., Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652 (1st Cir. 1974) (student speech); *Henkle v. Gregory*, 150 F. Supp. 2d 1067, 1075-77 (D. Nev. 2001) (same); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284-85 (D. Utah 1998) (coming out speech by teacher).

a strong interest and obligation to protect a student's unpopular expression in particular because "America's public schools are the nurseries of democracy." *Id.* at 2046.

CenterLink's member centers' speech also enjoys protection. The centers speak with students who seek information about sexual orientation and gender identity, including mental health resources and referrals, and they communicate with school district partners to create policies to address bullying. Providing training, expert advice or assistance, referrals, and other services, as CenterLink member centers do, constitutes protected First Amendment activity. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010). Communications that impart a specific skill or convey advice based on specialized knowledge are a form of pure speech. *Id.* "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568 (*quoting Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)). First Amendment protections also cover would-be recipients of such training and assistance, and this right is particularly vital in schools. *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972).

### 2. Plaintiff students have stated a claim that the Law violates their First Amendment right to receive information and ideas.

The right to receive information and ideas is well established, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976), and is nowhere more vital than in schools and universities, *Kleindienst*, 408 U.S. at 763. Schools violate this right by removing books from school libraries to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Bd. of Educ. v. Pico*, 457 U.S. 853, 855 (1982) (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)); *ACLU v. Miami Dade County Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009)

13

(applying *Pico* standard). Here, student Plaintiffs have stated a claim that the Law has caused multiple districts to remove books and library materials to which student Plaintiffs seek access, without adequate justification. The State may not pull books from school libraries solely to avoid "political controversy." ECF 112 at 16.

### 3. Plaintiffs have stated a claim that the Law is unconstitutionally overbroad.

Under the First Amendment, plaintiffs may bring a facial challenge to invalidate a law as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *U.S. v. Stevens*, 559 U.S. 460, 473 (2010). Even where a law is not void for vagueness, "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). The overbreadth remedy is most fitting where a law targets speech because "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." *Broadrick v. Okla.*, 413 U.S. 601, 612 (1973).

Plaintiffs have plausibly stated a claim that the Law's overbreadth is substantial in relation to any legitimate sweep. Although Defendants propose a narrowed construction of the Law as limited to formal K-3 curriculum, with no impact on speech by students and parents, ECF 112 at 2-3, this is not how courts examine statutory language for overbreadth. *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505–06 (11th Cir. 1990) (proper analysis is to "evaluate the ambiguous as well as the unambiguous scope of the enactment"). "[T]he First Amendment protects against the Government; it does not leave

14

us at the mercy of *noblesse oblige"* based on voluntary promises "to use a statute responsibly." *Stevens*, 559 U.S. at 480. Moreover, Defendants themselves have interpreted the Law as reaching beyond formal curriculum to include "discussion" among students and educators, or even expressive conduct that could "elicit discussions." ECF 82 at ¶¶ 33, 66.[8] By prohibiting "classroom instruction" related to "sexual orientation or gender identity," including by "third parties," the Law creates a "substantial risk" that it "will have an impermissible chilling effect on protected speech." *FF Cosms. FL, Inc. v. City of Miami Bch.*, 866 F.3d 1290, 1302 (11th Cir. 2017). State Defendants have not presented any basis to dismiss Plaintiff's overbreadth claim.

**B. Plaintiffs have stated a claim that the Law Is unconstitutionally vague.**

The Law is unconstitutionally vague on its face and as applied to Plaintiffs. ECF 82 ¶¶ 167-179. A vague law "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger*, 848 F.3d at 1319-20. Unconstitutionally vague laws encourage discriminatory enforcement by "giving government officials the sole ability to interpret the scope of the law." *Keister v. Bell*, 29 F.4th 1239, 1258 (11th Cir. 2022). A law may be unconstitutionally vague on its face even if some conduct is clearly within its reach. *Johnson v. U.S.*, 576 U.S. 591, 602 (2015).

"The First Amendment context amplifies these concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to 'steer far

---

[8] Thus, even if the Law were directed toward government speech, as State Defendants urge, it still chills protected speech because teachers fear supportive discussions with students even when such discussions would constitute private speech. *See, e.g, Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424-25 (2022) (high school coach engaging in public prayer on school property with students was engaging in protected speech).

wider of the unlawful zone' to avoid the law's unclear boundaries." *Keister*, 29 F.4th at 1258–59 (quotation omitted); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (when statute's "literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity"). "Content-based regulations thus require a more stringent vagueness test" to ensure that the government regulates protected speech "only with narrow specificity." *Wollschlaeger*, 848 F.3d at 1320 (internal quotations omitted).

State Defendants apply the incorrect standard at the outset, failing to assess the Law under the First Amendment standard. ECF 112 at 13, citing *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009). Indeed, no Defendant has addressed Plaintiffs' vagueness claim under the correct legal standard.

### 1.  The Law does not regulate with the required narrow specificity.

Plaintiffs have alleged sufficient facts, accepted as true, to show that the Law has chilled and will chill expressive conduct by causing citizens to steer far wide of its unclear boundaries. *Supra* Section II (standing). And school officials have interpreted the Law to apply broadly, for example, to student discussion and bullying intervention. *Supra* Section I(A). State Defendants argue the Court should disregard these allegations because those actions are based on school officials' interpretation of the Law, rather than the version State Defendants would prefer to defend. ECF 112 at 11-12. They ask this Court to conclude, as a matter of law and before discovery, that none of those school officials are "person[s] of ordinary intelligence" because, when faced with the task of implementing the Law, they steered farther than the state's proposed interpretation to avoid repercussions. *Keister*, 29 F.4th at 1258–59.

16

The Law's ambiguity is not only evident in these enforcement examples; it is apparent on its face. The legislature declined to use a more specific term such as "curriculum," and rejected multiple amendments that would have better approximated State Defendants' proposed definition of "instruction." ECF 82 ¶¶ 46-48 (amendments would have narrowed restricted subject matter and excluded student speech, bullying intervention, and family structures from Law's reach); *see also Reno v. Am. C.L. Union*, 521 U.S. 844, 871 n.37 (1997) (Congress's rejection of clarifying, limiting amendments relevant in holding statute unconstitutionally vague). Against this backdrop, it would be improper to presume, as State Defendants ask this Court to do, that reasonably intelligent people would conclude "instruction," especially in K-12, is limited to unilaterally delivered and prepared statements by a teacher. As Plaintiffs have alleged, "instruction" could include discussion, answering questions, classroom presentations, talking with a class about a bullying incident that arises, or reading or providing a book. ECF 82 ¶¶ 30-42.

Inconsistent interpretations across the state—including in non-party school districts—reasonably underscore Plaintiffs' fears because they show the Law is susceptible to those varied interpretations by public officials. ECF 82 ¶¶ 29 n.2, 66, 83. State Defendants' concession that the Law "shouldn't" be implemented in these ways (ECF 112 at 12) does not provide a basis for dismissal; to the contrary, it shows the Law is vague, is impacting a substantial swath of protected conduct, and should be enjoined.

### 2.  The Law encourages and has caused discriminatory enforcement.

Although the preceding is sufficient to state a claim, Plaintiffs also have alleged sufficient facts, accepted as true, that the Law's failure to establish any meaningful guidelines permits and has caused a "standardless sweep [that] allows [teachers and other administrators] to pursue their personal predilections" in determining whether

certain expression is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citing *Smith*, 415 U.S. at 574). For example, because instruction "on sexual orientation and gender identity" is transparently coded language for instruction acknowledging LGBTQ+ people, books have been targeted for removal not where a character has *any* sexual orientation or gender identity, but only where they are LGBTQ+ or question their heterosexual or cisgender identity. ECF 82 ¶¶ 37, 59. Stickers signaling safe spaces for LGBTQ+ people were among the first things to come under fire. *Id.* ¶ 66. And State Defendants are targeting policies that provide for the respectful treatment of LGBTQ+ students. *See, e.g.*, Duval Response to State Board of Education Letter to Duval County Schools, November 22, 2022, *supra* n. 2 (all procedures flagged for noncompliance in enforcement letter "are included in the LGBTQ+ Section" of support guide).

### C. Plaintiffs have stated a claim that the Law violates the Equal Protection Clause.

Because the law explicitly targets instruction about sexual orientation or gender identity, with the purpose and effect of suppressing content about LGBTQ+ people, it constitutes a classification based on sex, sexual orientation, and gender identity, all of which independently warrant heightened scrutiny. *See*, *e.g.*, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017) (sex); *Glenn v. Brumby,* 663 F.3d 1312, 1319 (11th Cir. 2011) (sex and gender identity); *Baskin v. Bogan*, 766 F.3d 648, 654-657 (7th Cir. 2014) (sexual orientation); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–13 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (transgender status).[9] Because these

---

[9] The Eleventh Circuit has never independently analyzed the appropriate level of scrutiny for classifications based on sexual orientation. In *Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, the court stated only that other Circuits had declined to treat sexual orientation classifications as suspect. 358 F.3d 804, 818 (11th Cir. 2004). Yet those cases turned on

traits "generally provide no sensible ground for differential treatment," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), government must provide an "exceedingly persuasive justification" for legislation that differentiates on these bases, *United States v. Virginia*, 518 U.S. 515, 531 (1996).

Because the Law lacks adequate tailoring in furtherance of even a legitimate governmental purpose, let alone a compelling (under the First Amendment) or exceedingly persuasive (under equal protection) one, it violates the Constitution. Even under the lowest level of scrutiny, governmental action must not disadvantage a disfavored group for its own sake, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and must bear at least a rational relationship to a legitimate governmental interest, *City of Cleburne*, 473 U.S. at 446. State Defendants may not justify the Law by labeling Plaintiffs' identities as "controversial," or "too sensitive." ECF 112 at 16. Government may not enact laws based on "respect for … personal or religious objections to homosexuality." *Romer v. Evans*, 517 U.S. 620, 634 (1996); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("private biases" are not "permissible considerations for" government action). The state similarly cannot justify a Law as promoting "parental rights in education," *see* Fla. Stat. § 1001.42(8)(c)(1), when it enacts impermissible class-based biases foreseeably resulting in discrimination. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (facially neutral law may nonetheless violate Equal Protection Clause if it has a discriminatory purpose and effect); *see also supra,* Section III(B)(2).

Nor is the Law simply an appropriate restriction on curriculum given its breadth and

---

*Bowers v. Hardwick*, 478 U.S. 186 (1986), and were necessarily abrogated when the Supreme Court overturned *Bowers* in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).

impact on LGBTQ+ peoples' protected expression. Even curricular decisions may offend the Constitution. *Meyer v. Neb.*, 262 U.S. 390, 403 (1923). The Law was adopted in response to concerns about students departing from certain "belief systems" by "coming out" at school, and to shield students from information about LGBTQ+ people. ECF 112 at 22; ECF 82 ¶¶ 43-44. Proposed amendments to narrow the Law to topics such as human sexuality or sexual activity failed. *Id.* ¶¶ 46-48. Although the rejected language would have been more tailored to State Defendants' alleged curriculum-related interests, it would not have served the Law's actual purpose. See *id.* ¶ 46 (amendment would "gut the effort of the bill"). Limiting speech to control exposure to a class of people is not a legitimate state interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny State Defendants' Motion to Dismiss.

Respectfully submitted this 31st day of January, 2023.

By: */s/ Debra Dandeneau*
**Debra Dandeneau, Esq.** (FBN 978360)
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018
(212) 626-4100
debra.dandeneau@bakermckenzie.com

**Simone Chriss, Esq.** (FBN 124062)
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601
simone.chriss@southernlegal.org

**Kell L. Olson, Esq.**
(admitted *pro hac vice*)
Lambda Legal Defense
and Education Fund, Inc.
800 South Figueroa St, Ste 1260
Los Angeles, CA 90017
kolson@lambdalegal.org

**Jennifer Vail, Esq.**
(admitted *pro hac vice*)
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL. 36104
jennifer.vail@splcenter.org

*On behalf of Plaintiffs and all Counsel for Plaintiffs*